DILLINGHAM & MURPHY, LLP
WILLIAM F. MURPHY (SBN 82482)
J. CROSS CREASON (SBN 209492)
155 Sansome St., Suite 700
San Francisco, California 94104
Telephone:     (415) 397-2700
Facsimile:     (415) 397-3300

Attorneys for Petitioner METALLURGICAL
 PLANT KAZSILICON LLP.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| METALLURGICAL PLANT KAZSILICON LLP, | Case No. |
| Petitioner, | |
| v. | **PETITION TO CONFIRM FOREIGN ARBITRATION AWARD AND TO HAVE JUDGMENT ENTERED ON ARBITRATION AWARD** |
| CLEAN POWER INNOVATIONS, LLC, | |
| Respondent. | |

Petitioner METALLURGICAL PLANT KAZSILICON LLC ("Petitioner" or "Kazsilicon"), by and through its undersigned attorneys of record, hereby petitions this Court for an Order: (a) confirming an arbitration award dated August 6, 2021, resolving commercial disputes between Petitioner Kazsilicon and Respondent CLEAN POWER INNOVATIONS, LLC ("Respondent" or "CPI") ("Award") (see Dauren Abishev Declaration ["Abishev Decl."] ¶ 1 & Exh. A; a copy is also attached to this Petition); (b) entering a judgment in Petitioner's favor and against Respondent in the full amount of the Award, plus post-award, pre-judgment interest and the reasonable attorneys' fees and costs incurred by Kazsilicon for bringing this Petition; and (c) for such other relief as the Court deems just and proper.

## I.     PARTIES, JURISDICTION AND VENUE

1.     Petitioner Kazsilicon is a company organized under the laws of the of the Republic of Kazakhstan ("Kazakhstan") with its principal place of business in Almaty region, Kazakhstan.

2.     Respondent CPI is a limited liability company organized under the laws of the State of California with its principal place of business in Belmont, California.

3.     This is an action to confirm an international arbitral award  under the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), a treaty in force in and with the United States of America. 9 U.S.C. § 201.

4.     The Award is governed by the New York Convention because the Award and the arbitration agreement arise from a legal relationship that is commercial and involves a foreign citizen, Petitioner Kazsilicon, and also involves performance abroad. 9 U.S.C. § 202.

5.     "[C]onfirmation petitions under the New York Convention are "deemed to arise" under the laws of the United States, 9 U.S.C. § 203; *Stileks v. Republic of Moldova* (D.C. Cir. 2021) 985 F.3d 871, 881. This court accordingly has subject-matter jurisdiction over this Petition under 9 U.S.C. § 203 and 28 U.S.C. § 1331.

6.     In addition, this Court also has original jurisdiction over this Petition pursuant to 28 U.S.C. § 1332(a)(2) in that it is an action where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between Respondent CPI, a citizen of California, and Petitioner, a citizen of the Republic of Kazakhstan. See Declaration of William F. Murphy ["Murphy Decl."] ¶ 8 & Exh. U.

7.     This court is the proper venue for this case under 9 U.S.C. § 204. This is a "court in which save for the arbitration agreement an action or proceeding with respect to the controversy between the parties could be brought":  Respondent CPI is a California limited liability corporation with its principal place of business in Belmont, California and so, "save for the arbitration agreement" could be sued in this district. See 28 U.S.C. § 1391(b), (c);

8.     The Court has personal jurisdiction over Respondent and venue is proper in the Northern District of California because Respondent's principal place of business is located in Belmont, California, in this judicial District. See Murphy Decl. ¶ 8 & Exh. U.

## II. THE ARBITRATION AGREEMENT

9.      As reflected in the Award and in the Parties' Contract, as amended, Petitioner and Respondent (the "Parties") agreed to resolve all disputes arising between them under the Contract or in connection with it by binding arbitration.

10.     The arbitration agreement is set forth in Article 13 of the "CONTRACT NO. OMTO/14-79 on procurement of purified solar grade silicon from single source method" dated June 13, 2014, pursuant to which Respondent agreed to supply Petitioner with solar grade silicon (also referred to as "SoG-Si").  Abishev Decl. ¶ 3 & Exh. B (the "Initial Contract").

11.     The arbitration agreement in the Contract provides in relevant part as follows:

> 13.1.  All disputes arising between the Parties under this Contract or in connection therewith shall be settled be negotiation between the parties.

> 13.2. The customer and the Supplier have to use reasonable efforts to resolve in the course of direct negotiations all disagreements or the disputes arising between them on the Contract or in connection with it.

> 13.3. If, within 21 (twenty one) calendar days after the start of such negotiations Customer and Supplier cannot resolve the dispute under the Contract, either party may request to address this issue in accordance with the rules of the International Chamber of Commerce. The arbitration shall be conducted in accordance with the above rules if the parties could not agree on the appointment of an arbitrator. The hearing has to be carried out in Geneva (The Swiss confederation) in English with simultaneous interpretation into Russian.

> 13.4. Expenses on carrying out arbitration will be paid according to the decision of arbitration judges. Decisions of arbitration is final and obligatory for both Parties.

> 13.5. Applicable law under the present Contract is the substantive and procedural law of the United Kingdom

*See* the Contract, Article 13, p. 8.

## III.    THE DISPUTE AND PETITIONER'S CLAIMS

12.     Under the terms of the Initial Contract, Respondent CPI was to deliver to Petitioner Kazsilicon 280 metric tons of solar grade silicon by the end of 2014 for a total price of USD $5,040,000. See the Initial Contract, Annex No.1 at p. 14. The original terms provided for payment in three installments: a 20% advance payment of the total cost of the solar grade silicon, a 60% pre-payment for each batch to be supplied, and the remaining 20% upon receipt of the

1    supplied SoG-Si. (Award ¶¶ 193-194)  Kazsilicon made advance payments to CPI of USD

2    $1,997.776.68 pursuant to the Initial Contract, but at the time the Initial Contract, as amended,

3    expired, CPI had delivered only about 39 metric tons of SoG-Si worth USD $701,776.68.  (Award

4    ¶ 203)

5          13.    The Parties entered into three (3) supplementary agreements which, pursuant to

6    Article 13.8 of the Initial Contract, became integral parts of the Contract (Award ¶ 253). Pursuant

7    to those supplementary agreements, among other things, the Parties agreed to extend the period of

8    the Initial Contract (Award ¶ 195) and to reduce the remaining amount of SoG-Si to be delivered

9    by Respondent to Petitioner to about 40 metric tons of SoG-Si to be delivered on or before

10   December 31, 2015, a date later extended to December 31, 2016 (Award ¶¶ 115-122, 195, 238).

11   The Parties further agreed that Respondent would refund to Petitioner amounts advanced or

12   prepaid to Respondent for SoG-Si that it did not deliver (Award ¶ 237).

13         14.    By the end of 2016, when the Parties' Contract, as amended, terminated,

14   Respondent CPI had delivered a total of only about 39 metric tons of SoG-Si to Petitioner

15   Kazsilicon. (Award ¶ 196). The remaining (reduced amount) of about 40 metric tons the parties

16   had agreed the CPI would deliver in their supplementary agreements remained undelivered.  The

17   amount paid by Petitioner Kazsilicon in excess of the amount owed under the Contract by

18   Kazsilicon for SoG-Si actually delivered by Respondent was USD $1,296,000, which Petitioner

19   Kazsilicon was entitled to have refunded to it by Respondent CPI. (Award ¶¶ 290, 294).

20         15.    In addition, Respondent's failure to deliver to Petitioner Kazsilicon the remaining

21   40 metric tons  of SoG-Si triggered the contractual penalty provisions set forth in Section 9.2 of

22   the Contract. That Section 9.2 provided that "[i]n the case of non-compliance and/or inadequate

23   execution of its obligations to deliver the Goods by Supplier within the period specified in the

24   Contract, the Customer is entitled to recyclers penalty of 1,0 (one)% of the value of undelivered

25   goods in time for each day of  delay, but not to exceed more than 10.0 (ten) % of the value of

26   undelivered goods."  The value of the 40 metric tons  of undelivered SoG-Si at USD

27   $18,000.00/ton was $720,000.00.  Thus, Respondent CPI also owed Kazsilicon a penalty payment

28

pursuant to Section 9.2 of the Initial Contract in the amount of USD $72,000.00 (USD $720,000 x 10% = $72,000.00). (Award ¶¶ 133, 296-310)

16.     Finally, Petitioner Kazsilicon claimed reimbursement for an administrative penalty imposed on Kazsilicon because of Respondent CPI's failure to fulfill its contractual obligations. The failure to perform by Respondent caused an infringement of the Republic of Kazakhstan's foreign currency regulations, that is, money was paid out for which no goods or services were received in a timely manner  which in turn resulted in Petitioner Kazsilicon having to pay an administrative fine of USD $11,707.00. Kazsilicon claimed the right to reimbursement for that penalty under Section 9.11 of the Initial Contract, which provided that "[i]n the event of the Customer's costs arising from late delivery of the good by the Supplier, the latter shall reimburse these expenses under the first requirement of the Customer in writing with supporting documents and/or the signing of this Contract to consent to such deductions of such expenses from the total of the Contract." *See* the Initial Contract, § 9.11, p.6.  The Arbitrator agreed. (Award, ¶¶ 311-333)

17.     The Arbitrator rejected CPI's counterclaims. (Award ¶¶334-339)

### IV. THE ARBITRATION AND THE ARBITRATION AWARD

18.     The history of the arbitration proceedings leading up to the issuance of the Award on August 6, 2021, is set forth in the Award itself at ¶¶ 32-113. Petitioner Kazsilicon initiated arbitration proceedings with the International Chamber of Commerce ("ICC") by a Request for Arbitration dated February 27, 2020. Abishev Decl.,  ¶ 9, Exh. D.  Petitioner Kazsilicon and Respondent CPI were each represented by counsel from at least October 9, 2020, through the issuance of the final Award dated August 6, 2021. See Award, Exhibit A, ¶ 49. On or about October 16, 2020, by agreement of the parties, the ICC Secretariat appointed Dr. Michael Feit as sole Arbitrator in this matter. See Award, Exhibit A, ¶¶ 47-52. On January 20, 2021, Respondent CPI submitted a Statement of Defense and Counterclaim. Abishev. Decl. ¶ 12, Exh. E.  On February 10, 2021, Kazsilicon submitted its Reply and Defense to Counterclaim. Abishev Decl. ¶ 13 & Exh. F.  On March 12, 2021, with the permission of the sole Arbitrator, Kazsilicon filed and served an "Updated Statement of Claim". Abishev Decl. ¶ 14 & Exh. G.  The arbitration hearing took place on March 22 and 23, 2021, by way of videoconference, as agreed to by the Parties, and

1    was conducted under the International Chamber of Commerce Rules of Arbitration in force as of

2    March 1, 2017. Abishev Decl. ¶ 15. The Opening Statement for Kazsilicon was presented on

3    March 22, 2021. Abishev Decl. ¶ 16 & Exh. H. The Opening Statement for Respondent CPI was

4    also presented on March 22, 2021. Abishev Decl. ¶ 17 & Exh. I.  Respondent's written opening

5    statement contains and relies on portions of Supplementary Agreements Nos. 3 and 4.  See Exhibit

6    I, p. 19. Further evidence and arguments were given, including testimonial evidence given by

7    Danel Skakov and Baizhumin Daniyar Anuarbekocivh on behalf of Petitioner Kazsilicon, and  Dr.

8    Kamel Ounadjela and Yvon Pellegrin on behalf of Respondent CPI. Abishev Decl. ¶ 17.

9           19.     On April 13, 2021, Kazsilicon filed and served its Post-Hearing Brief. On April 15,

10   2021, Respondent filed and served its Post-Hearing Brief. Following the parties' additional

11   submission of materials and comments regarding costs, by an email dated June 24, 2021, the sole

12   Arbitrator declared the proceedings closed. See Award, Exhibit A, ¶¶ 103-112; Abishev Decl. ¶¶

13   18-20 & Exhs. J & K.

14          20.     On August 6, 2021, the Arbitrator issued his Final Award. A true and correct,

15   certified copy of that Award is attached hereto as **Exhibit A** and to the Abishev Declaration as

16   **Exhibit A**. The Arbitrator awarded Petitioner damages in the amount of USD $1,379,707.00.

17   (Award, ¶ 424(2), p. 98). Of that USD $1, 379, 707.00, USD $1,296,000.00 was what the

18   Arbitrator determined Petitioner had overpaid Respondent. (Award ¶ 290, 294). The Arbitrator

19   also determined that Petitioner was entitled to USD $72,000 for Respondent's delays in delivery

20   under Article 9.2 of the Initial Contract (Award ¶ 310), and that Petitioner was entitled to USD

21   $11,707 from Respondent for having caused Petitioner to violate of Kazakh currency control law

22   and incur administrative penalties in that amount as a result of Respondent having failed to either

23   deliver all the SoG-Si represented by the funds advanced by Petitioner or to refund monies

24   advanced for SoG-Si that was not delivered (Award ¶¶ 311-341).

25          21.     In terms of costs, the Arbitrator fixed the total amount of arbitration costs at USD

26   $78,600.00, of which 75% was to be  borne by Respondent CPI and 25% by Petitioner Kazsilicon.

27   Award at ¶¶ 397-398. After taking into account the amounts Petitioner and Respondent had each

28

previously paid into the ICC Secretariat for costs, the Arbitrator determined that Respondent CPI was to reimburse Petitioner Kazsilicon a net USD $ 33,800.00 for its "costs of arbitration".

22.    As to attorneys' fees and costs to be awarded, the Arbitrator determined those fees and costs included legal fees, remote hearing services provided by Opus2 to enable to Parties to see the proceedings and communicate with each other, fees for translation services, fees for the service of hearing interpreters, and fees for disbursements of Respondent's witnesses. The Arbitrator fixed those costs and fees and then allocated them, with Petitioner Kazsilicon to recover a net of USD $141,134.25 and GBP £4,402.50 [USD $6.107.71]. The Arbitrator also awarded Petitioner an additional sum denominated in Kazakhstan currency:  1,500,000 Kazakhstan tenge (KZH) [USD $3,518.63]. However, the Arbitrator also awarded Respondent 41,095,60 Swiss Francs (CHF) [USD $44,908.81] and EUR €659.50 [USD $775.62]. After netting all of those fees, Petitioner is to recover USD $105,075.76 from Respondent for attorneys' fees and related costs ($150,760.19 [Petitioner's Awards in USD] - $45,684.43 [Respondent's Awards in USD] = $105,075.76). See Award ¶¶ 420-423.

23.    The total amount owed by Respondent to Petitioner after netting the awards of fees and costs to each party and adjusting for currency exchange rates is $1,5128,360.70:

|  |  |  |
|---|---|---|
| a. | Damages: | $1,296,000.00 |
| b. | Penalty: | $     72,000.00 |
| c. | Reimbursement for Fine: | $     11,707.00[1] |
| d. | Net costs of arbitration: | $     33,800.00[2] |
| e. | Net attorneys' fees and costs: | $   105,075.76 |
|  | TOTAL: | $1,518,582.76 |

24.    The Award was issued on August 6, 2021. The Parties' Contract provides that the "[a]pplicable law under the present Contract is the substantive and procedural law of the United Kingdom."  See Contract, § 13.5, p. 8. Under the United Kingdom's Late Payment of Commercial

---

[1]  Converted from Kazakhstan tenge by the Arbitrator. See Award at ¶¶ 332-333.
[2]  Portions of arbitration and legal costs converted from English pounds, Swiss Francs, Kazakhstan tenge and Euros at exchange rates in effect August 6, 2021. See https://www.exchange-rates.org/HistoricalRates/E/USD/8-6-2021. See William Murphy Declaration, ¶ 2 & Exh. P.

1  Debts (Interest) Act 1998 ("Late Payment Act"), post-Award, prejudgment interest began to

2  accrue from the date of the Award, August 6, 2021. Accordingly, the judgment to be entered on

3  the confirmed Award should include and award of prejudgment interest in the amount of $88,

4  857.89, representing prejudgment interest at rates set pursuant to the Late Payment Act varying

5  from 8.10% to 9.00% on the damages, penalty, fine, costs of arbitration and net attorneys' fees and

6  legal costs from August 6, 2021 through June 17, 2021, for a total of USD $1,605,693.24 to be

7  entered as the judgment (Declaration of William F. Murphy ["Murphy Decl."], ¶¶ 3 & Exh. Q;

8  Declaration of Tze Ling On ["Ong Decl."] ¶¶ 2-5 & Exhs. A-C) plus Petitioner's reasonable

9  attorneys' fees and costs in bringing this proceeding to confirm the Award and have judgment

10  entered on it (Murphy Decl. ¶ 4). Daily interest after June 17, 2022, runs at $374.45/day. Murphy

11  Decl. ¶ 3 & Exh. Q.

12      25.      Both Parties acknowledged the Arbitrator's jurisdiction to decide the dispute

13  (Award ¶ 344).

14                    **IV.    RESPONDENT HAS NOT PAID THE AWARD**

15      26.      On September 13, 2021, about five weeks after the issuance of the Award,

16  Respondent purported to object to the Award by way of letter to Petitioner on the asserted grounds

17  that Supplemental Agreement No. 3, upon which Respondent asserted the Award was "primarily

18  based", "may be a forged document that was never signed by the undersigned". Abishev Decl. ¶

19  25 & Exh. L [Sept. 13, 2021, Letter from Respondent to Petitioner]. The letter continued, "Given

20  the gravity of the facts we have already uncovered, CPI takes the preliminary result of this

21  investigation very seriously and is therefore actively continuing our investigation."

22      27.      Respondent's purported objection has no merit and is inconsistent with the theories

23  and testimony it presented during the arbitration.  On September 30, 2021, Petitioner replied to

24  Respondent's letter of September 13, 2021, refuting Respondent's claims and asking Respondent

25  to advise as to the time frame in which it would comply with the Arbitrator's Award. Abishev

26  Decl. ¶ 25 & Exh. M.  Although Respondent sent two more letters attempting to justify its

27  meritless claim that a document or documents had been "forged," Respondent has failed to

28

1    provide any timetable for complying with the Arbitrator's Award. Abishev Decl. ¶¶ 26 & Exhs. N

2    & O.

3           28.     Prior to and at the arbitration, and in post-hearing briefings, Respondent did not

4    challenge the authenticity of Supplemental Agreements Nos. 3 or 4 or assert that they "may be [a]

5    forged document[s]". Instead, Respondent argued variously that (a) Supplementary Agreement

6    No. 3 amended Contract Article 13.6 and Annex No. 1 (Award ¶ 149); (b) that Supplementary

7    Agreement No. 3 remained important (Award ¶ 150); (c) that Supplementary Agreement No. 3

8    was a short-term fix, agreed to by Respondent in order to relieve regulatory pressure on Petitioner

9    until the end of 2015 (Award ¶ 151); (d) that Supplementary Agreement No. 3 had proven

10   unworkable (Award ¶ 250); and (e) that Respondent had received Supplementary Agreement No.

11   3 and Supplementary Agreement No. 4 at the same time and signed them back-to-back rendering

12   Supplementary Agreement No. 3 without force. (Award ¶¶ 246-251). Declaration of Dauren

13   Abishev ["Abishev Decl."] ¶¶ 25-27.

14          29.     As to the last contention, the Arbitrator noted that "this allegation was made at a

15   late stage of the proceedings, namely for the first time at the hearing. Had the Respondent viewed

16   this as an important point, one would have expected it to raise that issue on an earlier occasion."

17   (Award, p. 56, ¶ 251). Respondent's new position that Supplementary Agreement Nos. 3 and 4

18   may be "forged" was raised for the first time only after Respondents had lost, and then only for the

19   purpose of attempting to evade Respondent's obligations under the Award.

20          30.     There are no other proceedings affecting this Petition. Respondent copied the ICC

21   on its post-arbitration correspondence to Petitioner regarding the alleged "forged" documents, and

22   contended in its letter of September 13, 2021 that "[p]ending the result of its investigation, CPI

23   sees no other choice but to file an application to set aside and to revise the Final Award before the

24   Swiss Supreme Court, and to consider, if need be, initiating further civil and/or criminal

25   proceedings to protect its rights." However, Respondent has not paid Kazsilicon pursuant to the

26   Award, and to the best of Petitioner Kazsilicon's knowledge, Respondent has taken no steps to set

27   aside or vacate the Award, reopen the arbitration proceedings, or seek modification of the

28   Arbitrator's Award. Abishev Decl. ¶¶ 28-29.

1

## V.     CONFIRMATION BY THIS COURT

2      31.     Under Section 207 of the Federal Arbitration Act, "[t]he court shall confirm the

3  award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the

4  award specified in the [New York] Convention." 9 U.S.C. § 207. No grounds exist for the Court to

5  refuse or defer recognition or enforcement of the Award under the New York Convention.

6      32.     As such, this Court should confirm the Award pursuant to 9 U.S.C. § 207, and enter

7  Judgment in favor of Petitioner Metallurgical Plant Kazsilicon, LLC and against Respondent

8  Clean Power Innovations, LLC in the total amount of USD $1,605,693.24, plus interest after June

9  17, 2022, and the reasonable attorneys' fees and costs incurred by Kazsilicon for bringing this

10  Petition; and for such other relief as the Court deems just and proper.

11  Dated:  May 27, 2022.                    DILLINGHAM & MURPHY, LLP
                                            WILLIAM F. MURPHY
12                                          J. CROSS CREASON

13

14                                   By: *William F. Murphy*
                                         Attorneys for Petitioner METALLURGICAL
15                                        PLANT KAZSILICON LLC

16

17

18

19

20

21

22

23

24

25

26

27

28

Certified Copy –
Arbitration  Award
Dated August 6, 2021

# ICC INTERNATIONAL COURT OF ARBITRATION

## CASE No. 25178/HBH

METALLURGICAL PLANT "KAZSILICON" LLP

(Kazakhstan)

vs/

CLEAN POWER INNOVATION LLC

(U.S.A.)

This document is a certified true copy of the original of the Final Award rendered in conformity with the Rules of Arbitration of the International Chamber of Commerce.

| ICC INTERNATIONAL COURT OF ARBITRATION | CASE NO. 25178/HBH |
|---|---|

**SOLE ARBITRATOR**

**Dr Michael Feit**
Walder Wyss Ltd.
Seefeldstrasse 123
P.O. Box 1236
8034 Zurich
Switzerland
Tel: +41 44 498 98 98
Fax: +41 58 658 59 59
Email: michael.feit@walderwyss.com

**PARTIES**

| **Claimant** | *Represented by:* |
|---|---|
| Metallurgical Plant "KazSilicon" LLP | Ms Dayana Assanova |
| Bastobe Village, Komarov St., bldg. 1 | Ms Svetlana Pavlovna Moroz |
| Karatal District | "DASS & Partners ltd" LLP |
| 041011 Almaty | Bussines center KDC, bldg. 38, office 7 |
| Kazakhstan | Dostyk Ave. |
|  | Almaty |
|  | Kazakhstan |
|  | Tel: +7 727 339 11 19 |
|  | Email: d.assanova@dass.kz |
|  | law@dass.kz |

| **Respondent** | *Represented by:* |
|---|---|
| Clean Power Innovation LLC | Mr Daniel Greineder |
| 837 Miramar Terrace | Ms Francesca Dal Poggetto |
| Belmont | Peter & Kim Ltd. |
| CA 94002 | Avenue de Champel 8C |
| U.S.A. | P.O. Box 71 |
|  | 1211 Geneva 12 |
|  | Switzerland |
|  | Tel: +41 58 317 70 70 |
|  | Fax: +41 58 317 70 75 |
|  | Email: dgreineder@peterandkim.com |

## FINAL AWARD

CERTIFIED TRUE COPY OF THE ORIGINAL
PARIS, 17 los 2022

Ana SERRA E MOURA
Deputy Secretary General
ICC International Court of Arbitration

## Table of Contents

1.  Introduction ............................................................................................. 6

2.  Procedural matters ................................................................................. 6
    2.1.    The Parties and their representatives ...................................... 6
            2.1.1.   The Claimant .................................................... 6
            2.1.2.   The Respondent ............................................... 7
    2.2.    The Sole Arbitrator ................................................................. 7
    2.3.    The arbitration agreement ...................................................... 8
    2.4.    The place of the arbitration .................................................... 10
    2.5.    The language of the arbitration .............................................. 10
    2.6.    The applicable law .................................................................. 11

3.  The history of the arbitral proceedings ................................................ 12

4.  Summary of the Parties' positions and their Prayers for Relief ........... 24
    4.1.    The Claimant's position .......................................................... 25
    4.2.    The Claimant's Prayers for Relief ........................................... 29
    4.3.    The Respondent's position ...................................................... 31
    4.4.    The Respondent's Prayers for Relief ...................................... 41

5.  The Sole Arbitrator's considerations .................................................... 43
    5.1.    Summary of the main relevant facts ....................................... 43
    5.2.    The Sole Arbitrator's jurisdiction ........................................... 44
    5.3.    The Claimant's claim for payment of USD 1,296,000 ............ 44
            5.3.1.   The matter in dispute ..................................... 44
            5.3.2.   Principles of contract interpretation under English law .......... 46
            5.3.3.   Interpretation of the Contract .................... 47
            5.3.4.   The Hong Kong Protocol ............................... 58
            5.3.5.   The Respondent's alleged intermediary role ............................ 62
            5.3.6.   The reconciliation act .................................... 63
            5.3.7.   The Sole Arbitrator's finding on the Claimant's claim for
                     payment of USD 1,296,000 ........................... 70
    5.4.    The Claimant's penalty claim ................................................. 70
    5.5.    The Claimant's claim for reimbursement of the administrative fine ........ 74
    5.6.    The Respondent's counterclaim .............................................. 79
    5.7.    The Sole Arbitrator's decision on the Parties' Prayers for Relief .............. 81

6.  The costs of the arbitration ................................................................... 83
    6.1.    The Parties' Submissions on Costs .......................................... 83
            6.1.1.   The Claimant's Submission on Costs ........................................... 83



|  | 6.1.2. | The Respondent's comments on the Claimant's Submission on Costs ................................................................. 84 |
| 6.2. | | The Respondent's Submission on Costs ................................................. 86 |
| 6.3. | | The Claimant's comments on the Respondent's Submission on Costs ..... 88 |
| 6.4. | | The Sole Arbitrator's decision on costs ................................................. 88 |
|  | 6.4.1. | The costs of the arbitration under the Contract and the ICC Rules ........................................................................ 88 |
|  | 6.4.2. | Apportionment of the costs .................................................. 90 |
|  | 6.4.3. | Advances on the ICC arbitration costs ...................................... 91 |
|  | 6.4.4. | The Sole Arbitrator's fees and ICC administrative expenses..... 93 |
|  | 6.4.5. | Legal costs and other costs ...................................................... 94 |

| 7. | Operative part ..................................................................................................98 |



## Glossary

| | |
|---|---|
| Claimant | Metallurgical Plant "KazSilicon" LLP |
| Claimant's Application for Injunction | dated 12 March 2021 |
| Claimant's Comments on the Respondent's Submission on Costs | dated 12 May 2021 |
| Claimant's Post-Hearing Brief | dated 14 April 2021 |
| Claimant's Reply and Defence to the Counterclaim | dated 10 February 2021 |
| Claimant's Submission on Costs | dated 26 April 2021 |
| Claimant's Updated SoC | Claimant's Updated Statement of Claim dated 12 March 2021 |
| Contract | Contract No. OMTO/14-79 on procurement of purified solar grade silicon from single source method dated 13 June 2014 |
| Hong Kong Protocol | Minutes of the Hong Kong meeting of 4 and 5 May 2016 |
| ICC | International Chamber of Commerce |
| ICC Court | International Court of Arbitration of the International Chamber of Commerce |
| ICC Rules | Rules of Arbitration of the International Chamber of Commerce as in force as from 1 March 2017 |
| ICC Secretariat | Secretariat of the International Court of Arbitration of the International Chamber of Commerce |
| JACO | Win Technology Limited |
| para(s). | paragraph(s) |
| Procedural Order No. 1 | dated 20 November 2020 |
| Procedural Order No. 2 | dated 16 April 2021 |
| Request for Arbitration | dated 27 February 2020 |
| Respondent | Clean Power Innovation LLC |
| Respondent's Answer to the Request for Injunction | dated 29 March 2021 |
| Respondent's Comments on the Claimant's Submission on Costs | dated 26 April 2021 |

| | |
|---|---|
| Respondent's Rejoinder and Reply to the Counterclaim | dated 3 March 2021 |
| Respondent's Post-Hearing Brief | dated 14 April 2021 |
| Respondent's SoDC | Respondent's Statement of Defence and Counterclaim dated 20 January 2021 |
| Respondent's Submission on Costs | dated 26 April 2021 |
| SoG-Si | Solar grade silicon |
| Sole Arbitrator | Dr Michael Feit |
| Terms of Reference | dated 20 November 2020 |



## 1.     Introduction

1        This Final Award is rendered in accordance with Article 31 of the ICC Rules of Arbitration in force as from 1 March 2017 (**"ICC Rules"**) and following arbitral proceedings which will be summarized below and based on the reasons which will be stated below.

## 2.     Procedural matters

### 2.1.     The Parties and their representatives

2        The Claimant and the Respondent are each individually also referred to as a "Party" and collectively as the "Parties".

#### 2.1.1.     The Claimant

3        The Claimant, Metallurgical Plant "KazSilicon" LLP, is a company incorporated under the laws of the Republic of Kazakhstan seated in Almaty, Kazakhstan.

4        The Claimant is an enterprise producing metallurgical-grade silicon.

5        The Claimant is represented in this arbitration by Ms Dayana Assanova and Ms Svetlana Pavlovna Moroz of the law firm "DASS & Partners ltd" LLP, Almaty, Kazakhstan.

6        The address of the Claimant is:

Metallurgical Plant "KazSilicon" LLP
Bastobe Village, Komarov St., bldg. 1
Karatal District
041011 Almaty
Kazakhstan

7        The address and contact details of its representative are:

Ms Dayana Assanova
Ms Svetlana Pavlovna Moroz
"DASS & Partners ltd" LLP
Bussines center KDC, bldg. 38, office 7
Dostyk Ave.
Almaty
Kazakhstan



Tel: +7 727 339 11 19
Email: d.assanova@dass.kz
       law@dass.kz

### 2.1.2.   The Respondent

8       The Respondent, Clean Power Innovation LLC, is a company incorporated under the laws of California, USA, seated in Belmont, California, USA.

9       The Respondent is an enterprise that is centred around developing on-grid and off-grid large scale solar power projects dedicated to emerging markets.

10      The Respondent is represented in this arbitration by Mr Daniel Greineder and Ms Francesca Dal Poggetto of the law firm Peter & Kim Ltd., Geneva, Switzerland.

11      The address of the Respondent is:

        Clean Power Innovation LLC
        837 Miramar Terrace
        Belmont
        CA 94002
        U.S.A.

12      The address and contact details of its representative are:

        Mr Daniel Greineder
        Ms Francesca Dal Poggetto
        Peter & Kim Ltd.
        Avenue de Champel 8C
        P.O. Box 71
        1211 Geneva 12
        Switzerland
        Tel: +41 58 317 70 70
        Fax: +41 58 317 70 75
        Email: dgreineder@peterandkim.com

### 2.2.   The Sole Arbitrator

13      On 29 October 2020, upon joint nomination of the Parties, the Secretary General of the International Court of Arbitration of the International Chamber of Commerce confirmed Dr Michael Feit as sole arbitrator ("**Sole Arbitrator**").

14      The address and contact details of the Sole Arbitrator are:



Dr Michael Feit
Walder Wyss Ltd.
Seefeldstrasse 123
P.O. Box 1236
8034 Zurich
Switzerland
Tel: +41 44 498 98 98
Fax: +41 58 658 59 59
Email: michael.feit@walderwyss.com

**2.3.**  **The arbitration agreement**

15      The arbitration agreement is set forth in Article 13 of the *"CONTRACT NO. OMTO/14-79 on procurement of purified solar grade silicon from single source method"* dated 13 June 2014 (the **"Contract"**) (Exhibit C-1) and reads as follows:

> *"13.1. All disputes arising between the Parties under this Contract or in connection therewith shall be settled by negotiation between the Parties.*
>
> *13.2. The customer and the Supplier have to use reasonable efforts to resolve in the course of direct negotiations all disagreements or the disputes arising between them on the Contract or in connection with it.*
>
> *13.3. If, within 21 (twenty one) calendar days after the start of such negotiations Customer and Supplier cannot resolve the dispute under the Contract, either party may request to address this issue in accordance with the rules of the International Chamber of Commerce. The arbitration shall be conducted in accordance with the above rules if the parties could not agree on the appointment of an arbitrator. The hearing has to be carried out in Geneva (The Swiss confederation) in English with simultaneous interpretation into Russian.*
>
> *13.4. Expenses on carrying out arbitration will be paid according to the decision of arbitration judges. Decisions of arbitration is final and obligatory for both Parties.*
>
> *13.5. Applicable law under the present Contract is the substantive and procedural law of the United Kingdom.*



*13.6. This Contract shall enter into force on the date of its signing by the authorized representatives of the Parties and is valid until "01" June 2015, and in the mutual settlements to their full maturity.*

*13.7. All notices, notifications, suggestions and other documents made pursuant to the execution of or in connection with it, one of the Parties to the Contract to the other Party shall be made simultaneously by email and in writing and sent by courier, registered mail, express mail, or by fax to addresses specified in section 14 of the Contract.*

*13.8. Any changes and / or additions to the Contract shall be valid only if made in writing and signed by authorized representatives of the Parties, with putting seal impressions. A written document with changes or additions made in two (2) copies of the originals, one for each of the parties and is an integral part of the Contract. Documents signed sent by email as scanned copy or signed by facsimile, to the Parties have equal legal force.*

*13.9. This Contract is made in the Russian and English languages, in two (2) original copies having equal legal force, one (1) copy for each party. In case of discrepancy between the English and Russian versions of this Contract the prevailing version is in Russian.[1]*

*13.10. An integral part of the Contract are the following applications:*
*13.10.1. Technical Specification of purchased Goods – Annex No 1."*

---

[1]   In its *"Case Information"* dated 16 October 2020, the ICC Secretariat confirmed that upon its review, *"the subsidiary English version of the arbitration agreement appears to correctly reflect the prevailing Russian version of the agreement."*

### 2.4.   The place of the arbitration

16      In its Request for Arbitration (and Updated SoC), the Claimant states in paragraph 14 that "*[p]ursuant to Article 13.3 of the Contract, the place of the arbitration is Geneva (the Swiss confederation)*".

17      By email dated 18 June 2020, the Respondent agreed that the place of arbitration shall be Geneva, Switzerland.

18      By email dated 24 June 2020, the Secretariat of the International Court of Arbitration of the International Chamber of Commerce (the "**ICC Secretariat**") accordingly noted that the place of arbitration agreed by the parties was Geneva, Switzerland.

19      The Sole Arbitrator noted that the ICC Secretariat's "*Case Information*" dated 16 October 2020 indicated that the place of arbitration was London, United Kingdom. Upon inquiry from the Sole Arbitrator, the ICC Secretariat confirmed that this statement was incorrect, and that it was also the ICC Secretariat's understanding that the Parties agreed on Geneva, Switzerland, as the place of arbitration. Accordingly, by letter dated 9 November 2020, the ICC Secretariat clarified that the place of arbitration was Geneva, Switzerland as agreed by the Parties.

20      The place of the arbitration is therefore Geneva, Switzerland.

### 2.5.   The language of the arbitration

21      In its Request for Arbitration (and Updated SoC), the Claimant refers in paragraph 16 to Article 13.3 of the Contract (Exhibit C-1), which provides:

> "*The hearing has to be carried out in Geneva (The Swiss confederation) in English with simultaneous interpretation into Russian*".

22      The Claimant concludes that "*[c]onsequently, the parties chose the English language as the language of the arbitration, having established that simultaneous translation into the Russian language is necessary*".

23      By email dated 18 June 2020, the Respondent agreed that the language of arbitration shall be English, however without simultaneous translation into Russian.

24      The language of the arbitration is therefore English as recorded in the Terms of Reference (para. 44). The Parties agreed in the Terms of Reference that the Sole Arbitrator would decide prior to the hearing on the Parties' disagreement about



the simultaneous translation into Russian at the hearing (para. 44). Following a discussion at the pre-hearing conference of 10 March 2021, the Parties agreed that the hearing of 22/23 March 2021 would be conducted in English with simultaneous translation into Russian. That agreement was recorded in the Summary Minutes of the Pre-Hearing Conference.

**2.6.    The applicable law**

25    In its Request for Arbitration (and Updated SoC), the Claimant refers in paragraph 15 to Articles 9.1 and 13.5 of the Contract (Exhibit C-1).

26    Article 9.1 provides:

> *"For non-performance and / or inadequate performance by the Parties of their obligations under the Contract, the Parties shall be liable in accordance with the terms of the Contract and legislation of the United Kingdom. To the extent not covered herein, the responsibility of the Parties governed by the legislation of the United Kingdom"*

27    Article 13.5 provides:

> *"Applicable law under the present Contract is the substantive and procedural law of the United Kingdom."*

28    The Claimant argues in its Request for Arbitration (and Updated SoC) that *"based on the meaning of Contract No. OMTO/14-79 and the actual intentions of the parties, it can be concluded that the parties have chosen the law of England and Wales as the applicable law."*

29    By email dated 13 November 2020, the Respondent confirmed that *"it shares Claimant's understanding that the choice of law clause in Contract OMTO/14-79 should be construed as an election of the laws of England and Wales as the governing law of the contract"*.

30    The applicable substantive law are therefore the laws of England and Wales.

31    The place of the arbitration is in Switzerland and none of the Parties has its seat in Switzerland. Therefore, Chapter 12 of the Swiss Private Law Act (the "**PILA**") applies to the present arbitration.



### 3. The history of the arbitral proceedings

32      By letter dated 15 November 2019 (Exhibit C-47), the Swiss Chambers' Arbitra-tion Institution acknowledged receipt of the Claimant's Notice of Arbitration which was filed on 7 November 2019 and was directed against the Respondent. By letter dated 19 December 2019 (Exhibit C-48), the Respondent objected to the arbitration being administered by the Swiss Chambers' Arbitration Institu-tion. By letter dated 23 January 2020 (Exhibit C-49), the Secretariat of the Swiss Chambers' Arbitration Institution informed the Parties that the Court of the Swiss Chambers' Arbitration Institution had decided not to administer this case, and that the Secretariat of the Swiss Chambers' Arbitration Institution therefore con-firmed that the arbitration case was closed.

33      By letter dated 6 March 2020, the ICC Secretariat acknowledged receipt of the Claimant's Request for Arbitration dated 27 February 2020 directed against the Respondent. The Request for Arbitration was received by the ICC Secretariat on 6 March 2020. Pursuant to Article 4(2) ICC Rules, the arbitration commenced on that date. In the Request, Claimant proposed (i) to have one arbitrator, (ii) that Geneva (Switzerland) be the place of arbitration and (iii) that English be the lan-guage of arbitration with simultaneous translation into Russian.

34      By letter dated 14 April 2020, the ICC Secretariat notified the Respondent that on 6 March 2020, it had received the Request for Arbitration and that the Answer to the Request for Arbitration was due within 30 days from the day following the Respondent's receipt of the correspondence. The ICC Secretariat requested the Respondent to submit its Answer together with any exhibits by email.

35      In the same correspondence, the ICC Secretariat requested the Respondent to comment on the Claimant's proposal to agree on (i) one arbitrator, (ii) Geneva, Switzerland, as the place of arbitration, and (iii) English as the language of arbi-tration with simultaneous translation into Russian.

36      That letter was sent by email dated 14 April 2020 to the email address info@cleanpowerinnovation.com. The ICC Secretariat received an automatic non-delivery notification for that email address.

37      On the same date, the ICC Secretariat informed the Parties that the Secretary General had fixed a provisional advance of USD 30,000 based on the amount in dispute quantified at USD 1,379,707. Taking the payment of the filing fee of USD 5,000 into account, the ICC Secretariat requested the Claimant to pay USD 25,000.



38    By email dated 21 April 2020, the ICC Secretariat notified the Respondent anew, this time, however, upon the Claimant's proposal, by using the email address "kamel@cleanpowerinnovation.com".

39    By email dated 8 June 2020, the ICC Secretariat informed the Claimant and the Respondent that the Respondent received the Request on 21 April 2021 and, as such, 30-day time limit for the Respondent to submit its Answer expired on 21 May 2020 without such Answer having been submitted.

40    On the same date, the ICC Secretariat acknowledged receipt of USD 25,000 by the Claimant and declared that as such, the provisional advance on costs was entirely paid by the Claimant.

41    By email dated 10 June 2020, the Respondent informed the ICC Secretariat that it had never received a notice from the ICC Secretariat and asked the ICC Secretariat to resend the letter and to allow time for the Respondent to respond. By email dated 11 June 2020, the Respondent reiterated its position and reserved its full rights against any claims.

42    By email dated 12 June 2020, the ICC Secretariat forwarded the Respondent's responses to the Claimant. In the same email, the ICC Secretariat informed the Respondent that, further to the Claimant's instructions, the Request for Arbitration had been duly delivered to the Respondent on 21 April 2020 to the email address provided by the Claimant (kamel@cleanpowerinnovation.com) and, accordingly, the 30-day time limit for the Respondent to submit its Answer expired on 21 May 2020. The ICC Secretariat added that it would nevertheless forward any Answer submitted by the Respondent to the arbitral tribunal, once constituted. Further, the ICC Secretariat invited the Respondent to submit its comments about the constitution of the arbitral tribunal, the place of arbitration and the language of arbitration. On the same date, the ICC Secretariat sent its correspondence of 21 April 2020 to the Respondent.

43    By email dated 18 June 2020, the Respondent asked the Claimant to be granted a 30-day deadline starting from 12 June 2020 to file its Answer. By email of the same date, the Respondent requested the International Court of Arbitration of the International Chamber of Commerce (the "**ICC Court**") to refrain from proceeding with the constitution of the arbitral tribunal until the Respondent filed its Answer. Further, the Respondent informed the ICC Secretariat that, without prejudice to the above, it agreed that the dispute shall be decided by one arbitrator and that the place of arbitration shall be Geneva, Switzerland. The Respondent also informed the ICC Secretariat that it agreed that the language of arbitration shall be English, however without simultaneous translation into Russian for cost-efficiency reasons, and that it did not agree that the Expedited Procedure Provisions applied to the arbitration.



44      By email dated 24 June 2020, the ICC Secretariat invited the parties to inform the
        ICC Secretariat by 30 June 2020 whether they had reached an agreement on an
        additional extension for Respondent to file its Answer. The ICC Secretariat also
        noted that the Parties agreed to submit the dispute to one arbitrator and invited
        the parties to inform the Secretariat by 30 June 2020 if they wished to agree on
        a sole arbitrator. The ICC Secretariat also noted that the Parties agreed on Ge-
        neva, Switzerland, as the place of arbitration. Further, the ICC Secretariat noted
        that the Respondent agreed that the language of the arbitration shall be English,
        but without the simultaneous translation into Russian, and rejected the applica-
        tion of the Expedited Procedure Provisions. The ICC Secretariat thus requested
        the Claimant to comment on Respondent's proposal for the language of the ar-
        bitration by 30 June 2020, while it concluded that the Expedited Procedure Pro-
        visions would not apply.

45      By email dated 30 June 2020, the Claimant agreed that the Respondent be
        granted an extension of time to submit its Answer not exceeding 5 working days.
        In its email, the Claimant also informed the Respondent and the ICC Secretariat
        that it agreed with the determination of the place of proceedings in Paris, France,
        but could not agree that there should be no simultaneous translation into Rus-
        sian.

46      By email dated 8 July 2020, the ICC Secretariat informed the Parties that the ad-
        ditional deadline for the Respondent to submit its Answer expired on 7 July 2020.
        Again, the ICC Secretariat informed the Respondent that it would in any event
        forward any Answer submitted by the Respondent to the arbitral tribunal, once
        constituted. The ICC Secretariat also informed the Parties that it was its under-
        standing that the Claimant had proposed that the parties should attempt to
        jointly nominate a sole arbitrator and invited the Respondent to confirm that it
        also agreed.

47      In the same correspondence, the ICC Secretariat further noted that the Parties
        had agreed on Geneva, Switzerland, as the place of arbitration and invited the
        Claimant to clarify by 13 July 2020 whether it now proposed that the place of
        arbitration should be Paris, France. By email of 14 July 2020, the Claimant re-
        sponded that it agreed that the place of arbitration would be in Paris, France. By
        email of 15 July 2020, the Claimant wrote that it agreed to choose one of the two
        cities, namely Paris, France, or Geneva, Switzerland, as the place of the arbitra-
        tion. By email dated 13 July 2020, the Respondent confirmed that it agreed with
        the Claimant's proposal that the Parties would try to jointly nominate the sole
        arbitrator by 30 July 2020. By email dated 17 July 2020, the ICC Secretariat invited
        the Parties to try to agree on a sole arbitrator and to agree on one of the cities
        and to inform the ICC Secretariat accordingly by 30 July 2020. The place of arbi-
        tration was thereafter no longer discussed with the ICC Secretariat.



Page 14 of 98

48    In the following weeks, a number of emails were exchanged between the Parties to find an agreement on the nomination of the sole arbitrator.

49    By email dated 9 October 2020, Mr Daniel Greineder of the law firm Peter & Kim Ltd., Geneva, Switzerland, informed the Claimant and the ICC Secretariat that he now acted as counsel of record for the Respondent.

50    Following further correspondence between the Parties and the ICC Secretariat on the nomination of the sole arbitrator, by email dated 14 October 2020, the Respondent confirmed its agreement to the Claimant's proposal to appoint Dr Michael Feit of the law firm Walder Wyss Ltd., Zurich office, as the sole arbitrator of the dispute. By email dated 15 October 2020, the Claimant confirmed that it supported the nomination of Dr Michael Feit as sole arbitrator. By email dated 16 October 2020, the ICC Secretariat informed the Parties that it took note of the Parties' agreement to nominate Dr Michael Feit as sole arbitrator in this matter.

51    By letter dated 16 October 2020, the ICC Secretariat informed Dr Michael Feit that he had been nominated by the Parties as sole arbitrator.

52    By letter dated 30 October 2020, the ICC Secretariat informed the Parties and Dr Michael Feit that the Secretary General had confirmed Dr Michael Feit on 29 October 2020 as sole arbitrator upon the joint nomination of the parties. The ICC Secretariat also acknowledged that the provisional advance had been fully paid and that it would now transmit the file to the Sole Arbitrator.

53    By separate letter dated 30 October 2020, the ICC Secretariat informed the Sole Arbitrator about the transmission of the file. It also informed the Sole Arbitrator that the Respondent had not submitted an Answer to the Request for Arbitration, that the parties had been informed on 8 June 2020 that the matter had not been referred to the Court, and that the Sole Arbitrator had therefore to decide any question of jurisdiction or of whether the claims may be determined together, after providing the Parties with an opportunity to comment, in accordance with Article 6(3) ICC Rules.

54    By email dated 6 November 2020, the Sole Arbitrator sent the Parties a draft Terms of Reference and a draft Procedural Order no. 1 for their review.

55    On 9 November 2020, the ICC Secretariat informed the Parties that the Court fixed the advance on costs on 5 November 2020 at USD 90,000, subject to later readjustments, and that it did so based on an amount in dispute quantified at USD 1,379,707 (for the principal claims) and one arbitrator. Pursuant to the Financial Timetable dated 9 November 2020 and the payment request of the same date, the ICC Secretariat had already received USD 30,000 from the Claimant,



and requested payment of USD 15,000 from the Claimant and USD 45,000 from the Respondent both by 4 December 2020.

56      By email dated 13 November 2020, and upon the Sole Arbitrator's invitation, the Respondent submitted a joint proposal for the procedural timetable. By email dated 14 November 2020, the Claimant confirmed that the submitted procedural timetable had been jointly agreed by the Parties.

57      By email dated 17 November 2020, the Sole Arbitrator sent the Parties an amended draft Terms of Reference, incorporating the Parties' case summary and current prayers for relief and other updates, and stated that this document would serve as the basis for the Case Management Conference of 18 November 2020.

58      On 18 November 2020, the Case Management Conference was held, which was attended by the Parties and the Sole Arbitrator.

59      By email dated 20 November 2020, the Sole Arbitrator sent the Parties the Terms of Reference, the Procedural Order No. 1, the Summary Minutes of the Case Management Conference of 18 November 2020, and the Provisional Procedural Timetable. The Provisional Procedural Timetable adopted the Parties' joint proposal, and therefore provided that the Claimant's Request for Arbitration would stand as the Claimant's Statement of Claim. As to the Terms of Reference, the Sole Arbitrator invited the Parties to sign it.

60      Upon receipt of the scans of the Parties' signatures by email, the Sole Arbitrator signed and dated the Terms of Reference with 25 November 2020. By email dated 25 November 2020, the Sole Arbitrator sent the electronic copy of the signed Terms of Reference to the ICC Secretariat.

61      By email dated 27 November 2020, the ICC Secretariat confirmed receipt of the electronic copy of the Terms of Reference. It noted that pursuant to its section 9, the amount in dispute was now estimated at USD 1,939,707 and it updated the Financial Table accordingly. The ICC Secretariat further noted that the time limit of six months within which the arbitral tribunal must render the final award started to run on 25 November 2020, and added that the Court may extend the time limit for rendering the final award.

62      By email dated 4 December 2020, the ICC Secretariat informed the Parties that by payment requests dated 9 November 2020, the Secretariat invited the parties to pay the balance of the advance on costs, which the ICC Secretariat had not yet received. The ICC Secretariat enclosed payment requests, in which the ICC Secretariat granted the Parties additional time to pay the amounts set forth therein,



i.e. USD 15,000 from the Claimant and USD 45,000 from the Respondent both by 18 December 2020.

63      By email dated 7 December 2020, the Sole Arbitrator informed the Parties that he had received on that day the hard copy signature pages of the Terms of Reference and that the hard copies of the Terms of Reference would be dispatched on that same day to the Parties and the ICC.

64      By email dated 8 December 2020, the ICC Secretariat informed the Parties that it had transmitted the signed Terms of Reference to the International Court of Arbitration of the International Chamber of Commerce (the "**Court**") at its session of 3 December 2020.

65      By email dated 15 December 2020, the ICC Secretariat acknowledged receipt of the payment order of the Claimant.

66      Following an exchange of email correspondence on whether to hold the hearing of March 2021 in person or remotely, the Claimant declared by email dated 12 January 2021 that the Parties decided to hold the hearing remotely.

67      Following an extension request by the Respondent, and no comments received by the Claimant within the set time limit, the Sole Arbitrator extended by email dated 13 January 2021 the time limit to file the Statement of Defence and Counterclaim (initially due by 15 January 2020) until 20 January 2021. Upon a request for reconsideration by the Claimant by email of 13 January 2021, which expressed its objection to the extension, the Sole Arbitrator reconfirmed the extension by email of the same date. By email dated 14 January 2021, the Claimant again seemed to ask for reconsideration. Following receipt of the Respondent's comments, the Sole Arbitrator again confirmed by email of the same date that he saw no ground to revoke an already granted moderate extension, and that it was common ground that the Claimant should be granted an equivalent extension for the filing of its Reply and Defence to the Counterclaim so not to suffer any prejudice. The Sole Arbitrator therefore maintained the filing date of 20 January 2021, and again invited the Parties to submit a proposed amendment of the timetable by 18 January 2021.

68      By email dated 21 January 2021 (received at 00:32 CET), the Respondent filed its Statement of Defence and Counterclaim (the "**SoDC**") together with the first witness statement of Dr Kamel Ounadjela and accompanying exhibits.

69      Following an exchange of emails by the Parties on the amendment of the Provisional Procedural Timetable, and after having carefully reviewed the Parties' positions, the Sole Arbitrator noted that the Parties were largely in agreement and



issued an amended Provisional Procedural Timetable by email dated 26 January 2021.

70      On 10 February 2021, the Claimant filed its Reply and Defence to the Counter-claim together with the witness statements of Messrs Danel Skakov and Daniyar Baizhumin and accompanying exhibits.

71      On 13 February 2021, the ICC Secretariat acknowledged receipt of USD 15,000 from the Claimant. The ICC Secretariat recalled that by payment requests dated 9 November and 4 December 2020, it invited the Respondent to pay the balance of the advance on costs, without having received such payment. The ICC Secretariat enclosed to that correspondence a payment request, in which the ICC Secretariat granted the Respondent additional time to pay the amount of USD 45,000 by 18 February 2021. The ICC Secretariat informed the Parties that if the ICC Secretariat would not receive the requested payment, it might invite the Claimant to substitute for the Respondent's share.

72      On 22 February 2021, the Respondent requested to fix separate advances on costs for the claim and counterclaim pursuant to Article 37(3) of the ICC Rules and issue new payment requests accordingly.

73      On 23 February 2021, the ICC Secretariat provided the Parties with estimates of separate advances and invited the Respondent to inform it by 25 February 2021 whether it intended to maintain its request for separate advances on costs, or whether it was willing to pay the balance of the global advance on costs, i.e., USD 45,000. The ICC Secretariat also invited the Claimant to provide any comments on the request for separate advances on costs within the same time limit.

74      On 24 February 2021, the Claimant requested to fix separate advances on costs for the claims and the counterclaims.

75      On 26 February 2021, the ICC Secretariat acknowledged receipt of the Claimant's correspondence dated 24 February 2021, by which the Claimant requested that the Court would fix separate advances on costs. The Respondent was invited to provide its comments by 25 February 2021.

76      On 1 March 2021, the Respondent informed the ICC Secretariat that it stood by its demand for separate advances for the claims and counterclaims.

77      By email dated 2 March 2021, for the purpose of preparing the hearing, the Sole Arbitrator directed certain questions to the Claimant related to the Claimant's factual exhibits, including potentially missing translations, wrong references, exhibits not referenced in the Claimant's submissions and overlapping reference numbers.



78      On 2 March 2021, the ICC Secretariat acknowledged receipt of the Respondent's correspondence dated 1 March 2021, by which the Respondent reiterated its request that the Court would fix separate advances on costs. The ICC Secretariat informed that the matter would accordingly be submitted to the ICC Court.

79      By email dated 4 March 2021, the Respondent filed its Rejoinder and Reply to Counterclaim together with the second witness statement of Dr Ounadjela and the first witness statement of Mr Yvon Pellegrin and accompanying exhibits.

80      By email dated 5 March 2021, the Claimant filed its *"Response to the Arbitrator's Letter"* to the Sole Arbitrator's questions of 2 March 2021 related to the Claimant's factual exhibits.

81      By email dated 9 March 2021, the Sole Arbitrator noted that in its *"Response to the Arbitrator's Letter"* dated 5 March 2021, the Claimant requested *"to provide an amendment to the Statement of Arbitration that would indicate new numbering of the attached document"*. The Sole Arbitrator stated that he believed that a Statement of Claim with an accurate numbering of the referenced factual exhibits would indeed be helpful. The Sole Arbitrator therefore agreed with the filing of such corrected version of the Statement of Claim by 12 March 2021.

82      On 10 March 2021, the Pre-Hearing Conference took place, which was attended by the Parties and the Sole Arbitrator. By email dated 11 March 2021, the Sole Arbitrator sent the Parties the Summary Minutes of the Pre-Hearing Conference. As to the language of the hearing and the simultaneous translation into Russian, the Summary Minutes of the Pre-Hearing Conference recorded the Parties' agreement that (i) the language of the hearing would be English, and an interpreter may interpret the exchanges for the Claimant's representatives comprehension, (ii) the Claimant's legal team would be assisted by two translators, who would be sitting in the same room as counsel for the Claimant during the hearing, and that (iii) as for the examination of the Claimant's witnesses Mr Danyiar Baizhumin and Mr Danel Skakov, the Parties agreed to jointly agree on a suitable independent translator and that the Respondent agreed to advance the costs of such translator.

83      By email dated 11 March 2021, the Claimant announced to file on the next day a *"Rejoinder on counterclaim"*, an *"Addition to the statement of claim"*, an *"Updated statement of claim, only with corrections to the numbering, without any corrections to the document"* and made a request *"for a CPI bank statement for all banking transactions from the start of our contract to the present day with JACO to clearly see all financial transactions"*. On the same date, the Respondent requested to comment on that application.



84      By email of the same day, the Sole Arbitrator granted the Respondent's request to file short comments on the Claimant's applications by 12 March 2021. The Sole Arbitrator also directed the Claimant to refrain from filing the *"Rejoinder on counterclaim"*, the *"addition to the statement of claim"* and the *"CPI bank statement"* on 12 March 2021, and to first await the Sole Arbitrator's decision. As to the filing of the *"updated statement of claim, only with corrections to the numbering, without any corrections to the document"*, the Sole Arbitrator noted that the Claimant had made such request already in its letter dated 5 March 2021, and that the Sole Arbitrator had approved that by email dated 9 March 2021 and was to be filed by 12 March 2021.

85      By email dated 12 March 2021, the Respondent objected against the Claimant's applications, with the exception of the filing of an updated statement of claim, with changes limited to those directed by the Sole Arbitrator.

86      By email of the same day, the Sole Arbitrator ruled on the Claimant's various requests:

87      As to the requested filing of a *"Rejoinder on counterclaim"*, the Sole Arbitrator noted that the Parties submitted a joint proposal for the Procedural Timetable on 13 November 2020, which was discussed and approved at the Case Management Conference of 18 November 2020, referring to the Summary Minutes of the Case Management Conference dated 20 November 2020, section 5. The proposed and thereafter approved Procedural Timetable did not provide for a *"Rejoinder on counterclaim"*. The Sole Arbitrator further considered that the Claimant had not provided a reasoning as to why, in deviation of the Procedural Timetable, a *"Rejoinder on counterclaim"* should now be permitted. The Sole Arbitrator also noted that the Respondent's concern were understandable that it would be very challenging for a party in the present circumstances to review and analyze a new written submission on the merits so shortly before the hearing. Admitting a new written submission on the merits at this stage would have indeed the potential to significantly disrupt the hearing preparation. The Sole Arbitrator also took into consideration that, within the applicable procedural framework, the Claimant will have the opportunity to comment on the counterclaim during its opening presentation, just like the Respondent would have the chance to do so as regards the claim. Both Parties' right to be heard was therefore sufficiently safeguarded. In light of these considerations, the Sole Arbitrator dismissed the Claimant's request to file a *"Rejoinder on counterclaim"*.

88      As to the requested filing of an *"addition to the statement of claim"*, the Sole Arbitrator noted that the proposed and thereafter approved Procedural Timetable did not provide for an *"addition to the statement of claim"*. The Sole Arbitrator noted that filing an amended version of the statement of claim by the cut-off date was uncommon in arbitration practice, and it remained unclear what



purpose such an addition intended to serve. The Sole Arbitrator could also understand the Respondent's concern that it would be very challenging for a party in the present circumstances to review and analyze an addition (with a yet unclear content) to an already filed written submission on the merits so shortly before the hearing. The Sole Arbitrator also took into consideration that, within the applicable procedural framework, the Claimant would have the opportunity to present its case during its opening, just like the Respondent would have the chance to do so. The Parties' right to be heard was therefore sufficiently safeguarded. In light of these considerations, the Sole Arbitrator dismissed the Claimant's request to file an "*addition to the statement of claim*".

89    As to the "*Official request for a CPI bank statement for all banking transactions from the start of our contract to the present day with JACO to clearly see all financial transactions*", the Sole Arbitrator noted that it was not clear from the Claimant's request whether the Claimant sought the production of a bank statement by the Respondent, or whether the Claimant requested to file such document in its possession. If the Claimant sought the *production of such document by the Respondent*, the Sole Arbitrator noted that the Procedural Order No 1 provided rules for making such production requests. Paragraph 21 of the Procedural Order No 1 provided, *inter alia*, that "*[t]he Parties making such requests are invited to submit them in the format of the Redfern Schedule*", "*[e]very request must be sufficiently specific and the requesting party needs to explain why the requested documents are relevant to the dispute and material to its outcome*", and that "*[a]ny such request shall satisfy the requirements set forth in IBA Rules on the Taking of Evidence in International Arbitration*". As there was no reasoning for its request, the Claimant's application did not meet these requirements. It also remained unclear as to how this request related to Exhibit R-3 on record. Thus, the Sole Arbitrator decided that if document production was sought, such request was dismissed. Should, however, the Claimant request the *filing of such document in its possession*, the Sole Arbitrator noted that a more lenient approach applied to the submission of new evidence and factual allegations prior to the cut-off date, whereas a strict standard applied following the cut-off date as set out in paragraph 7 of the Procedural Order No 1. The Sole Arbitrator also took into consideration that the requested filing was limited in scope and potentially consisted of a single document. Such filing should therefore not disrupt the hearing preparation in any significant manner. Thus, the Sole Arbitrator decided that if the filing of a bank statement in possession of the Claimant was sought, such request was granted.

90    On 12 March 2021, the Claimant filed its "*Updated Statement of Claim*" (the "**Updated SoC**"), as had been approved by the Sole Arbitrator by email dated 9 March 2021 and reconfirmed by email dated 11 March 2021. Consistent with the Sole Arbitrator's directions, the Claimant refrained from filing a "*Rejoinder to counterclaim*" and an "*addition to the statement of claim*".



91      By email of the same date, the Claimant filed an Application for Injunction to-gether with a witness statement of Mr Dauren Abishev. On the same day, the Respondent requested leave to comment on that application and proposed to do so at or after the hearing in order to minimize disruption to its hearing prep-aration.

92      By email dated 16 March 2021, the Claimant commented on the Sole Arbitrator's decision of 12 March 2021 and accepted the ruling. By email of the same date, the Sole Arbitrator responded to those comments. As regards the issue of the *"Rejoinder on counterclaim"*, the Sole Arbitrator referred to the considerations set out in his correspondence of 12 March 2021 and further noted that in the Respondent's Rejoinder and Reply to the Counterclaim, the Respondent's com-ments on the merits of the counterclaim appeared to consist of two paragraphs only. Considering all circumstances, the Sole Arbitrator continued to believe, as set out in his correspondence of 12 March 2021, that the proper way forward was for the Claimant to comment on the counterclaim during its opening and that by doing so, the Claimant's right to be heard would be fully safeguarded.

93      On 16 March 2021, the ICC Secretariat informed the Parties that on 11 March 2021, the Court fixed separate advances on costs for the principal claims with USD 85,000 and for the counterclaims with USD 40,000. By payment request dated 16 March 2021, the Parties were asked to each pay USD 40,000 by 25 March 2021.

94      On 18 March 2021, the test run for the hearing took place, which was set up by Opus2 and in which the Parties, translators and the Sole Arbitrator participated.

95      The hearing was preceded by a large number of exchanges related to the organ-ization of the hearing, in particular the retention of the services of Opus2.

96      On 22 and 23 March 2021, the hearing took place. As agreed by the Parties, the hearing was conducted by way of a videoconference, which was organized by Opus2. In the course of the hearing, each Party presented an opening statement (and the Parties' Opening Statements were circulated thereafter), followed by the testimony of the Claimant's witnesses Messrs Danel Skakov and Daniyar Baizhumin and the Respondent's witnesses Dr Ounadjela and Mr Yvon Pellegrin. At the end of the hearing, both Parties confirmed that they had no objections to the way the hearing was conducted.[2]

---

[2]   Cf. Transcript Day 2, p. 131/14-25.



97   By email dated 24 March 2021, the Sole Arbitrator sent the Parties the updated Provisional Procedural Timetable with the dates for the filing of the Post-Hearing Brief and the Submission on Costs.

98   By email dated 29 March 2021, the Respondent filed its Answer to the Request for Injunction and accompanying exhibit.

99   On 30 March 2021, the ICC Secretariat acknowledged the receipt of USD 40,000 from the Claimant and USD 40,000 from the Respondent. Therefore, the ICC Secretariat confirmed that the separate advances fixed by the Court were paid by the parties in full. Pursuant to the Financial Table dated 30 March 2021, the ICC Secretariat confirmed that in total, it had received USD 85,000 from the Claimant and USD 40,000 from the Respondent.

100   Following an extension request for the filing of the Post-Hearing Brief by the Respondent, and the Claimant's objection to that request, the Sole Arbitrator extended by email dated 9 April 2021 the filing date from 12 April 2021 to 14 April 2021, and, accordingly, the filing for the Submission on Costs to 26 April 2021.

101   By email dated 13 April 2021, the Claimant filed its Post-Hearing Brief.

102   By email dated 15 April 2021, the Respondent filed its Post-Hearing Brief with accompanying exhibit (received at 00:37 CET). By email of the same date, the Claimant objected against the belated filing of the Claimant's Post-Hearing Brief and of a new legal exhibit RL-9. On the same day, the Sole Arbitrator replied that he considered that the delay of a bit more than half an hour was marginal and did not result in any prejudice, and that consistent with common practice in international arbitration, such limited delays did not justify that the tribunal would disregard the submission. The Sole Arbitrator therefore decided that the Respondent's Post-Hearing Brief was therefore accepted and formed part of the record. Further, the Sole Arbitrator noted that the Parties were entitled to file new legal authorities, in contrast to new factual exhibits, together with their post-hearing briefs. RL-9 was therefore accepted as well.

103   By email dated 16 April 2021, the Sole Arbitrator issued the Procedural Order No. 2, by which he dismissed the Claimant's Application for Injunction on the basis that the Claimant's Application was not sufficiently precise and specific to serve as a basis for issuing the requested orders and no particular urgency had been shown that would outweigh the potential disadvantages the Respondent might face upon issuance of the requested orders. The decision on costs related to the Claimant's Application was reserved for the final award.

104   By email dated 26 April 2021, the Respondent filed its Submission on Costs with accompanying exhibits.



105     By email dated 27 April 2021, the Claimant filed its Submission on Costs with accompanying exhibits (received at 10:07 CET).

106     By email dated 30 April 2021, the Respondent requested leave to comment on the Claimant's Submission on Costs.

107     By email of the same date, the Sole Arbitrator granted both Parties the right to file comments on the other Party's Submission on Costs by 10 May 2021.

108     On 30 April 2021, the ICC Secretariat informed the Parties that on 29 April 2021, the Court extended the time limit for rendering the final award until 30 June 2021.

109     Following an extension request by the Respondent on 10 May 2021, to which the Claimant objected, the Sole Arbitrator extended by email dated 10 May 2021 the time limit to comment on the other Parties' Submission on Costs until 12 May 2021.

110     By email dated 12 May 2021, the Respondent filed its Comments on the Claimant's Submission on Costs.

111     By email dated 13 May 2021, the Claimant filed its Comments on the Respondent's Submission on Costs (received at 06:37 CET).

112     By email dated 24 June 2021, the Sole Arbitrator declared the proceedings closed with respect to the matters to be decided in the award pursuant to Article 27 ICC Rules. On the same day, the Sole Arbitrator submitted the draft final award to the ICC Court for approval. Still on the same day, the ICC Court further extended the time limit for the rendering of the final award until 30 July 2021. On 15 July 2021, the ICC Court approved the draft final award (Article 34).

113     On 30 June 2021, the ICC Secretariat informed the Parties that on 24 June 2021, the Court extended the time limit for rendering the final award until 30 July 2021.

4.      **Summary of the Parties' positions and their Prayers for Relief**

114     This section is not intended to provide a full repetition of all the Parties' written and oral submissions, but solely aims at providing a short overview. That a specific allegation from a Party is not reflected in the below summary does not mean that it has not been taken duly into consideration by the Sole Arbitrator. Further, the Sole Arbitrator will, where deemed appropriate, refer to allegations by the



Parties in the section containing the Sole Arbitrator's considerations and findings.

### 4.1.    The Claimant's position

115    The Claimant states that on 13 June 2014, the Parties concluded the Contract. Under the terms of the Contract, the Respondent undertook to supply 280 t[3] of solar grade silicon ("**SoG-Si**") and the Claimant undertook to pay a price of USD 18,000 per t. The total amount of the Contract was USD 5,040,000.[4]

116    The Claimant explains that the Contract is a supply agreement, and the Parties of the Contract are the Claimant, who is the customer and the Respondent, who in turn is the supplier. No other parties are provided for by the Contract.[5]

117    The Claimant claims that the Contract initially expired on 1 June 2015, but the Respondent did not fulfil the contractual obligations within the specified period and did not deliver SoG-Si. Subsequently, the Parties entered into four amendments, by which the validity period was extended until 31 December 2016.[6]

118    The Claimant argues that the delivery schedule was repeatedly amended at the initiative of the Respondent, since it could not timely execute the terms of the Contract.[7]

119    The Claimant states that it fulfilled its obligation under the Contract by making timely advance payments for SoG-Si delivery in the amount of USD 1,997,776.68.[8]

120    The Claimant alleges that the final volume of SoG-Si, according to the Supplementary Agreement No. 3 (Exhibit C-3), amounted to 79 t SoG-Si.[9]

121    The Claimant argues that the Respondent supplied only 38,987.59 kilogram of SoG-Si, which costs USD 701,776.68.[10]

---

[3]   A metric ton equals 1,000 kilograms.
[4]   Cf. Claimant's Post-Hearing Brief, para. 2.1.
[5]   Cf. Claimant's Post-Hearing Brief, para. 2.2 et seq.
[6]   Cf. Claimant's Post-Hearing Brief, para. 2.5.
[7]   Cf. Claimant's Post-Hearing Brief, para. 2.6.
[8]   Cf. Claimant's Post-Hearing Brief, para. 2.8.
[9]   Cf. Claimant's Post-Hearing Brief, para. 2.9.
[10]  Cf. Claimant's Post-Hearing Brief, para. 2.10.



122     The Claimant concludes that therefore, as of today, the Respondent's debt equals to USD 1,296,000.[11]

123     The Claimant contests the testimony of Dr Ounadjela, pursuant to which the Supplementary Agreement No. 3 (Exhibit C-3) did not have any legal significance and was signed in December 2015 simultaneously with the Supplementary Agreement No. 4 (Exhibit C-4).[12]

124     The Claimant argues, amongst others, that these agreements bear different dates, namely that the Supplementary Agreement No. 3 is dated 22 October 2015, and the Supplementary Agreement No. 4 is dated 25 January 2016,[13] and that the Respondent did not provide any evidence in support of its claim that the Supplementary Agreement Nos. 3 and 4 were presented to it for signing at the same time in December 2015.[14]

125     Further, the Claimant contests the Respondent's arguments that upon the signing of Supplementary Agreement No. 4, the terms of the Supplementary Agreement No. 3 had lost their force. By agreeing on the Supplementary Agreement No. 4, the Parties did not cancel in any way Supplementary Agreement No. 3, which is an integral part of the Contract and is binding on the Parties.[15]

126     The Claimant claims that just because the Supplementary Agreement No. 3 was concluded earlier than the Supplementary Agreement No. 4, that does not yet indicate that the latter one cancels the previous one. This were only possible if both supplementary agreements amended the same clauses of the Contract. But this is not the case; the Supplementary Agreement No. 3 amends Articles 6.1 and 13.6 of the Contract, Appendix No. 1 in terms of the period and volumes of supply, and establishes in Clause 4 a requirement to return the balance of money paid by the Claimant to the Respondent earlier in the form of an advance payment in accordance with Article 6.3 of the Contract based on the reconciliation act until 31 December 2015, while the Supplementary Agreement No. 4 introduces amendments only to Article 6.1 of the Contract and in Appendix No. 1 in terms of the period of supply (which were changed to 31 December 2016) without amending the wording of Article 13.6 of the Contract and without cancelling Clause 4 of the Supplementary Agreement No. 3. The Claimant argues that the Respondent did neither comply with Clause 4 of the Supplementary Agreement

---

[11]  Cf. Claimant's Post-Hearing Brief, para. 2.11.
[12]  Cf. Claimant's Post-Hearing Brief, para. 2.14.
[13]  Cf. Claimant's Post-Hearing Brief, para. 2.17.
[14]  Cf. Claimant's Post-Hearing Brief, para. 2.15.
[15]  Cf. Claimant's Post-Hearing Brief, paras. 2.18 et seq.



No. 3 nor with the provision of the Supplementary Agreement No. 4 on the supply of the remaining SoG-Si by 31 December 2016.[16]

127　　The Claimant alleges that the Supplementary Agreement No. 3 changed Clause 6.1. of the Contract and Appendix No. 1 concerning the quantity of SoG-Si, whereas Supplementary Agreement No. 4 does not provide for any changes to Clause 6.1. of the Contract and to Appendix No. 1 as to the quantity of SoG-Si.[17]

128　　Moreover, the Claimant denies the Respondent's argument, pursuant to which the Supplementary Agreement No. 4 restored the quantity of delivery to 280 t; rather, the Claimant argues that under the Supplementary Agreement No. 4, the Parties were to negotiate additional supplies, which would be concluded in a separate agreement. The Claimant and the Respondent, however, did not come to any such agreement.[18]

129　　At the meeting in Hong Kong in May 2016, the Parties and Win Technology Limited ("JACO")[19] signed a document (the "Hong Kong Protocol") (Exhibit C-14). The Claimant claims that this protocol does not imply that it in any way replaces or changes the terms of the Contract, but only recorded the agreement of the involved parties to agree on the conclusion of a subsequent contractual relationship.[20]

130　　Further, the Claimant argues that the priority for the Claimant during this meeting was to obtain from the Respondent the delivery of SoG-Si.[21]

131　　The Claimant argues that as a result of the conduct of the Respondent, the terms of this protocol were not fulfilled.[22] The Hong Kong Protocol (Exhibit C-14) foresaw the issuance of a letter of credit by the Claimant to JACO , but in order to do so, the Claimant needed to be bound by a contractual relationship with JACO. But at that time, the Claimant had a contractual relationship only with the Respondent.[23] The Claimant therefore invited the Respondent to conclude an assignment agreement, according to which its obligations would be transferred to JACO, which would have enabled the Claimant to provide the letter of credit. The

---

[16]　Cf. Claimant's Post-Hearing Brief, paras. 2.23.
[17]　Cf. Claimant's Post-Hearing Brief, paras. 2.25.
[18]　Cf. Claimant's Post-Hearing Brief, paras. 2.26.
[19]　For the contractual relationship between the Respondent and JACO cf., e.g., the Respondent's summary of the JACO contract below at paras. 158 et seqq.; for the Sole Arbitrator's assessment of the alleged intermediary role of JACO cf. below 272 et seq.
[20]　Claimant's Post-Hearing Brief, para. 3.11.
[21]　Cf. Claimant's Post-Hearing Brief, para. 3.2.
[22]　Cf. Claimant's Post-Hearing Brief, para. 3.4.
[23]　Cf. Claimant's Post-Hearing Brief, para. 3.5.



Respondent, however, refused this proposal. By that rejection it became impossible for the Claimant to execute the protocol.[24]

132    The Claimant further argues that first the Respondent should have delivered SoG-Si in the volume of 40 t to the Claimant, and subsequently the parties would discuss the granting of the letter of credit.[25]

133    As to the **penalty**, the Claimant also claims a contractual penalty under Article 9.2 of the Contract at the maximum, capped amount of USD 72,000.[26] The Claimant argues that as a result of the Respondent's delay to deliver the volume of 40 t of SoG-Si, the Claimant was entitled, on the basis of the agreed price of 18 USD per kilogram and by applying the penalty cap of 10%, to request payment of USD 72,000.[27]

134    As to the **administrative fine**, the Claimant claims that it has the right to be reimbursed for the administrative fine paid by the Claimant in the amount of KZT 4,538,000, which equals the claimed amount of USD 11,707 as per the exchange rate of 26 September 2019, as a consequence of the Respondent's non-fulfilment of its contractual obligations,[28] and relies to that end on Article 9.11 of the Contract.[29] It argues that it warned the Respondent repeatedly that if it failed to comply with its obligations, the Claimant would face fines imposed by state authorities because of non-compliance with currency control legislation.[30]

135    Had the Respondent complied with its obligations, no fines would have been imposed on the Claimant.[31]

136    As regards the **counterclaim**, the Claimant argues that (i) the nature of the profits remained unclear, (ii) the Respondent did not present evidence for the calculation of profit, (iii) the Respondent did not identify what exactly constituted the fault committed by the Claimant that caused the Respondent to be deprived of its profit, and (iv) it is the Respondent's fault that the Contract was not performed.[32]

---

[24]  Cf. Claimant's Post-Hearing Brief, paras. 3.7 et seq.
[25]  Cf. Claimant's Post-Hearing Brief, paras. 3.14 et seqq.
[26]  Cf. Claimant's Request for Arbitration/Updated SoC, para. 19.
[27]  Cf. Claimant's Request for Arbitration/Updated SoC, para. 19; Claimant's Reply and Defence to the Counterclaim, para. 150.
[28]  Cf. Claimant's Request for Arbitration/Updated SoC, para. 20.
[29]  Cf. Claimant's opening presentation, slide 34.
[30]  Cf. Claimant's Post-Hearing Brief, paras. 4.3 et seq.
[31]  Cf. Claimant's Post-Hearing Brief, para. 4.6.
[32]  Cf. Claimant's Post-Hearing Brief, paras. 10.3 et seqq.



### 4.2. The Claimant's Prayers for Relief

137     The Claimant's Request for Arbitration contained the following Prayers for Relief in paragraph 21:

> "As a result, Claimant respectfully requests the Arbitral Tribunal to
> issue an award :
> i. declaring that the Arbitral Tribunal has jurisdiction to consider the dispute between the Parties described herein;
> ii . declaring that Respondent violated its obligations by violating Clauses 6.1 and 8.1.1 of the Contract;
> iii. ordering Respondent to compensate Claimant for the damages and losses suffered as a result of Respondent's breaches of the Contract, currently estimated to be in the amount of 1 379 707 (one million three hundred and seventy- nine thousand seven hundred and seven) US Dollars;
> iv. ordering Respondent to pay all arbitration costs, including Claimant's counsel's costs and expenses."

138     In paragraph 55 of the Terms of Reference, the Claimant's Prayers for Relief read as follows:

> "1. To recover from CPI LLC in favour of MP "KS" a part of advance (advance payment) under the Contract in the amount of **1,296,000** US dollars.
>
> 2. To recover from CPI LLC in favour of MP "KS" the fine under the Contract in the amount of **72,000** US Dollars.
>
> 3. To recover from CPI LLC in favour of MP "KS" the expenses for payment of the administrative penalty in the amount of **11,707 US Dollars.**
>
> 4. To recover from CPI LLC in favour of MP "KS" the expenses for payment for the services of the representative in the amount of **100,000 (one hundred thousand) US dollars.**
>
> 5. To recover from CPI LLC in favour of MP "KS" the expenses for payment of filing and arbitration fees, as well as other expenses for the arbitration proceedings.



> *6. To dismiss the Respondent's counterclaim in its en-*
> *tirety."*

139      As set out in paragraph 60 of the Terms of Reference, Prayer for Relief No. 4 concerns the legal costs for the Claimant's representation in this arbitration and was an amount that the Claimant expected to increase in the further course of the arbitration.

140      In its Post-Hearing Brief, the Claimant formulated the following Prayers for Relief:[33]

> *"Considering the above, the Claimant asks the Sole Arbi-*
> *trator to recover from the Respondent in favor of the*
> *Respondent:*
> *1. The amount of unjustified gain, namely the amount*
> *of an advance payment of 1,296,000 US dollars for the*
> *goods not delivered;*
> *2. Penalty in the amount of USD 72,000;*
> *3. Damage in the amount of US $ 11,707;*
> *4. Claimant's expenses related to the current arbitra-*
> *tion;*
> *5. Expenses of the Claimant related to the representa-*
> *tion of his interests in the International Arbitration*
> *Court of the International Chamber of Commerce.*
>
> *And also, the Claimant asks the Sole Arbitrator to reject*
> *all the claims of the Respondent."*

141      While the wording of the Claimant's Prayers for Relief slightly changed, the essence of the relief sought and the legal arguments remained the same. The Sole Arbitrator also notes that the Respondent did not object to these Prayers for Relief. Any changes made to the Prayers for Relief do not amount to any *"new claims"* in the meaning of Article 23(4) ICC Rules, and no such objection was made by the Respondent. The Claimant's Prayers for Relief as presented in its Post-Hearing Brief will therefore form the basis of the Sole Arbitrator's decision.

---

[33]   Cf. Claimant's Post-Hearing Brief, paras. 11.7 et seq.



### 4.3.    The Respondent's position

142    The Respondent sets out that the Parties entered into the Contract on 13 June 2014. Broadly, the Contract provides for Respondent as "Supplier" to supply 280 t of SoG-Si to Claimant as "Customer" by the end of 2014.[34]

143    The Respondent states that the total contract price is USD 5,040,000 for 280 t of SoG-Si with a price of USD 18 per kilogram.[35]

144    The Respondent explains that as is standard in the silicon business, the Contract provided for payment in three tranches: a 20% advance payment of the total cost of the silicon to be supplied under the Contract, a 60% pre-payment for each batch of silicon to be supplied, and the remaining 20%, the balance of the cost of each supplied batch of silicon, upon receipt.[36]

145    The Respondent sets out that the instalments are not structured so that the Claimant buys the goods a tonne at a time, paying the full price, for example, for the first 40 t and then the full price for the next 40 t and so on until it has received and paid for the full 280 t. Rather, the first advance payment represents 20 per cent of the price of the entire volume. The second and third payments are part-payments towards the total cost of entire batches.[37]

146    The Respondent notes that the Contract sets out broad rights of termination in case of breach at Article 11.[38] Additionally, the Claimant enjoys a discretion to refuse delivery of goods as a first step to termination as set out in Article 8.4.3.[39]

147    The Respondent states that in sum, for all its complaints about the Respondent's supposedly poor performance and the Respondent's illegitimate commercial pressure on it, the Claimant would have been in a strong position to terminate the Contract, if only it had held an honest and well-founded belief that the Respondent was in breach of contract. The Claimant did not do so but instead entered successive supplementary agreements.[40]

148    The Respondent notes that the Parties amended the terms of the Contract on three occasions by entering into supplementary agreements, the main effect of which is to change the delivery schedule and extend the term of the Contract.

---

[34]  Cf. Respondents' SoDC, para. 20.
[35]  Cf. Respondents' SoDC, para. 25.
[36]  Cf. Respondents' SoDC, para. 26.
[37]  Cf. Respondents' SoDC, para. 27.
[38]  Cf. Respondents' SoDC, para. 28.
[39]  Cf. Respondents' SoDC, para. 29.
[40]  Cf. Respondents' SoDC, para. 31.



The result is that a six-month project set to last until the end of 2014, was drawn out into two and a half-year one with deliveries to be completed in or after 2016.[41]

149    The Respondent argues that Supplementary Agreement No. 3 amended Article 13.6 and Annex No. 1. By that time, the Respondent had delivered some 40 t of SOG-Si to the Claimant. The Supplementary Agreement No. 3 envisaged a reduction of the total contract volume from 280 t to just 79 t. The Supplementary Agreement No. 3 valued this amount at some USD 3.6 million less than the original contract price of USD 5,040,000. Under Clause 4, the Respondent shall return the cash balance on the advance to Claimant by 31 December 2015 upon to any final reconciliation of the amounts.[42]

150    The Respondent claims that although the Parties restored the original contract volume and thus the contract price under the Supplementary Agreement No. 4, the Supplementary Agreement No. 3 remains important. In these proceedings, the Claimant wrongly relies on it for the assertion that the parties conclusively reduced the contract volume, and that the Respondent is now committed to re-imburse the balance of the advance payment.[43]

151    The Respondent argues that Supplementary Agreement No. 3 was an anomalous short-term fix, agreed by the Respondent in order to relieve regulatory pressure on the Claimant until the end of 2015. Under Supplementary Agreement No. 2, the contract term ended on 15 September 2015, leaving the Parties out of contract by the end of the year. After that, the Parties would apply new terms under a different agreement, the Supplementary Agreement No. 4.[44]

152    The Respondent alleges that the circumstances of the conclusion of the Supplementary Agreement No. 3 support the Respondent's view that the Parties did not seriously intend to depart from the original contract volume, and the same conclusion is reached on the Contract wording alone.[45]

153    The Respondent underlines that the Supplementary Agreement No. 4 is of especial importance, because it records the Parties' final agreement as to the quantities and price of SoG-Si to be delivered. Its terms are those by which the Arbitral Tribunal must judge the crucial events during 2016 on which both Parties rely.[46]

---

[41] Cf. Respondents' SoDC, para. 34.
[42] Cf. Respondents' SoDC, para. 39.
[43] Cf. Respondents' SoDC, para. 40.
[44] Cf. Respondents' Post-Hearing Brief, para. 31.
[45] Cf. Respondents' Post-Hearing Brief, para. 34.
[46] Cf. Respondents' SoDC, para. 41.



154   The Respondent states that under Supplementary Agreement No. 4, the term of the Contract is extended to 31 December 2016 or, in light of Clause 4, until the Parties fully performed it, presumably if they did so sooner.[47] Importantly, the Supplementary Agreement No. 4 imposes a new deadline – the end of 2016 – for the delivery of 40 t of SoG-Si, while leaving the precise delivery date open. In the most significant departure from the previous supplementary agreement, the Parties reinstated the original contract volume of 280 t. Clause 3 presupposes this in requiring them to agree "*a new schedule for the delivery of the remaining SOG-Si under the original contract*".[48]

155   The Respondent claims that the Supplementary Agreement No. 4 imposes new obligations on the Claimant: First, the Claimant must request delivery of a batch of 40 t for it to take place. Equally, unless the Claimant requests the delivery, the Respondent is under no obligation to make the delivery. Second, the Parties must jointly agree a schedule for the delivery of outstanding volumes of SOG-Si under the original version of the Contract, i.e. 280 t.[49]

156   The Respondent alleges that the obligation is significant in being mutual: it is an obligation on the Claimant as much as on the Respondent. To comply with it the Parties must achieve a particular result, namely agree a schedule. This of its nature presupposes cooperation and constructive engagement. The previous commercial relationship shows that agreeing a delivery schedule is not straightforward. Rather, the Claimant, the Respondent as supplier and JACO as producer need to coordinate their efforts to create a supply chain.[50]

157   The Respondent argues that Supplementary Agreement No. 4 replaces Supplementary Agreement No. 3. Given the extension of the contract term, Clause 4 of the Supplementary Agreement No. 3 becomes meaningless: The Respondent could not sensibly reimburse the Claimant for the full advance payments only to deliver 40 t in 2016 and schedule new delivery dates for 200 t more. This is reinforced by Clause 3 of the Supplementary Agreement No. 4. It imposes an obligation on the parties to agree on "*a new schedule*" for the "*remaining*" SoG-Si volume "*under the original Contract*". If the Contract volume had been reduced to 79 t, the volume of 201 t could not be said to remain under the original Contract.[51]

158   The Respondent also denies that the Supplementary Agreement No. 3 finally reduced the contract volume from 280 t to 79 t, and that new agreements would

---

[47] Cf. Respondents' SoDC, para. 43.
[48] Cf. Respondents' SoDC, para. 44.
[49] Cf. Respondents' SoDC, paras. 46 et seq.
[50] Cf. Respondents' SoDC, paras. 48 et seq.
[51] Cf. Respondents' Post-Hearing Brief, para. 36.



have been necessary to reinstate the volume and establish a schedule. The Respondent argues that this argument fails because the Supplementary Agreement No. 4 already reinstated the full volume; that is the further agreement. Nor does the argument make commercial sense because it would put the Respondent in a precarious and uncertain position vis-à-vis JACO with which it had contracted.[52]

159   As to its contract with JACO, the Respondent states that to meet its obligations to the Claimant the Respondent as "Customer" entered into Contract # CPI06102014 *"Delivery of 280 MT JACO Solar Grade Silicon"*, dated 10 June 2014, with JACO as "Supplier" (Exhibit R-1).[53]

160   The Respondent argues that under the JACO contract, the price for the 280 t of SoG-Si is USD 4,480,000 based on a unit price of USD 16 per kilogram. The difference of USD 2 per kilogram or USD 560,000 in total between the unit price of USD 18 per kilogram and the price under the JACO contract is the only financial benefit that the Respondent would derive from transaction.[54]

161   The Respondent sets out that similarly to the Contract, the JACO contract provides for payment to be made in three part-payment in Article 6.3.[55]

162   The Respondent notes that several provisions are similar to those in the Contract. For example, Articles 8 and 11 resemble Articles 8 and 11 of the Contract. However, the Respondent does not have a broad right of termination equivalent to Claimant's under Clause 8.4.3 of the Contract. Article 9.1 of the JACO contract provides for Californian law as the governing law. Clause 13.2 provides for the final resolution of disputes by arbitration under the ICC Rules and with a seat in San Francisco.[56] The similarity between the terms of the Contract and of the JACO contract reinforces the Respondent's position that it entered into the JACO contract purely to perform the Contract.[57]

163   The Respondent claims that the Claimant's confusing account of the different payments is aimed at supporting its flawed argument that the Claimant paid X, received goods worth Y, and so is entitled to be reimbursed for the difference between X and Y. Each one of the payments the Claimant made to the Respondent was made for a specific purpose according to the payment mechanism agreed by the Parties under Article 6.3 of the Contract. By the same token, for

---

[52] Cf. Respondents' Post-Hearing Brief, para. 36.
[53] Cf. Respondents' SoDC, para. 50.
[54] Cf. Respondents' SoDC, paras. 51 et seq.
[55] Cf. Respondents' SoDC, para. 53.
[56] Cf. Respondents' SoDC, paras. 55 et seq.
[57] Cf. Respondents' Post-Hearing Brief, para. 22.



every payment made by the Claimant to the Respondent, the Respondent made an equivalent payment to JACO, corresponding to the terms of the JACO contract.[58]

164    The Respondent summarized the transactions in a table in paragraph 58 of its SoDC, which is copied below:

| | Payments from ICS to CPI | | | | | Payments from CPI to JACO | | |
|---|---|---|---|---|---|---|---|---|
| | Date | Amount | Corresponding to | Exh. | | Date | Amount | Corresponding to | Exh. |
| | | | | | | Prior to Contract | USD 156,300 in raw silicon (150 t) | | R-2 |
| 1 | 13.06.14 (received 16.06.14) | USD 180,000 | 50% payment of first lot[32] | C-7 | 1 | 13.06.14 | USD 89,600.17 | Advance payment for raw materials | R-3 |
| | | | | | 2 | 17.06.14 | USD 192,000 | 93% pre-payment of first lot[33] | R-3 |
| 2 | 25.06.14 (received 26.06.14) | USD 936,000 | Advance payment of 20% of total cost of Contract[34] | C-8 | 3 | 27.06.14 | USD 672,000 | Advance payment of 15% of total cost of Contract[35] | R-3 |
| 3 | 12.08.14 (received 13.08.14) | USD 179,871 | Remaining 50% payment of first lot[36] | C-9 | 4 | 18.08.14 | USD 85,645.28 | 25% balance payment for first lot[37] + additional payment for raw materials | R-3 |
| 4 | 21.08.14 (received 22.08.14) | USD 72,000 | 60% pre-payment of second lot (partial) | C-10 | | | | | |
| 5 | 25.08.14 (received 26.08.14) | USD 133,143.41 | 60% pre-payment of second lot (balance)[38] | C-11 | 5 | 27.08.14 | USD 182,349.70 | 60% pre-payment of second lot[39] | R-3 |
| 6 | 05.01.15 | USD 64,762.27 | 20% balance payment for second lot[40] | C-12 | 6 | 05.01.15 | USD 86,536.56 | 25% balance payment for second lot[41] + additional payment for raw materials | R-3 |
| 7 | 29.05.15 | USD 432,000 | 60% pre-payment of third lot[42] | C-13 | 7 | 02.06.15 | USD 290,220 | 60% pre-payment of third lot[43] | R-3 |
| | | = USD 1,997,776.68 | | | | | = USD 1,754,651.71 | | |

165    The Respondent argues that terms of payment followed the same mechanism (an advance payment on the total cost of the contract, a pre-payment for each individual batch, and a final payment for the remaining amount of each individual batch). The percentages of the payments were, however, slightly different. Under the Contract between the Parties, the Claimant had to make a 20% advance payment on the total cost of the contract, a 60% pre-payment on each individual batch, and a final 20% payment on each individual batch upon receipt. Under the JACO contract, the Respondent had to make a 15% advance payment on the total cost of the contract, a 60% pre-payment on each individual batch, and a final 25% payment on each individual batch upon receipt of the batch by the Claimant.[59]

166    The Respondent claims that it not only punctually transferred all the payments received from Claimant to JACO, complying with its role of an intermediary in the supply of SoG-Si between the Claimant and JACO, but it also performed a number

---

[58]  Cf. Respondents' SoDC, para. 58.
[59]  Cf. Respondents' SoDC, para. 60.



of additional services for the exclusive benefit of the Claimant. Even before sign-ing the Contract with the Claimant, the Respondent provided JACO with signifi-cant resources, both in the form of capital and materials. Afterwards, from June 2014 to almost the end of 2016, the Respondent worked constantly and tirelessly towards ensuring the smooth performance of the Contract.[60]

167     The Respondent explains that as a result of differences between the involved parties, Dr Ounadjela, the Chief Executive Officer of the Respondent, decided to bring the parties together for a two-day meeting held in Hong Kong on 4 and 5 May 2016. He persuaded senior offers of the companies involved to attend in person. Apart from him, Mr Jackson Su, the Chief Executive Officer of JACO, Mr Rustem Makulbekov, Deputy Chief Executive Officer of Claimant's parent company, Kazatomprom-Damu LLP, and Mr Danel Skakov, CEO of MC KazSilicon LLP attended the meeting. It was a high-level meeting and took place without lawyers with a view to finding a commercial solution.[61]

168     The Respondent states that the participants recorded their discussions in the Hong Kong Protocol and signed the document (Exhibit C-14).[62]

169     The Respondent argues that the most relevant points of agreement are set out under the header *"JACO, KAZ and CPI agreed on the following"*.[63] In the Hong Kong Protocol, the Claimant accepted the full contractual delivery volume of 280 t. Further, the Claimant agreed to providing a letter of credit for JACO's benefit. Finally, the Hong Kong Protocol looks to a new contractual arrangement directly between JACO and the Claimant. The Respondent understandably no longer wanted to be trapped as the intermediary between the Claimant and the Claim-ant's *de facto* supplier.[64]

170     The Respondent claims that although the Hong Kong Protocol looks to a new contract, none was in place, so the parties were bound by the Supplementary Agreement No. 4 at the time of the Hong Kong Meeting. The Claimant itself acknowledged this in its pre-claim letter of 7 August 2019. Referring to the addi-tional tripartite contract envisaged in the Hong Kong Protocol, the Claimant spells out: *"the Protocol does not provide and does not mean that this additional agreement will replace or change the [existing] Agreement, if the new Agreement between the Partnership and JACO is not signed."*[65]

---

[60] Cf. Respondents' SoDC, paras. 69 et seqq.
[61] Cf. Respondents' SoDC, para. 99.
[62] Cf. Respondents' SoDC, para. 101.
[63] Cf. Respondents' SoDC, para. 102.
[64] Cf. Respondents' SoDC, para. 103.
[65] Cf. Respondents' SoDC, para. 104 with reference to Exhibit C-36.



171     The Respondent argues that the Hong Kong Protocol records a trilateral struc-
        tured action plan for performing the Supplementary Agreement No. 4.[66] It con-
        tained a delivery schedule for consignments of 40 t and then 200 t of SoG-Si. In
        agreeing on that schedule, the Parties performed their major contractual obliga-
        tion under the Supplementary Agreement No. 4. JACO's performance on the
        agreed dates was, however, dependent on a letter of credit for its benefit from
        Claimant.[67]

172     The Respondent claims that the Claimant went back on the Hong Kong Protocol.
        As to the legal significance of this, Respondent makes two arguments in the al-
        ternative. On Respondent's primary case, in agreeing to the Hong Kong Protocol,
        the Claimant performed its obligation to request 40 t of SoG-Si and to agree a
        schedule for the delivery of the remaining 200 t. Having agreed that schedule,
        the Claimant cannot go back. The Respondent argues that, alternatively, if the
        Arbitral Tribunal were to find that the Parties' obligation to agree a schedule and
        make a request were more flexible, then the Respondent argues, that even if the
        Claimant were entitled to go back on the Hong Kong Protocol, it would still be
        obliged to agree a schedule and request a 40 t-batch. In the event, the Claimant
        made no request and agreed no schedule. Consequently, the Respondent's obli-
        gation to deliver the outstanding SoG-Si never accrued and the Claimant has no
        claim now. Even to the extent the Respondent was obliged to deliver any part of
        the SoG-Si, the Claimant's persistent efforts to renegotiate or terminate the Con-
        tract prevented Respondent's performance. The Claimant cannot bring a claim
        accusing the Respondent of performing obligations that the Claimant prevented
        the Respondent from doing.[68]

173     The Respondent further argues that one of the Claimant's obligations under the
        Hong Kong Protocol was to provide a letter of credit in favour of JACO for the
        outstanding contract price. The Claimant did not do so. It claims it could not have
        provided a letter of credit unless the Claimant had also entered into a contract
        with JACO. The Respondent argues that the Claimant's explanation is implausible
        and is not supported by the contemporaneous documentation.[69]

174     The Respondent also comments on the Claimant's argument that the Respond-
        ent did not agree to the transfer or assignment of the Contract to JACO. By letter
        from the Claimant to the Respondent dated 13 June 2016 (Exhibit C-30), the
        Claimant alleges that the Respondent agreed in Hong Kong to the Claimant's con-
        tracting directly with JACO. The thrust appears to be that if the Claimant con-
        tracted directly with JACO, it would do so at the prices under the JACO contract.

---

[66] Cf. Respondent's Post-Hearing Brief, para. 47.
[67] Cf. Respondents' SoDC, para. 107.
[68] Cf. Respondent's Post-Hearing Brief, para. 50.
[69] Cf. Respondents' Post-Hearing Brief, paras. 51 et seq.



The Claimant then takes the lower prices and different payment schedules under that contract to demand reimbursement of USD 336,000 from the Respondent.[70] Such reimbursement had neither been discussed nor agreed in Hong Kong. The Claimant's principal motivation was therefore to renegotiate the Contract in order to obtain a refund from the Respondent. The Respondent notes that while any party is free to renegotiate the Contract, that does not absolve it from its obligations under the Contract.[71]

175     The Respondent further argues that the Claimant vaguely claims that it had entered into the Contract or perhaps one or other Supplementary Agreement under duress. The Respondent explains that duress is a legal doctrine which states that a contract is voidable where a party's consent or agreement has been obtained by illegitimate pressure from its counterparty. The victim of duress is entitled to make an election or choice either to void the contract or to continue to perform it. The standard of duress is very high. Fundamentally, however, the allegation of duress is irrelevant. The Claimant's entire case is premised on the validity of the Contract and the Supplementary Agreements. At no point did it purport to void it nor does it seek a declaration to that effect in its prayers for relief.[72]

176     The Respondent notes that in its Request for Arbitration, the Claimant invoked Articles 6.1 and 8.1 of the Contract in support of its claims. The Respondent argues that it did not breach these provisions and that they do not entitle the Claimant to damages.[73]

177     In its **legal section**, the Respondent argues that the Claimant's case rests on two pervasive misconceptions: that its principal claim is one for a debt, USD 1,296,000 and that the debt corresponds to 72 t of undelivered SoG-Si at the contract price of USD 18 per kilogram. The Claimant builds the argument that it paid USD 1,997,776.68 to the Respondent, received goods worth just USD 701,776.68 corresponding to 38.98759 t of SoG-Si, and is now entitled to its money back.[74]

178     The Respondent contends that the Claimant is wrong to characterize the sums claimed as a debt. To do so would presuppose that the Respondent owed the Claimant that amount or that the Claimant had a right to it. The Claimant cannot just assert a right to be refunded for money paid to the Respondent under a contract. It must establish a right in law, whether that is a right under the Contract,

---

[70]   Cf. Respondents' SoDC, para. 113.
[71]   Cf. Respondents' Post-Hearing Brief, paras. 55 et seqq.
[72]   Cf. Respondents' Post-Hearing Brief, para. 27.
[73]   Cf. Respondents' Post-Hearing Brief, paras. 28 et seq.
[74]   Cf. Respondents' SoDC, para. 126.



i.e. contained in the Contract, a right to damages to compensation for breach of contract, or a right that otherwise arises under the applicable law. It must then prove facts that support that legal entitlement. And finally, the Claimant must show that it suffered the loss in respect of which it seeks compensation. The Claimant fails on each and every count.[75]

179    The Respondent continues that the second misconception is a symptom of the Claimant's distortion and simplification of the provisions for payment under the Contract. The USD 1,296,000 claimed may arithmetically correspond to the price of 72 t of SoG-Si, but that is neither here nor there. The Respondent has set out in detail that the Contract provides for staggered payments in successive tranches with each payment making up a part-payment towards the total contract volume or batch.[76]

180    Specifically, the Respondent has shown that Supplementary Agreement No. 4, the relevant agreement, imposes an obligation on the Claimant to request delivery of 40 t of SoG-Si and an obligation on both parties to agree a schedule for delivery. The Claimant failed to perform either obligation putting itself in breach of contract. As a result, the Claimant's claim fails on the following grounds:[77]

181    First, the Respondent's obligation to deliver the outstanding SoG-Si did not accrue, because the Claimant failed in any meaningful and practicable way to request the outstanding 40 t and failed to agree a schedule for the delivery of the outstanding 200 t. The Claimant put itself in breach of contract when it went back on the Hong Kong Protocol: this contained the request for the 40 t and schedule for the delivery of the 200 t.[78]

182    Alternatively, to the extent the Arbitral Tribunal finds that Additional Agreement No. 4 entitled the Claimant to go back on the Hong Kong Protocol, the Respondent submits that the Claimant put itself in breach of contract through its failure to take any constructive steps to agree a new or better schedule. Again, on the alternative case, the Respondent's obligation to deliver the outstanding goods never accrued.[79]

183    Second, if and to the extent the Arbitral Tribunal finds that the Respondent's obligation to deliver the outstanding SoG-Si accrued, the Respondent argues that the Claimant made it practically impossible for the Respondent to perform that obligation. The Claimant acted in a manner inconsistent with the Contract

---

75    Cf. Respondents' SoDC, para. 127.
76    Cf. Respondents' SoDC, para. 128.
77    Cf. Respondents' SoDC, para. 134.
78    Cf. Respondents' SoDC, paras. 135 et seq.
79    Cf. Respondents' SoDC, para. 137.



offering to assign or transfer the Respondent's obligations in return for a payment. In those circumstances, the Claimant cannot demand performance.[80]

184 Third, the Respondent relies on a further independent ground. If and to the extent the strictures of the Kazakh authorities made the Claimant's continued performance impossible, then Claimant incapacitated itself, that is to make it impossible for it to perform Supplementary Agreement No. 4.[81] In support of that argument, the Respondent refers to the Claimant's letter dated 30 June 2016 (Exhibit C-31) and claims that the Claimant asserted that it had no more access to funds for a year and would have to recover sums already expended under the Contract. The Respondent continues that the Claimant's position should be treated as no different from that of a contracting party that is indebted and unable to secure financing to perform its obligations.[82]

185 As to the **penalty payment**, the Respondent notes that the Claimant claims a contractual penalty under Article 9.2 of the Contract at the maximum, capped amount of USD 72,000. The Claimant calculates the penalty in relation to the outstanding delivery of 40 t in relation to the period from 5 August 2014 to 26 September 2019. In the event, the Claimant is not entitled to the penalties claimed. No period predating Supplementary Agreement No. 4 can be considered. By extending the delivery schedule the Claimant waived any entitlement to penalties in relation to earlier delays. Further, no delay can be considered before the Claimant requested delivery of the 40 t under Supplementary Agreement No. 4, which, it is submitted, it did at the Hong Kong Meeting in May 2016. No delay can be considered up to the end of 2016, because the Claimant prevented performance. Finally, no delay can be considered after the end of 2016, because, under the terms of Supplementary Agreement No. 4, the contract term lapsed.[83]

186 As to the **administrative penalty**, the Respondent argues that the Claimant tries to pass on an administrative penalty of 4,538,000 tenge or USD 11,707 to Respondent. This apparently relates to Claimant's breaches of Kazakh foreign currency regulations. The Respondent claims that the Claimant has no entitlement to recover this. It is too remote from the parties' contractual performance to be recoverable. The Claimant's compliance with Kazakh regulations is not Respondent's responsibility.[84] The Respondent takes the position that an American company operating in an alien and very different market cannot be taken to have assumed responsibility for its counterparty's exposure to peculiarly local risks.[85]

80 Cf. Respondents' SoDC, para. 138.
81 Cf. Respondents' SoDC, para. 139.
82 Cf. Respondents' SoDC, para. 139.
83 Cf. Respondents' SoDC, para. 150.
84 Cf. Respondents' SoDC, para. 151.
85 Cf. Respondents' Post-Hearing Brief, para. 63.

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

187    As to the **counterclaim**, the Respondent argues that the Claimant's breaches of contract prevented the Respondent from performing its obligations under the Contract. Consequently, the Respondent lost the benefit of USD 2 per kilogram of SoG-Si that it would have earned if the Parties had fully performed the Contract by the Respondent delivering 280 t. The Respondent now claims damages to put it in the position that it would have been in but for the Claimant's breach of contract.[86] The adjusted counterclaim is quantified with USD 316,875.03.[87] The Respondent claims simple interest on the sums claimed at a rate of 8 per cent p.a. from the date of the award in which the Arbitral Tribunal orders damages in favour of the Respondent until such date as the Claimant discharges its debt to the Respondent.[88]

## 4.4.    The Respondent's Prayers for Relief

188    In paragraph 57 of the Terms of Reference, the Respondent formulated the following Prayers for Relief:

> *"The Respondent requests the Arbitral Tribunal issue an award –*
>
> *(i) dismissing the Claimant's claims in their entirety;*
>
> *(ii) granting the Respondent's counterclaim and ordering the Claimant to pay to the Respondent outstanding commission in the order of USD 560,000, to be finally quantified in the course of proceedings;*
>
> *(iii) order the Claimant to pay interest on sums awarded to the Respondent at a rate to be specified at a later date; and*
>
> *(iv) order that the Claimant should bear the Respondent's costs incurred in these proceedings, including but not limited to the Respondent's legal fees and disbursements, the Respondent's reasonable disbursements and other costs incurred by the Respondent."*

---

[86] Cf. Respondents' SoDC, paras. 152 et seqq.

[87] Cf. Respondents' Post-Hearing Brief, para. 64. For the computation of the counterclaim cf. the Respondent's opening presentation, slide 28 and the Claimant's opening presentation, slide 53.

[88] Cf. Respondents' Rejoinder and Reply to the Counterclaim, para. 104.



189     In its Post-Hearing Brief, the Respondent presented the below Prayers for Re-lief:[89]

> "a. declaring that it has jurisdiction over the present dis-pute;
> b. dismissing Claimant's request that it should find Re-spondent in breach of Clauses 6.1 and 8.1.1 of the Con-tract;
> c. dismissing Claimant's claim for damages in its en-tirety;
> d. granting the counterclaim in the amount of USD 316,875.03;
> e. dismissing Claimant's request that Respondent should bear the costs of the arbitration;
> f. ordering Claimant to pay simple interest on damages awarded under the counterclaim at a rate of 8 per cent p.a. from the date of such award in which the damages are awarded and up to the date on which Claimant pays them to Respondent;
> g. ordering Claimant to bear the full costs of the arbitra-tion, including but not limited to legal fees, disburse-ments and the costs and fees of the Arbitral Tribunal and the ICC, and reimburse Respondent for those costs that it has incurred;
> h. dismissing all other claims and requests by Claimant."

190     The Respondent's Prayer for Relief (a) concerns the Sole Arbitrator's jurisdiction. This is not a contentious matter, and the same declaration was sought by the Claimant in its Request for Arbitration.[90] The Respondent's Prayer for Relief (b) mirrors a relief the Claimant had sought in its Request for Arbitration (but which the Claimant no longer maintained when the Terms of Reference were drawn up).[91] The wording of other prayers for relief slightly changed compared to the ones presented in the Terms of Reference, but remained in substance the same, with the exception of the reduction of the quantum of the Respondent's counterclaim.

---

[89]   Cf. Respondents' Post-Hearing Brief, para. 66. In its Submission on Costs, the Respondent rectified a typographic error of its Prayers for Relief in the introductory sentence, which reads in its final version: *"In light of the foregoing Re-spondent requests that the Arbitral Tribunal render a final and binding award –"*.
[90]   Cf. Claimant's Request for Arbitration, para. 21. See also the Terms of Reference, para. 53, quoting from the Claim-ant's Request for Arbitration.
[91]   Cf. Claimant's Request for Arbitration, para. 21. See also the Terms of Reference, para. 53, quoting from the Claim-ant's Request for Arbitration.



191     The Sole Arbitrator notes that the Claimant did not object to these Prayers for Relief. Any changes made do not amount to any *"new claims"* in the meaning of Article 23(4) ICC Rules, and no such objection was made by the Claimant. The Respondent's Prayers for Relief as presented in its Post-Hearing Brief will therefore form the basis of the Sole Arbitrator's decision.

## 5.     The Sole Arbitrator's considerations

### 5.1.     Summary of the main relevant facts

192     This section contains a short summary of the factual background of this dispute.

193     The Parties concluded on 13 June 2014 the Contract (Exhibit C-1). Under the Contract, the Respondent would supply 280 t of SoG-Si to the Claimant by the end of 2014. The total contract price was USD 5,040,000 for 280 t of SoG-Si with a price of USD 18 per kilogram (Article 6.1 of the Contract in conjunction with Annex No. 1 of the Contract).

194     The Contract provided for payment in three instalments: a 20% advance payment of the total cost of SoG-Si to be supplied under the Contract, a 60% pre-payment for each batch of SoG-Si to be supplied, and the remaining 20% upon receipt of the supplied SoG-Si (Article 6.3 of the Contract).

195     The Parties entered into three supplementary agreements, each of which, *inter alia*, extended the date of validity of the Contract. Under the last supplementary agreement, the Supplementary Agreement No. 4, the Contract was valid until end of 2016 (Clause 1 of the Supplementary Agreement No. 4).

196     By the end of 2016, the Claimant delivered 38,987.59 kilogram of SoG-Si (which corresponds to USD 701,776.68 pursuant to the contractually agreed price of USD 18 per kilogram),[92] and the Claimant paid to the Respondent USD 1,997,776.68 under the Contract.[93]

197     The Claimant claims to have the advance payment returned, the payment of the contractually agreed penalty for late delivery and the reimbursement of an administrative fine. The Respondent claims that the Claimant's breaches of contract

---

[92] Cf. Claimant's Reply and Defence to the Counterclaim, para. 126; Claimant's Post-Hearing Brief, para. 2.10; Respondent's SoDC, para. 39; Respondent's Rejoinder and Reply to the Counterclaim, para. 15; Respondent's Post-Hearing Brief, para. 23.

[93] Cf. Claimant's Reply and Defence to the Counterclaim, para. 59; Claimant's Post-Hearing Brief, para. 2.8; Respondent's SoDC, para. 58; Respondent's Post-Hearing Brief, para. 24.



prevented the Respondent from performing its obligations under the Contract, and that, consequently, the Respondent was lost the benefit of USD 2 per kilo-gram of SoG-Si that it would have earned if the Parties had fully performed the Contract.

### 5.2.    The Sole Arbitrator's jurisdiction

198    Both Parties requested, at some point, the Sole Arbitrator to declare that he has jurisdiction over the present dispute.[94]

199    The Sole Arbitrator's jurisdiction is based on the arbitration clause contained in Article 13 of the Contract (Exhibit C-1), and the Sole Arbitrator's jurisdiction over the Claimant's claims and the Respondent's counterclaim remained undisputed between the Parties.

200    The Sole Arbitrator has therefore jurisdiction over the Claimant's claims and the Respondent's counterclaim.

### 5.3.    The Claimant's claim for payment of USD 1,296,000

#### 5.3.1.    The matter in dispute

201    The Claimant claims payment of USD 1,296,000.[95]

202    For the purpose of determining that claim, the Sole Arbitrator deems it worth-while to first identify on which points the Parties agree.

203    The Sole Arbitrator notes that a number of issues are common ground between the Parties. In particular, the Parties agree that

-    the Claimant paid to the Respondent USD 1,997,776.68 under the Contract;[96] and that

---

94   Cf. Claimant's Request for Arbitration, para. 21; Respondents' Post-Hearing Brief, para. 66.
95   Cf. Claimant's Post-Hearing Brief, para. 11.7.
96   Cf. Claimant's Reply and Defence to the Counterclaim, para. 59; Claimant's Post-Hearing Brief, para. 2.8; Respondent's SoDC, para. 58; Respondent's Post-Hearing Brief, para. 24.



- the Respondent supplied 38,987.59 kilogram of SoG-Si under the Contract, which the Parties agree corresponds, on the basis of the agreed price of USD 18 per kilogram, to USD 701,776.68.[97]

204   The Respondent formulated the points of agreement as follows in its Rejoinder and Reply to the Counterclaim:[98]

> "The sum of USD 1,296,000 represents the total of Claim-
> ant's advance payments to Respondent under the Con-
> tract of USD 1,997,776.68 less USD 701,776.68 for SoG-
> Si delivered by Claimant. The figures and calculations are
> common ground."

205   The Parties, however, disagree as to whether the Claimant can claim the amount of USD 1,296,000.

206   The Claimant appears to primarily base its claim on the Supplementary Agree-ment No. 3 and argues, in essence, that under this amendment, the Parties agreed that the Respondent shall return the balance of the advance payment upon reconciliation.[99] As to the relation between the Supplementary Agreement No. 3 and No. 4, the Claimant claims that the Supplementary Agreement No. 4 does not replace the Supplementary Agreement No. 3 entirely, but only those provisions to which it specifically refers.[100]

207   The Respondent, in turn, takes the position that the Supplementary Agreement No. 3 is superseded by the Supplementary Agreement No. 4 and cannot serve as a basis for the Claimant's claim.[101]

208   The Sole Arbitrator agrees that the Supplementary Agreement No. 3 and its re-lation to the Supplementary Agreement No. 4 are relevant to decide this dispute.

209   The issue at question pertains to the interpretation of the Contract and its amendments. To that end, the Sole Arbitrator will briefly set out the general prin-ciples under English law and the Parties' respective positions thereon.

---

[97] Cf. Claimant's Reply and Defence to the Counterclaim, para. 126; Claimant's Post-Hearing Brief, para. 2.10; Respond-ent's Rejoinder and Reply to the Counterclaim, para. 15; Respondent's Post-Hearing Brief, para. 23.

[98] Cf. Respondent's Rejoinder and Reply to the Counterclaim, para. 15.

[99] Cf., e.g., Claimant's Post-Hearing Brief, paras. 2.16 et seqq. Cf. also the Claimant's letter dated 18 October 2019, Exhibit C-38, in which the Claimant requested refund of the advance payment by relying on the "special contractual obligation" Clause 4 of the Supplementary Agreement No. 3. Cf. also Respondents' SoDC, para. 40 and Respondent's Post-Hearing Brief, para. 30 summarizing Claimant's position.

[100] Cf. Claimant's Post-Hearing Brief, paras. 2.16 et seqq.

[101] Cf. Respondent's Post-Hearing Brief, para. 36.



210     The Respondent set forth the principles in its SoDC and submitted a legal author-ity to that end,[102] noting , however, that *"[t]here is no need to consider rules of contract interpretation under English law at any length"* because *"[t]he meaning of the key provisions is clear enough, if they are only read with care and a little commercial sense"*.[103] The Claimant accepts the validity of the principles relied upon by the Respondent, but argues that one would only need to resort to them where the contractual terms were ambiguous. The Claimant claims that in the present case, one should focus on *"the express terms (established in the Con-tract) and the implied terms (business practice, previous experience of coopera-tion between the parties, the court or the law)"*.[104]

211     The Parties appear to agree that the contractual terms are rather straightforward and that, as a consequence thereof, there is no need in the present case to dwell at length on the applicable rules of interpretation. Still, the Sole Arbitrator be-lieves that it is worthwhile to first set out, in brevity, the basic rules of contract interpretation under English law. In essence, the Sole Arbitrator believes, the Parties' positions do not differ, since English law considers both the *"express terms"* and the background of the contract, which covers, to the extent relevant, factors such as *"previous experience of cooperation between the parties"*.

### 5.3.2.   Principles of contract interpretation under English law

212     The basic principle reads as follows:

> *"Interpretation is the ascertainment of the meaning which the document would convey to a reasonable per-son having all the knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract".[105]*

213     The parties' agreement is interpreted objectively:

> *"It is important to note that 'the reasonable person' is the notional audience, not the notional parties. The rea-sonable audience will expect parties to a legal docu-ment to have said something which, against the availa-ble background, makes rational sense, but will not necessarily expect them to have been reasonable in the*

---

[102] Respondent's SoDC, paras. 21 et seqq. and Exhibit RL-2, Peel E., The Law of Contract, Fifteenth Edition, 2020.
[103] Respondent's SoDC, para. 21.
[104] Claimant's Reply and Defence to the Counterclaim, para. 21.
[105] Exhibit RL-2, Peel E., The Law of Contract, Fifteenth Edition, 2020, para. 6-041 quoting from *Investors Compensation Scheme Ltd v West Bromwich Building Society ICS.*



> *sense of being fair to each other. It does not matter whether that meaning would have been in some commercial sense 'reasonable' or not."*[106]

214   Further principles relate to (i) the background at the time of the contract, which *"includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man",*[107] (ii) the striking of the proper balance between the literal meaning and the contextual meaning under which *"the court must consider the contract as a whole and, depending on the nature, formality and quality of drafting of the contract, give more or less weight to elements of the wider context in reaching its view as to that objective meaning",*[108] and (iii) recent decisions stressing the primacy of the language of the contract[109].

### 5.3.3.   Interpretation of the Contract

215   To decide the present dispute, the Supplementary Agreement No. 3 and No. 4 need to be assessed.

216   Supplementary Agreement No. 3:

- consists of six clauses[110]; and amends

- in Clause 1 Article 6.1 (reducing the total costs of the goods under the Contract to USD 1,421,776.68);

- in Clause 2 Article 13.6 (extending the end date of the Contract to 31 December 2015); and

- in Clause 3 Annex No. 1 (delivery of 40 t of SoG-Si up to 31 December 2015 and reducing the *"Total under the Contract"* to 79 t of SoG-Si); and

- Clause 4 deals with the reconciliation by the end of 2015 (the end date of the Contract pursuant to the then amended Article 13.6) and contains the following wording:

---

[106] Exhibit RL-2, Peel E., The Law of Contract, Fifteenth Edition, 2020, para. 6-042 quoting Lord Hoffmann.

[107] Exhibit RL-2, Peel E., The Law of Contract, Fifteenth Edition, 2020, para. 6-043 quoting from *Investors Compensation Scheme Ltd v West Bromwich Building Society ICS*.

[108] Exhibit RL-2, Peel E., The Law of Contract, Fifteenth Edition, 2020, para. 6-044 quoting from *Wood v Capita Insurance Services Ltd*.

[109] Exhibit RL-2, Peel E., The Law of Contract, Fifteenth Edition, 2020, para. 6-045 referring to *Arnold v Britton*.

[110] Exhibit C-3; the Supplementary Agreement No. 3 contains Clauses 1 to 4 and 6 to 7. There is no Clause 5.



> *"The Parties reached mutual agreement that within a pe-*
> *riod before **December 31, 2015** on the basis of corre-*
> *sponding Act of reconciliation the Supplier undertakes to*
> *return the cash balance to the Buyer, paid by the Buyer*
> *earlier in a form of advanced payment according to par-*
> *agraph 6.3 of the Contract, as a single payment to the*
> *account of the Buyer stated in the Contract."*

- Clause 6 governs the entry into force and Clause 7 the execution of the Supplementary Agreement No. 3.

217 Supplementary Agreement No. 4:

- consists of five clauses; and amends

- in Clause 1 Article 13.6 (extending the end date of the Contract to 31 December 2016);

- in Clause 2 Annex No. 1 (delivery of 40 t of SoG-Si by not later than 31 December 2016);

- in Clause 3 deals with the delivery schedule and contains the following wording:

> *"CPI and KazSilicon will agree on a new schedule for the*
> *delivery of the remaining SOG Si under the original con-*
> *tract."*

- Clause 4 governs the entry into force and Clause 5 the execution of the Supplementary Agreement No. 4.

218 The Sole Arbitrator will first assess the Supplementary Agreement No. 3 and No. 4 from a literal perspective.

219 The Respondent argues that the Supplementary Agreement No. 4 replaced the Supplementary Agreement No. 3.[111] Based on the wording of the agreements, the Sole Arbitrator disagrees with this position to the extent the Respondent claims that the Supplementary Agreement No. 4 replaced the Supplementary Agreement No. 3 in its entirety. There is no clause in the Supplementary Agreement No. 4 calling for a complete replacement of the Supplementary Agreement

---

[111] Cf. Respondent's Post-Hearing Brief, para. 36.



No. 3. Rather, the Supplementary Agreement No. 4 provides for the amendment of specific clauses.

220    The Claimant, in turn, argues that the Supplementary Agreement No. 4 did neither amend Clause 6.1 nor did it cancel Clause 4 of the Supplementary Agreement No. 3.[112] That is, on its face, correct.

221    The Sole Arbitrator further notes that pursuant to Article 13.8 of the Contract, these supplementary agreements form *"an integral part of the Contract"*. Thus, contractual provisions introduced in a supplementary agreement, or changes made to contract clauses, which were thereafter not amended in any subsequent supplementary agreement remain, in principle, binding for the Parties.

222    Based on a literal construction, and read in conjunction, the status therefore was that upon signing of the Supplementary Agreement No. 4,

- the latest version of Article 6.1 (stemming from the Supplementary Agreement No. 3) provided in relevant parts that *"[t]he total costs of the Goods under the Contract in accordance with Annex No. 1, which is an integral part, is – 1 421 776, 68 (one million four hundred twenty-one thousand seven hundred seventy-six dollars and sixty eight cents) USD"*; that amount corresponds, on the basis of the contractually agreed price of USD 18 per kilogram, to about 79 t of SoG-Si.

- the latest version of Article 13.6 (stemming from the Supplementary Agreement No. 4) provided in relevant parts that the Contract *"is valid until December 31, 2016"*;

- the latest version of Annex No. 1 (stemming from the Supplementary Agreement No. 4) provided: *"- 20 MT of SOG-Si delivery time before July 23, 2014; - 19 MT SOG-Si supply date up to October 2, 2014; - 40 MT of SOG-Si delivery at the request of the Buyer, but not later than December 31, 2016;"*; and

- the Contract contained both a clause providing that upon a reconciliation, *"the Supplier undertakes to return the cash balance to the Buyer, paid by the Buyer earlier in a form of advanced payment according to paragraph 6.3 of the Contract, as a single payment to the account of the Buyer stated in the Contract"* (stemming from the Supplementary Agreement No. 3) and a clause *"CPI and KazSilicon will agree on a new schedule for the delivery of the remaining SOG Si under the original contract"* (stemming from the Supplementary Agreement No. 4).

---

[112] Cf. Claimant's Post-Hearing Brief, paras. 2.23 and 2.25.





223    In line with English law principles of contract interpretation, the Sole Arbitrator will now consider the wider contractual context and background at the time of conclusion of the Supplementary Agreement No. 3 and No. 4 as well.

224    The Sole Arbitrator notes that Clause 4 of the Supplementary Agreement No. 3 is not an anomaly in the contractual framework between the Parties, but rather seems to fit into the contractual context.

225    More specifically, Article 8.4.3 of the Contract provides:

> "[Customer has the right:] Unilateral refusal to imple-
> ment this Contract at its own discretion only by sending
> the written notice on immediate stopping of supply of
> goods under Contract followed by payment for the actu-
> ally incurred and documentary confirmed expenses of
> the Supplier, about what authorized representatives of
> the Parties subscribe the Act of the actual calculations.
> In this case the Contract is considered as terminated
> within 30 (thirty) calendar days from the date of send-
> ing of such notice in written form to the Supplier."

226    Under that clause, the Claimant has the right to refuse the implementation of the Contract at its own discretion and to immediately stop the supply of SoG-Si. When issuing such notice, the Claimant would have to pay the actually incurred and documentary confirmed expenses of the Supplier.

227    Further, Article 11.3 of the Contract states:

> "[This Contract may be terminated by Contract of the
> Parties, in the cases provided for by the Contract, or uni-
> laterally initiated by one of the parties in the following
> cases:] In the event of early termination, the Customer
> pays the documented amount actually received the
> goods on the date of termination of the Contract, about
> what the Act of the actual calculations is signed by au-
> thorized representatives of the Parties."

228    Pursuant to that clause, if the Contract is terminated early, the Claimant pays the amount of the actually received SoG-Si on the date of termination.

229    Those provisions show that the Parties foresaw the possibility that the Claimant might terminate the Contract before the delivery of the entire amount of SoG-Si with the effect that the Claimant would only need to pay for the amount received by the termination date (and any expenses).



230     Clause 4 of the Supplementary Agreement No. 3 fits to those provisions. By the end date of the Contract (pursuant to the Supplementary Agreement No. 4 by the end of 2016) and upon reconciliation, the Claimant would pay for the amount received by that date.

231     The Sole Arbitrator will now move from an interpretation of Clause 4 of the Supplementary Agreement in light of the wider contractual context to an assessment of the factual background at the time of the contract. The Sole Arbitrator notes in that regard that the Claimant's termination letter dated 2 October 2015 (Exhibit C-23) and the ensuing discussion shortly preceded the conclusion of the Supplementary Agreement No. 3, and therefore formed the background of that supplementary agreement.

232     By letter dated 2 October 2015 (Exhibit C-23), the Claimant:

-    terminated the Contract (*"[... ] we hereby terminate the Contract in accordance with paragraph 11.2. as of October 15, 2015"*),

-    requested delivery of the outstanding 40 t SoG-SI (*"[...] considering our partnership aimed for a long-term cooperation, and also taking into account your readiness to deliver 40 MT of SoG Si, we kindly ask you to execute shipment within shortest time (not later October 15, 2015)"*),

-    demanded the Respondent to return the advance payment of USD 1,296,000 for the amount for which no delivery was made (*"under terms and conditions of the said Contract, we ask you to return funds transferred to your account in the form of advance payment. According to data of 'MC KazSilicon LLP.' the debt of your company to 'MC KazSilicon LLP.' amounts to $1 296 000.00 (one million two hundred ninety six thousand) (USD) as of September 30, 2015"*), and

-    expressed its intention to discuss, following the performance of the present agreement, the delivery of the amount of SoG-Si originally provided for in the Contract (*"After performance of the present Contract, we suggest to consider conclusion of the new contract for delivery of the remained volume of SoG Si"*).

233     By letter dated 6 October 2015 (Exhibit C-25), the Respondent accepted, in principle, the Claimant's right to terminate the Contract and to ask for the return of the advance payment (Exhibit C-25, p. 4):

        *"CPI hereby acknowledges KazSilicon's request to terminate the Contract and will inform JACO of this request. CPI will further request JACO to return the prepayment*



*executed in June 2014 for the remaining undelivered SOG material.*

*CPI is currently working in China on the next delivery of SOG to KSS. I expect personally to be in China before the end of the month to negotiate the termination of the contract with JACO. CPI will inform you as soon as we have more information about the termination.*

*In the meantime, CPI's financial department is reviewing the verification report that you sent us in September 2015. We will send you our comments as soon as our financial review is completed. We will also inform you of the exact amount left to be repaid to KazSilicon after termination of the contract."*

234     By letter dated 6 October 2015, the Claimant confirmed that the Contract had expired and that it was necessary to transfer the money back (Exhibit C-26):

*"At the same time, as you know, period of validity of the Contract No. OMTO/14-79 dated June 13, 2014 'On procurement of purified solar grade silicon from single source method' (further in the text - the Contract), concluded between our companies, expired. According to Samruk-Kazyna JSC' Procurement Rules for goods, works and services, MC KazSilicon LLP has no possibility to prolong the Contract.*

*In this regard, according to Currency Control Rules and bank's order, it is necessary to terminate the Contract and transfer money back. Besides, it is necessary to deliver 40 MT of SoG Si, which the advance payment was made for.*

*On completion of the said specified procedures, in case of interest of Kazakhstan Solar Silicon in SoG Si, the question of new contract conclusion will be considered."*

235     By letter dated 13 October 2015, the Respondent, while expressing disappointment, did not deny the Claimant's right to terminate the Contract and to have funds returned for not delivered material (Exhibit C-27, p. 2):

*"While CPI will use its best efforts to honor the request to terminate the contract, we must first ship the 40MT that*



> *is scheduled to be shipped by November 15th, and then*
> *do a complete reconciliation for the amount of the pay-*
> *ment that needs to be returned to KazSilicon."*

236    That discussion formed the backdrop of the Supplementary Agreement No. 3. The content of the Supplementary Agreement No. 3, including its Clause 4, were consistent with that discussion. The Sole Arbitrator does therefore not share the Respondent's argument that *"[t]he circumstances of the conclusion of Supplementary Agreement No. 3 support Respondent's view that the parties did not seriously intend to depart from the original contract volume"*,[113] and that Supplementary Agreement No. 3, and presumably in particular its Clause 4, was *"an anomalous short-term fix"*.[114]

237    The circumstances of the conclusion of the Supplementary Agreement No. 3 rather suggest that a reasonable person would have understood that the delivery amount would be reduced, that the Respondent would need to repay the amount for which no delivery was made and that the Parties would, following the performance of the present agreement and therefore at a later stage, discuss an agreement on the delivery of the amount originally foreseen by the Parties.

238    When Supplementary Agreement No. 3 and No. 4 are read in conjunction, from the perspective of a reasonable person, the status was that the Parties agreed that (i) the Contract ended by end of 2016, (ii) the Respondent would deliver 40 t of SoG-Si at the request of the Claimant, but not later than by the end of 2016, (iii) the Respondent would return the advance payment for which no delivery was made by end of 2016, and (iv) the Parties would agree on a new schedule for SoG-Si for the amount originally provided for under the Contract.

239    The Parties disagree as to whether by concluding the Supplementary Agreement No. 4, they merely recorded their intention to agree on a new schedule in a separate agreement, as the Claimant argues, or whether they bindingly reinstated the original amount of 280 t, as the Respondent claims.

240    The Sole Arbitrator is more convinced by the Claimant's position that the agreement between the Parties *"on a new schedule for the delivery of the remaining SOG Si under the original contract"* as foreseen in Clause 3 of the Supplementary Agreement No. 4 would have taken the form of a separate agreement.

241    Such reading is supported by the argument that upon signing the Supplementary Agreement No. 4, the latest version of Article 6.1 was that the total costs of the

---

[113] Cf. Respondent's Post-Hearing Brief, para. 34.
[114] Cf. Respondent's Post-Hearing Brief, para. 31.



goods under the Contract were USD 1,421,776.68, which corresponded to about 79 t of SoG-Si. So the total costs under the Contract remained with the amount for delivery of 79 t. The Claimant's position is also in line with the Parties' prior conduct as reflected by the supplementary agreements, by which the Parties recorded the delivery schedules in form of a signed agreement. In such a separate agreement, the Parties would have, consistent with their prior conduct, presumably amended Article 6.1 by increasing the total costs of the goods accordingly.

242     Further, the understanding to agree on a separate agreement was already reflected in the Claimant's letter dated 2 October 2015, by which the Claimant notified the Respondent of the termination of the present Contract, and its proposal that "*[a]fter performance of the present Contract, we suggest to consider to consider conclusion of the new contract for the delivery of the remained volume of SoG Si*" (Exhibit C-23). This is the position the Claimant communicated to the Respondent, which formed the backdrop of the conclusion of the Supplementary Agreement No. 3 and No. 4.

243     The Claimant repeated that understanding after the conclusion of the Supplementary Agreement No. 3 and No. 4. By letter dated 31 October 2016, the Claimant wrote (Exhibit C-34, p. 3):

> "*To date we have a signed supplementary agreement to the Agreement No OMTO/14-79 dated 13.06.2014, in which we changed overall volume of polysilicon supply from 280 MT to 79 MT. Wherein, the parties have to come with a solution regarding remaining 201 MT before December 31, 2016.*"

244     The Sole Arbitrator notes that the Respondent disputed this statement by arguing that "*[t]o our understanding, there has never been an agreement between the parties that the Silicon volume agreed in the contract #OMTO/1479 have been changed*" (Exhibit C-35). The Sole Arbitrator, however, considers that claiming that there never was an agreement changing the volume is not reconcilable with the Supplementary Agreement No. 3.

245     The Sole Arbitrator further notes that the Respondent argues that the use of the term "*remaining*" SoG-Si volume in Clause 3 of the Supplementary Agreement No. 4 suggests that the Parties did not intend to reduce the amount of delivery.[115] The Sole Arbitrator is not convinced that such meaning can be attached to that word in the present context. It rather appears that when using the term

---

[115] Cf. Respondent's Post-Hearing Brief, para. 36.



*"remaining"*, the Parties referred to the difference between the now reduced amount to the amount provided for *"under the original Contract"*.

246     At the hearing, Dr Ounadjela, the Chief Executive Officer of the Respondent, stated that he had received the Supplementary Agreements No. 3 and No. 4 at the same time and signed them back-to-back. More specifically, he testified:

> *"When I received from KS the amendment, the Amendment No. 3, I received from KS in December Amendment No. 3 and Amendment No. 4 together in an email saying that KS is facing issues with the legal – the local regulation for -- that enforced to have an agreement to be signed, under the law, so they asked me to sign agreement number 3 which was actually a first version, a version pretty much of this one, and there was an agreement number 4 which was almost a continuation of an agreement that would reach, actually, the end of 2016.*

> *So we focused on agreeing on Amendment No. 4 because it will precede -- it will come into force as the agreement that will be actually valid until 2016, until the end of 2016, so if you refer to this agreement, it was signed back-to-back with the Amendment No. 4."[116]*

> *"The Agreement No. 3 and the Agreement No. 4 [...] came together and were signed back-to-back. The Agreement No. 3 was actually an agreement with main purpose, was actually to solve regulatory issues at KazSilicon between their authorities. Agreement No. 4 was the agreement that came into force until December 2016, [...]"[117]*

247     The Claimant denies that the Supplementary Agreements No. 3 and No. 4 were sent and signed at the same time.[118]

248     There are a number of observations to be made in that regard:

---

[116] Transcript Day 2, p. 59/23-25 and p. 60/1-14 (Cross-examination of Dr Ounadjela). Cf. also Respondent's Post-Hearing Brief, para. 31.
[117] Transcript Day 2, p. 80/20, 22-25 and p. 81/1-2 (Cross-examination of Dr Ounadjela). Cf. also Respondent's Post-Hearing Brief, para. 31.
[118] Claimant's Post-Hearing Brief, paras. 2.15 et seqq.

249    First, the date on the two amendments suggests that these two supplementary agreements were concluded at different points in times. It would therefore have been on the Respondent to submit evidence supporting the notion that the dates on the supplementary agreements do not correspond to the actual course of events. That, it appears, would have been a straightforward task for the Respondent. For one, the Respondent could have submitted the mail correspondence to which these amendments were attached. But no such correspondence is on record.

250    Further, the Respondent's earlier statements conflict with the testimony. In its SoDC, the Respondent commented on the Supplementary Agreement No. 4 by noting that the Parties *"entered into the agreement just three months after the previous Supplementary Agreement, dated 22 October 2015, which suggests the earlier agreement had very soon proved unworkable"*[119] and that *"[t]he parties replaced it with Supplementary Agreement No. 4 only three months later"*.[120]

251    The Sole Arbitrator also notes that this allegation was made at a late stage of the proceedings, namely for the first time at the hearing. Had the Respondent viewed this as an important point, one would have expected it to raise that issue on an earlier occasion.

252    The Sole Arbitrator does not question the credibility of Dr Ounadjela, whom he considered to be, like all witnesses who testified, an honest witness. But the Sole Arbitrator finds that, on balance, the evidence on record rather supports the position that the Supplementary Agreements No. 3 and No. 4 were concluded at different points in time, as indicated by their date.

253    However, even if these two supplementary agreements had been presented to the Respondent at the same time, the Sole Arbitrator does not view such circumstance as relevant to change his assessment. If a party receives two supplementary agreements at the same time, which do not overlap in all points which they address, one might well regard them as being of equal importance. By signing them, the Parties approved them and declared to be bound by them. This is consistent with Article 13.8 of the Contract, which provides that the supplementary agreements form *"an integral part of the Contract"*.

254    Therefore, whether the Respondent signed the Supplementary Agreement No. 3 a few months before signing the Supplementary Agreement No. 4, or at the same date, does, eventually, not alter the legal effect that both of these agreements have become valid and binding. To the extent Supplementary Agreement No. 3

---

[119] Cf. Respondents' SoDC, para. 41.
[120] Cf. Respondents' SoDC, para. 85.



is not superseded by Supplementary Agreement No. 4, the Parties remain to be bound by it.

255    The Sole Arbitrator further notes that the Respondent referred in its Post-Hearing Brief to a testimony made by the Claimant's witness Mr Baizhumin (the Acting Director General of the Claimant from October 2016 to August 2020) at the hearing as regards the Contract volume.[121] More specifically, the Respondent refers to the below testimony:[122]

> "MR GREINEDER: Mr Baizhumin, paragraph 15 of your witness statement, you say there, [...] 'During the entire period of work under our CPI contract, only 38 out of 280 tonnes were supplied'. The amount, then, that was due to be supplied was 280 tonnes, correct?
>
> A Yes, that's correct."

256    The Respondent argues on that basis that the Claimant's witness Mr Baizhumin agreed that the Contract volume was 280 t. The Sole Arbitrator, however, rather views this testimony to confirm the Parties' original agreement to deliver 280 t and was made in connection with the Claimant's position that it had made advance payments for that amount, but had only received about 38 t in return. This seems to be further confirmed upon reading paragraph 15 of Mr Baizhumin's witness statement dated 9 February 2021 (CWS-1) in full. Despite referring to the *"entire period of work"*, the focus of the quoted sentence, if read in context, appears to primarily lie on the time period before the conclusion of the Supplementary Agreement No. 3 (*"A year or a year and a half later, he did convince KazSilicon of the need for a trilateral meeting in Hong Kong"*).

257    In any event, the Sole Arbitrator does not believe that the quoted witness testimony is specific and clear enough to contradict the Claimant's position that the delivery amount was reduced to 78 t by Supplementary Agreement No. 3. Similar considerations apply to other singular statements referred to by the Respondent (which include questions asked by Mr Abishev to Dr Ouandjela in cross-examination, wording in the Hong Kong Protocol and in the Claimant's Reply and Defence to the Counterclaim).[123] If read in context, the Sole Arbitrator does not believe that they could be understood to alter the general position the Claimant has taken in its pre-arbitration correspondence and in this arbitration.

---

[121] Cf. Respondent's Post-Hearing Brief, para. 38.
[122] Transcript Day 1, p. 111/14-22 (Cross-examination of Mr Baizhumin).
[123] Cf. Respondent's Post-Hearing Brief, para. 38.



258    In summary, the status upon the signing of the Supplementary Agreement No. 4 was that that (i) the Contract ended by end of 2016, (ii) the Respondent had to deliver 40 t of SoG-Si at the request of the Claimant, but not later than by the end of 2016, (iii) the Respondent would return the advance payment for which no delivery was made by end of 2016, and (iv) the Parties would agree on a new schedule for SoG-Si for the amount originally provided for under the Contract in the form of a separate agreement. The question now arises as to the relevance of the Hong Kong Protocol.

### 5.3.4.   The Hong Kong Protocol

259    It is undisputed between the Parties that a tripartite meeting took place in Hong Kong from 4 to 5 May 2016 that was attended by representatives of the Claimant, the Respondent and JACO.[124] The Parties, however, seem to disagree on the results that were achieved during that meeting.

260    The Respondent argues that the most relevant points of agreement in the protocol are set out under the header *"JACO, KAZ and CPI agreed on the following"*.[125] In short, the Respondent argues that in the Hong Kong Protocol, (i) the Claimant accepted the full contractual delivery volume of 280 t, (ii) the Claimant agreed to provide a letter of credit for JACO's benefit, and (iii) the Hong Kong Protocol looks to a new contractual arrangement directly between JACO and the Claimant.[126] The Claimant, however, takes the position that (i) the Respondent first had to deliver 40 t of SoG-Si and only thereafter the parties would discuss the issuance of a letter of credit, that (ii) in order to obtain the letter of credit, the Claimant needed to be bound by a contractual relationship with JACO, and that the Claimant therefore invited the Respondent to conclude an assignment agreement by which its obligations would have been transferred to JACO, but that the Respondent rejected that proposal, and that (iii) the Hong Kong Protocol did not in any way replace or change the terms of the Contract, but was only made in view of a yet to be concluded subsequent contractual relationship.[127]

261    The Sole Arbitrator believes that in a first step, the nature of the Hong Kong Protocol needs to be examined.

262    The Parties seem to agree that the Hong Kong Protocol does not qualify as a contract with enforceable rights and duties for the Parties.

---

[124] Cf., e.g., Claimant's Post-Hearing Brief, paras. 3.1 et seqq.; Respondents' SoDC, paras. 99 et seqq.
[125] Cf. Respondents' SoDC, para. 102.
[126] Cf. Respondents' SoDC, para. 103; Respondent's Rejoinder and Reply to the Counterclaim, paras. 70 et seqq.
[127] Cf. Claimant's Post-Hearing Brief, paras. 3.5 et seqq.



263     The Claimant argued that the Hong Kong Protocol "*does not reflect the tripartite expression of the will of all parties, but enshrines the preliminary agreement of each of the parties in relations with each other*" [128] and characterized it as an "*informal arrangement*".[129]

264     The Respondent, in turn, stated in its Rejoinder and Reply to the Counterclaim:[130]

> "*It is not Respondent's case that the protocol is a contract. Consequently, the question of governing law does not arise. Rather, Respondent analyses it under the aspect of the parties' obligations under Supplementary Agreement No. 4 and performance of those obligations, specifically to agree a schedule for the delivery of 200 t of SoG-Si and for Claimant to request the outstanding 40 t of SoG-Si.*"

265     The Respondent confirmed that position in its Post-Hearing Brief:[131]

> "*It is not relevant to Respondent's case whether the Hong Kong Protocol resulting from the meeting and signed by the participants is a contract in its own right. Claimant's arguments about the governing law of such an agreement are beside the point. The issue is rather that the Hong Kong Protocol represents a serious effort by Respondent to perform its obligations and is to be judged in light of the parties' obligations under Supplementary Agreement No. 4.*
>
> *The Hong Kong Protocol records a trilateral structured action plan for performing Supplementary Agreement No. 4.*"

266     The Sole Arbitrator shares the view that the Hong Kong Protocol records an attempt by the Parties to resolve the pending issues. In particular, as it derives from contemporary correspondence, the Claimant was rather desperate to receive 40 t of SoG-Si. The Respondent, in turn, depended on delivery by JACO, and sought to find a way out of the situation by involving JACO in the discussion. The Sole Arbitrator, however, also is of the opinion that the Hong Kong Protocol does not qualify as a contract, and that it does not contain binding obligations.

---

[128] Cf. Claimant's Reply and Defence to the Counterclaim, para. 101.
[129] Cf. Claimant's Reply and Defence to the Counterclaim, para. 107.
[130] Cf. Respondent's Rejoinder and Reply to the Counterclaim, para. 62 (footnotes omitted).
[131] Cf. Respondent's Post-Hearing Brief, paras. 46 et seq. (footnotes omitted).



267    This is also supported by the circumstances. The Respondent confirms that it was a high-level meeting and took place without lawyers with a view to finding a commercial solution.[132] Such meetings are meant to resolve issues, but not to impose binding obligations on the parties.

268    The Sole Arbitrator sees no reason to believe that the Parties did not act with the best intentions in mind when attending that meeting. While it might be regrettable that the steps envisaged in the Hong Kong Protocol were eventually not implemented (and the Claimant says were not possible to be implemented), the Sole Arbitrator does not believe that this impacts the Parties' legal position that existed upon entering into the Supplementary Agreement No. 3 and No. 4.

269    The Sole Arbitrator therefore believes that the meeting in Hong Kong was an attempt to find a solution, and that the Hong Kong Protocol recorded the results of those discussions, but they were not legally binding on the Parties. The Hong Kong Protocol did therefore not alter the Parties' rights and duties under the Contract. It therefore follows that, e.g., the Claimant remained entitled to the delivery of 40 t SoG-Si without any duty to issue a letter of credit.

270    While the Respondent agrees that the Hong Kong Protocol is not a contract, it argues that it should be analysed *"under the aspect of the parties' obligations under Supplementary Agreement No. 4 and performance of those obligations, specifically to agree a schedule for the delivery of 200 t of SoG-Si and for Claimant to request the outstanding 40 t of SoG-Si"*.[133] The Sole Arbitrator is not convinced by that argument.

271    It follows from the correspondence on record that by May 2016, it was of utmost importance to the Claimant to receive 40 t of SoG-Si for which it had already settled the entire advance payment about a year ago.[134] The Sole Arbitrator will elaborate on the Claimant's request for delivery in more detail further below,[135] but notes already here that the pending delivery of 40 t of SoG-Si was an issue which the Claimant repeatedly raised in its correspondence, such as in its letter dated 2 October 2015 (Exhibit C-23), where the Claimant wrote that *"we kindly ask you to execute shipment [of 40 MT of SoG Si] within shortest time (not later October 15, 2015)"*. The Claimant again requested delivery of 40 t of SoG-Si at the meeting in Hong Kong in May 2016 (the urgency of which is reflected in the

---

[132] Cf. Respondent's SoDC, para. 99; Respondent's Rejoinder and Reply to the Counterclaim, para. 80.

[133] Cf. Respondent's Rejoinder and Reply to the Counterclaim, para. 62 (footnotes omitted).

[134] Cf. Respondent's SoDC, paras. 58, 68: *"Finally, on 29 May 2015, Claimant paid USD 432,000. This amount corresponded to the 60% pre-payment for the third lot of 40 t, whose estimated price was USD 720,000."*

[135] Cf. in particular paras. 304 et seqq. below.



minutes[136]) and is acknowledged by the Respondent.[137] The Sole Arbitrator is therefore not convinced that the Hong Kong Protocol is properly characterized by describing it as a *"performance"* of the Claimant's obligation to request delivery of 40 t SoG-Si. Rather, the communication on record shows that the Parties were well aware that the Claimant had been waiting for the delivery for a considerable time, and that the Claimant agreed to the meeting *"to help CPI get out of the situation"*,[138] namely the Claimant's difficulty to obtain, on its part, the delivery by JACO, which would have allowed the Respondent to fulfil its delivery obligations towards the Claimant.[139] The Sole Arbitrator does therefore not share the view that the Claimant's participation in the Hong Kong meeting, or the decisions recorded in the Hong Kong Protocol, can be qualified as a fulfilment of its contractual duty. Rather, it is more aptly described as a good faith attempt by the Claimant to help resolving the Respondent's difficulties to deliver the pending amount of 40 t of SoG-Si (to which the Claimant was neither obliged nor which created legal obligations upon the Claimant) and on the occasion of which the Claimant repeated its need to receive the delivery of 40 t of SoG-Si *"as quickly as possible"*. As to the agreement for a schedule for the delivery of 200 t of SoG-Si, the Sole Arbitrator finds the Claimant's position convincing that the reason for the Claimant to attend that meeting was to obtain the pending delivery of 40 t SoG-Si.[140] It is understandable that a party first wants to receive a pending delivery, for which it had settled the entire advance payment about a year ago, and would only thereafter bindingly agree on the delivery schedule for an additional amount. That order of priority was already reflected in the Claimant's letter dated 2 October 2015 (Exhibit C-23), by which the Claimant sought to terminate the Contract and in which it proposed that *"[a]fter performance of the present Contract"* – a performance which included the delivery of 40 t of the SoG-Si – *"we suggest to consider conclusion of the new contract for delivery of the remained volume of SoG Si"*. Consistent therewith, the Sole Arbitrator found above that a binding agreement on the delivery of the originally foreseen amount would have taken the form of a separate agreement,[141] which the Parties eventually never concluded. Therefore, the Sole Arbitrator does also not share the

---

[136] Cf. Exhibit C-14, p. 2: *"It is extremely important for KAZ to obtain the prepaid 40 MT of SoG silicon as quickly as possible [...]."*

[137] Cf. Respondent's SoDC, para. 150.

[138] Cf. Claimant's Post-Hearing Brief, para. 3.2.

[139] Cf. Claimant's Reply and Defence to the Counterclaim, para. 99: *"The tripartite meeting in Hong Kong was a consequence of the Respondent's inability to fulfil its obligations to the Claimant and, as it turned out, the presence of problem issues in the relationship between JACO and the Respondent."*

[140] Cf. Claimant's Reply and Defence to the Counterclaim, para. 107: *"[...] we should not forget about the real purpose of the Hong Kong meeting, namely, the determination of the deadlines of 40 MT shipment, which the Respondent had to ship to the Claimant and for which it had received money long time ago [...]."* Cf. also Claimant's Post-Hearing Brief, para. 3.2.

[141] Cf. paras. 240 et seqq. above.



view that the Hong Kong Protocol can be characterized as the fulfilment of the Claimant's duty to agree on a delivery schedule.

### 5.3.5.    The Respondent's alleged intermediary role

272    The Respondent further argues that it entered into the JACO contract purely to perform the Contract,[142] that the Claimant paid it USD 1,997,776.68 and that the Respondent, in turn, made payments totalling USD 1,754,651.71 to JACO under the JACO contract (Exhibit C-27). The Respondent claims that for every payment made by the Claimant to the Respondent, the Respondent made an equivalent payment to JACO, corresponding to the terms of the JACO contract.[143] The Respondent therefore claims that it *"does not have the money any more having paid it almost entirely to JACO and been entitled to keep the rest"*.[144] Further, the Respondent claims that it was *"committed to purchasing 280 t of SoG-Si under the JACO Contract with no option to reduce the volumes"* and *"that terminating the Contract and reimbursing Claimant would have been commercially a practical impossibility"*.[145]

273    The Sole Arbitrator understands that for the Respondent to perform its obligations under the Contract towards the Claimant, the Respondent depended on the delivery by JACO under its contract with JACO. That role assumed by the Respondent placed it in the present case in a difficult situation. However, the Sole Arbitrator agrees with the Claimant that in the relevant relationship between the Claimant and the Respondent under the Contract, the Respondent assumed the role of the supplier, and that only the rights and duties contained in that relationship are relevant to decide the present dispute. It is, under the Contract, not the Claimant's concern how or from whom the Respondent sourced SoG-Si, the Claimant is only concerned about receiving the requested amount on time. The Respondent's contract with JACO is therefore the Respondent's responsibility, not the Claimant's. The Respondent acknowledges that the Contract granted the Claimant more favourable termination rights than the Respondent possessed under the JACO contract (*"However, Respondent does not have a broad right of termination equivalent to Claimant's under Clause 8.4.3 of the Contract"*).[146] To the extent the Contract between the Claimant and the Respondent provides the Claimant with more favourable rights than the Respondent possesses under the JACO contract that is a commercial risk that, eventually, must be borne by the Respondent. For the determination of the present dispute, it is therefore not decisive whether the Respondent is still in possession of the funds paid by the

[142] Cf. Respondents' Post-Hearing Brief, para. 22.
[143] Cf. Respondents' SoDC, para. 58.
[144] Cf. Respondent's Post-Hearing Brief, para. 24.
[145] Cf. Respondent's Post-Hearing Brief, para. 33.
[146] Cf. Respondent's SoDC, para. 55.



Claimant or whether the Respondent forwarded it (partially) to JACO, whether the JACO contract mirrors the Contract or to which extent these agreements deviate from each other, and, eventually, whether the Claimant exercising its rights under the Contract might place the Respondent in a difficult situation in another contract. In the present case, the Sole Arbitrator only needs to determine the rights and duties of the Parties under the Contract.

### 5.3.6.   The reconciliation act

274     Based on the above considerations, the Sole Arbitrator therefore concludes that the Claimant can invoke Clause 4 of the Supplementary Agreement No. 3 to request to have the advance payments returned for which the Respondent did not deliver an equivalent amount of SoG-Si on the basis of the contractually agreed price of USD 18 for 1 kilogram of SoG-Si.

275     Clause 4 of the Supplementary Agreement No. 3 bases the claim for repayment on a *"corresponding Act of reconciliation"*. The Respondent denies that the Claimant ever drew up a reconciliation act.[147] The Respondent does not address that point in any further detail, and the Sole Arbitrator disagrees with that statement.

276     Upon review of the correspondence exchanged between the Parties, the Sole Arbitrator notes that on a number of occasions, the Claimant set out the status of the actual delivery and that it demanded repayment on that basis.

277     By letter dated 25 September 2015 (Exhibit C-20), the Claimant wrote that it would demand the return of its payment if no delivery of the outstanding 40 t was made:

> *"We repeatedly informed you that non-delivery of SoG Si creates big problems for Kazakhstan Solar Silicon plant. The KazSilicon LLP gets claims because of this fact. In this regard, we ask you to provide us the accurate schedule of shipment of 40 MT SoG Si till October 01, 2015. Otherwise, these circumstances force us to terminate the Contract No. OMTO-14/79 of June 13, 2014 and to demand earlier paid money return."*

278     By letter dated 2 October 2015 (Exhibit C-23), the Claimant sought to terminate the Contract and demanded repayment in the amount of USD 1,296,00:

---

[147] Cf. Respondent's Post-Hearing Brief, para. 35.



"With this letter, in conformity with expiration of the Contract No. OMTO/14-79 'On procurement of purified solar grade silicon from single source method' (hereinafter - the Contract) dated June 13, 2014, we hereby terminate the Contract in accordance with paragraph 11.2. as of October 15, 2015.

In this regard, under terms and conditions of the said Contract, we ask you to return funds transferred to your account in the form of advance payment.

According to data of 'MC KazSilicon LLP.' the debt of your company to 'MC KazSilicon LLP.' amounts to $1 296 000.00 (one million two hundred ninety six thousand) (USD) as of September 30, 2015. For verification of the actual calculations the relevant Verification Report was sent to you. We ask it to sign and to send it back to our address.

At the same time, considering our partnership aimed for a long-term cooperation, and also taking into account your readiness to deliver 40 MT of SoG Si, we kindly ask you to execute shipment within shortest time (not later October 15, 2015).

After performance of the present Contract, we suggest to consider conclusion of the new contract for delivery of the remained volume of SoG Si."

279    By letter dated 6 October 2015 (Exhibit C-25), the Respondent accepted, in principle, that upon the termination of the Contract, the Claimant was entitled to have the payment returned for the remaining undelivered material (Exhibit C-25, p. 4):

"CPI hereby acknowledges KazSilicon's request to terminate the Contract and will inform JACO of this request. CPI will further request JACO to return the prepayment executed in June 2014 for the remaining undelivered SOG material.

CPI is currently working in China on the next delivery of SOG to KSS. I expect personally to be in China before the end of the month to negotiate the termination of the



> *contract with JACO. CPI will inform you as soon as we have more information about the termination.*
>
> *In the meantime, CPI's financial department is reviewing the verification report that you sent us in September 2015. We will send you our comments as soon as our financial review is completed. We will also inform you of the exact amount left to be repaid to KazSilicon after termination of the contract."*

280    By letter dated 6 October 2015 (Exhibit C-26), the Claimant stated that the Contract had expired and that it was necessary to transfer money back:

> *"At the same time, as you know, period of validity of the Contract No. OMTO/14-79 dated June 13, 2014 'On procurement of purified solar grade silicon from single source method' (further in the text - the Contract), concluded between our companies, expired. According to Samruk-Kazyna JSC' Procurement Rules for goods, works and services, MC KazSilicon LLP has no possibility to prolong the Contract.*
>
> *In this regard, according to Currency Control Rules and bank's order, it is necessary to terminate the Contract and transfer money back. Besides, it is necessary to deliver 40 MT of SoG Si, which the advance payment was made for.*
>
> *On completion of the said specified procedures, in case of interest of Kazakhstan Solar Silicon in SoG Si, the question of new contract conclusion will be considered."*

281    By letter dated 13 October 2015 (Exhibit C-27), the Respondent, while expressing disappointment, did not deny the Claimant's right to terminate the Contract and to have funds returned for not delivered material (Exhibit C-27, p. 2):

> *"While CPI will use its best efforts to honor the request to terminate the contract, we must first ship the 40MT that is scheduled to be shipped by November 15th, and then do a complete reconciliation for the amount of the payment that needs to be returned to KazSilicon."*



282    By letter dated 15 March 2016 (Exhibit C-29), the Claimant repeated that it had a claim for repayment of USD 1,296,000 and proposed that the Respondent might deliver SoG-Si instead:

> "As you know, at the moment a work is being carried out on search for options to solve the issue of repayment of account receivables of CPI towards MC 'KazSilicon' LLP on supply of solar grade silicon in amount of 1 296 000 USD in accordance with Agreement JVb OMTO/14-79 dated 13.06.2014.
>
> One of such options is the repayment of account receivables by means of supply of solar grade silicon. In this regard, we kindly ask you to provide us with information on availability of solar grade silicon ready for shipment on Jaco plant in China with volume of 60MT."

283    By letter dated 13 June 2016 (Exhibit C-30) the Claimant provided an overview of payments made and deliveries received, arriving at a balance of USD 1,296,000 as "debt" of the Respondent to the Claimant (Exhibit C-30, p. 1):

> "As it is known, there is a concluded Agreement between KazSilicon and CPI on supply of solar grade silicon with a volume of 280 MT OMTO/14-79 dated 13.06.14 on total amount of 5 040 000 USD (hereinafter- Agreement).
>
> Towards CPI a lump-sum advance payment was made in amount of 936 000 USD (20% of 260 MT volume), as well as 80% of cost of every following bat[c]hes. As of today two batches were supplied with volume of 19 992,830 kg and 18 994,76 kg respectively on total amount of 701 776,68 USD. 72 000 USD was taken from the advance payment for SOG purchase. The debt for advance payment is 864 000 USD.
>
> On 29.05.2015. a prepayment was done for 40 MT in amount of 432.000 USD. As of today CPI's debt towards MC 'KazSilicon' LLC under this Agreement is 1 296 000 USD (debt for advance payment + prepayment for 40 MT)."

284    In that letter, the Claimant also submitted another proposal. The Claimant argued that the parties at the meeting in Hong Kong were of the opinion that the execution of the Contract in the current form was not possible, and that the



Respondent accepted that the Claimant and JACO would directly contract for the supply of SoG-Si. To that end, the Claimant proposed that the Respondent would assign its rights towards JACO to the Claimant and that the Respondent would refund USD 336,000 to the Claimant. That amount is, in essence, based on the Claimant's presumption that if the Claimant were to directly contract with JACO, it would do so at the lower prices under the JACO contract and so the Respondent would have to repay the difference resulting from the higher prices under the Contract.[148]

285     By letter dated 30 June 2016 (Exhibit C-31, p. 1), the Claimant reiterated its position, summarising that:

> "At the moment, KazSilicon has paid 1 296 000 US dollars and can not get any money or silicon for more than 1 year."

286     It repeated its proposal that the Respondent would assign its rights to the Claimant and make a repayment of USD 336,000. The Claimant informed the Respondent that if that offer is not accepted, the Claimant would need to resort to arbitration. By letter dated 19 July 2016 (Exhibit C-32), the Respondent did not accept that offer. The Respondent argued, amongst others, that the Claimant provided services under the Contract and was entitled to full payment for the work performed, that the Claimant needed to conclude its current obligations with the Respondent prior to signing a new contract with JACO and that the Claimant had no right to enter into an agreement with JACO without getting a three party agreement that included the Respondent.

287     By letter dated 5 September 2016 (Exhibit C-33), the Claimant repeated that if its offer is not accepted, the Claimant is entitled to "seek repayment of the entire debt to the sum of USD 1,296,000". On 28 September 2016, the Claimant sent a proposed "Mediation Agreement" to the Respondent, which again recorded that "[t]he total debt of Party-2 [the Respondent] to Party-1 [the Claimant] is 1 296 000 USD" (Exhibit R-15). On 13 October 2016, the Respondent made clear in its response that no solution could be found on the basis of the Claimant's proposal by referring to JACO's position (Exhibit R-11).

288     By letter dated 31 October 2016 (Exhibit C-34), the Claimant noted that its offer was rejected, and therefore informed the Respondent that "CPI has a debt to LLP 'MC KazSilicon' in the amount of 1.296 million USD", and requested to make a refund or to deliver commodity of 72 t of SoG-Si.

---

[148] Cf. also Respondent's SoDC, para. 113.



289     In 2019, the Claimant notified the Respondent of the initiation of arbitration. In its letter dated 18 October 2019 (Exhibit C-38), the Claimant wrote that the Parties agreed in the Supplementary Agreement No. 3 to change Article 6.1 of the Contract by reducing the total cost to USD 1,421,776.68, reflecting a reduction to 79 t by reducing the total scope of material from 280 t to 79 t, pursuant to the revised price. The Claimant argued that the Supplementary Agreement No. 4 did not modify Article 6.1 of the Contract, but obliged for delivery of 40 t by end of 2016. The Claimant continued that the Hong Kong Protocol did not change these agreements if no new agreements were concluded with the Claimant and with JACO. And, so the Claimant argued, no new agreements resulted from the meeting in Hong Kong. The Claimant claimed that by not delivering 40 t by end of 2016, the Respondent violated the Contract. The Claimant noted that the Contract expired by the end of 2016, and the obligation to deliver 40 t terminated. By relying on Clause 4 of the Supplementary Agreement No. 3, the Claimant argued that the Respondent had *"a special contractual obligation on advance payment refund"* and thus had to refund USD 1,296,000 as received payments for which no delivery was made.

290     Considering the correspondence exchanged between the Parties, the Sole Arbitrator finds that the Claimant gave account of the actual amount of SoG-Si delivered by the Respondent and the payments made under the Contract. The Sole Arbitrator also notes that the figures presented by the Claimant remained unchallenged. Also in this arbitration the Parties agree on (i) the amount of SoG-Si delivered by the Respondent under the Contract, (ii) the amount paid by the Claimant under the Contract, and, as a result, (iii) the amount paid by the Claimant for which no delivery was made, namely USD 1,296,000.

291     The Sole Arbitrator therefore concludes that by giving account on the amount of SoG-Si which the Respondent had delivered (which remained uncontested) and the payments the Claimant had made under the Contract (which also remained uncontested), the Claimant satisfied the requirement of the *"corresponding Act of reconciliation"*.

292     In light of this correspondence and the further considerations set out above, the Sole Arbitrator is not convinced by the Respondent's line of legal arguments.[149] The Claimant settled the entire advance payment for the delivery of 40 t of SoG-Si, and it is therefore understandable that receipt of this delivery was the Claimant's priority (and formed an issue which it wanted to resolve first before discussing and agreeing on further deliveries). The correspondence on record shows that the Claimant requested the delivery of 40 t of SoG-Si on a number of occasions. As set out earlier, under the Contract, the Claimant's entitlement to the

---

[149] Cf. Respondent's SoDC, paras. 135 et seqq. and Respondent's Post-Hearing Brief, paras. 50 et seqq.



delivery did not depend on the issuance of a letter of credit (cf. paras. 259 et seqq.) or upon any other performance by the Claimant. But even though the Claimant had paid the entire advance and had requested the delivery of 40 t of SoG-Si, the Respondent made no such delivery by the end date of the Contract. The Sole Arbitrator does therefore not share the Respondent's view that the Claimant was in breach (because the Claimant fulfilled its duties under the Contract, most notably by settling the required advance payment) nor that the Claimant rendered the performance impossible (because the Claimant was entitled to request delivery under the Contract without any further performance, such as, e.g., the issuance of a letter of credit). The Sole Arbitrator does also not follow the Respondent's argument that the Claimant acted in a manner inconsistent with the Contract by offering to assign or transfer the Respondent's obligations in return for a payment.[150] The assignment proposal by the Claimant formed part of the discussions between the Parties when contemplating how to overcome the delivery issues. The Sole Arbitrator does not consider that under the Contract, the Claimant was under any duty to look for such solutions. The Claimant was rather entitled to insist on the delivery of 40 t of SoG-Si and thereafter agree on further deliveries.

293    The Sole Arbitrator does also not share the Respondent's position that the strictures of the Kazakh authorities made the Claimant's continued performance impossible and that the Claimant therefore incapacitated itself. When making that argument, the Respondent referred to the Claimant's letter dated 30 June 2016 (Exhibit C-31) and claimed that the Claimant asserted that it had no more access to funds for a year and would have to recover sums already expended under the Contract. The Respondent continues that the Claimant's position should be treated as no different from that of a contracting party that is indebted and unable to secure financing to perform its obligations.[151] This, however, is not what the Claimant wrote. The Sole Arbitrator assumes that the Respondent refers to the statement in the Claimant's letter where it wrote that *"[a]t the moment, KazSilicon has paid 1 296 000 US dollars and can not get any money or silicon for more than 1 year"* (Exhibit C-31, p. 1). By that statement, the Claimant expressed its position that while it had made payments to the Respondent under the Contract, it had neither received in return SoG-Si nor a refund from the Respondent. The Sole Arbitrator does not see how it can be argued on that basis that the Kazakh authorities rendered the Claimant's continued performance impossible. What is correct, however, is that on other occasions, the Claimant made the Respondent aware that by the end date of the Contract, it required either delivery of SoG-Si or a refund because of the Kazakh currency regulations.[152] The Sole Arbitrator can, however, not follow the argument that such regulations rendered

---

[150] Cf. Respondents' SoDC, para. 138.
[151] Cf. Respondents' SoDC, para. 139.
[152] Cf. in particular paras. 311 et seqq. below.



the Claimant's performance impossible. The Claimant was entitled to request performance under the Contract by end of 2016, which was the end date of the Contract, and the Claimant was under no duty to agree on a further extension of the Contract.

### 5.3.7. The Sole Arbitrator's finding on the Claimant's claim for payment of USD 1,296,000

294    In conclusion, the Sole Arbitrator finds that the Claimant is entitled to a payment in the amount of USD 1,296,000 by the Respondent.

295    By that finding, the Sole Arbitrator does not deem the other the arguments made in the course of this arbitration by both the Claimant and the Respondent to be of relevance to determine the Claimant's claim for payment of USD 1,296,000.

### 5.4. The Claimant's penalty claim

296    The Claimant also claims a contractual penalty under Article 9.2 of the Contract at the maximum, capped amount of USD 72,000.[153] In relevant parts, Article 9.2 provides:

> "9.2. In the case of non-compliance and/or inadequate execution of its obligations to deliver the Goods by Supplier within the period specified in the Contract, the Customer is entitled to recyclers penalty of 1,0 (one)% of the value of undelivered goods in time for each day of delay, but not to exceed more than 10.0 (ten) % of the value of undelivered goods[.]"

297    In the Request for Arbitration (and the Updated SoC), the Claimant argues that the delivery date for delivery of 40 t SoG-Si was repeatedly postponed by way of the three supplementary agreements. Under Supplementary Agreement No. 4, the volume of 40 t had to be delivered by 31 December 2016. The Claimant then notes that "[i]n addition, to date, the Goods have not been delivered"[154] and the Claimant calculates the time period for the delay from 1 January 2017 to 26 September 2019 and arrives at 998 days. Arguing that the costs for 40 t SoG-Si amount to USD 720,000 (on the basis of the contractually agreed price of 18 USD per kilogram), and by applying the limitation of 10%, the Claimant requests payment of USD 72,000.[155]

---

[153] Cf. Claimant's Request for Arbitration/Updated SoC, para. 19.
[154] Cf. Claimant's Request for Arbitration/Updated SoC, para. 19.
[155] Cf. Claimant's Request for Arbitration/Updated SoC, para. 19. See also Terms of Reference, para. 55.



ICC Case No. 25178/HBH
FINAL AWARD

298     In its Reply and Defence to the Counterclaim, the Claimant argued that it was entitled to calculate the penalty from 5 August 2014. More specifically, the Claimant argued that the Respondent did not fulfil the Contract, and that therefore the Claimant had the right to calculate the penalty from 5 August 2014, and that each time the Contract was extended, so was the period of default by the Respondent.[156]

299     The Respondent argues that the Claimant is not entitled to the penalties claimed. It claims that no period predating Supplementary Agreement No. 4 could be considered. By extending the delivery schedule the Claimant waived any entitlements to penalties in relation to earlier delays. Further, no delay could be considered before the Claimant requested delivery of the 40 t under Supplementary Agreement No. 4, which the Respondent submits, the Claimant did at the Hong Kong meeting in May 2016. No delay could be considered up to the end of 2016, because Claimant prevented performance. Finally, no delay could be considered after the end of 2016 because, under the terms of Supplementary Agreement No. 4, the contract term lapsed.[157]

300     Before addressing the claim on the merits, the question arises whether the Claimant relied for the first time on dates preceding the end date of the Contract (i.e. 31 December 2016) in its Reply and Defence to the Counterclaim, and therefore after the signing of the Terms of Reference, and whether that would qualify as a new claim under Article 23(4) ICC Rules. The Sole Arbitrator does not consider that the Claimant's position taken in its Reply and Defence to the Counterclaim forms a new element. While somewhat vague, the Claimant suggested already in its Request for Arbitration that the postponement of the delivery date by way of the supplementary agreements constituted a delay, covering the time span from 5 August 2014 to 31 December 2016 (i.e. dates preceding the end date of the Contract).[158] Indeed, in the SoDC, the Respondent (also) argued that no penalties could be claimed prior to the end date of the Contract.[159] This shows that also the Respondent understood that the argument advanced by the Claimant in its Reply and Defence to the Counterclaim formed part of the Claimant's case at the signing of the Terms of Reference. Consistent therewith, following the filing of the Claimant's Reply and Defence to the Counterclaim, the Respondent did not object and did not argue that the Claimant had introduced a new claim. In any event, the Sole Arbitrator does not consider that the arguments

---

[156] Cf. Claimant's Reply and Defence to the Counterclaim, para. 150.
[157] Cf. Respondent's SoDC, para. 150.
[158] Cf. Claimant's Request for Arbitration/Updated SoC, para. 19: "As it follows from the case papers, the delivery time of the under-delivered Goods in the amount of 40 MT was postponed time and again, first from 05.08.2014 to 15.04.2015 (see Exh.2), then from 15.04.2015 to 31.12.2015 (See Exh.3), finally from 31.12.2015 to 31.12.2016 (See Exh.4)."

[159] Cf. Respondent's SoDC, para. 150.



presented by the Claimant in its Reply and Defence to the Counterclaim consti-
tuted a relief based on an entirely new ground, or a new cause of action that was
independent from the original claim, and did therefore not amount to a "new
claim" in the meaning of Article 23(4) ICC Rules.[160]

301     On the merits, the Sole Arbitrator shares the Respondent's view that that by en-
        tering into the supplementary agreements, the Parties agreed to postpone the
        delivery date of 40 t SoG-Si. Supplementary Agreement No. 4 provides under
        Clause 2 that *"40 MT of SOG-Si delivery at the request of the Buyer, but not later
        than December 31, 2016"*.

302     To the extent the Claimant relies on an alleged delay from 1 January 2017 on-
        wards, the Sole Arbitrator accepts the Respondent's proposition that the Con-
        tract had lapsed by end of 2016 and so did the Respondent's duty to deliver SoG-
        Si. That understanding seems, in fact, to be shared by the Claimant, which ex-
        plained in its letter dated 18 October 2019 (Exhibit C-38) to the Respondent that
        *"the Agreement expired on December 31, 2016"* and that therefore *"Obligations
        of CPI for delivery of remained 40 MT of Goods (and an obligation of the Partner-
        ship to accept Goods) were terminated"*.

303     The Claimant, however, also claimed that it was entitled to penalties as of 5 Au-
        gust 2014,[161] which includes the time period following the conclusion of the Sup-
        plementary Agreement No. 4 in early 2016 (i.e. the period from 25 January 2016
        when the Supplementary Agreement was concluded until 31 December 2016,
        when the Contract term lapsed).

304     The pending delivery of 40 t of SoG-Si was an issue which the Claimant repeatedly
        raised in its correspondence. By way of example, in its letter dated 2 October
        2015 (Exhibit C-23), the Claimant wrote that *"considering our partnership aimed
        for a long-term cooperation, and also taking into account your readiness to de-
        liver 40 MT of SoG Si, we kindly ask you to execute shipment within shortest time
        (not later October 15, 2015)"*. While that correspondence predates the conclu-
        sion of the Supplementary Agreement No. 4 and can therefore not serve as the
        starting date for calculating the penalty, such correspondence remains relevant
        because it demonstrates the Claimant's request to the Respondent to receive
        delivery of 40 t *"within shortest time"*.

---

[160] Cf. Fry/Greenberg/Mazza, The Secretariat's Guide to ICC Arbitration, 2012, paras. 3-893 et seq., 3-898; Jaisili Kull, In:
Manuel Arroyo (ed.), Arbitration in Switzerland: The Practitioner's Guide, 2nd edition, 2018, Art. 23 ICC Rules, paras.
29 et seq., 32.
[161] Cf. Claimant's Reply and Defence to the Counterclaim, para. 150.



305     The Claimant (again) requested delivery of 40 t at the meeting in Hong Kong in May 2016. This is reflected in the minutes, which, *inter alia*, state (Exhibit C-14, p. 2):

> "It is extremely important for KAZ to obtain the prepaid 40 MT of SoG silicon as quickly as possible since this issue is under strict financial and currency control of the Government of Kazakhstan and the National Bank of Kazakhstan. In the case of further delays in shipment, the National Bank will take strict measures against KAZ and KAZ will have to take legal actions to solve this issue."

306     The Respondent acknowledges that the Claimant requested delivery at the meeting in Hong Kong but claims that no delay could be considered up to the end of 2016 *"because Claimant prevented performance"*.[162] The Sole Arbitrator disagrees that the Claimant prevented performance. As set out earlier, the Sole Arbitrator does not entertain the view that the Hong Kong Protocol changed the legal obligations that existed under the Contract (cf. paras. 259 et seqq.). And under the Contract, the Respondent was under a duty to deliver 40 t upon request by the Claimant. While the correspondence on record suggests that the Claimant required delivery already when concluding the Supplementary Agreement No. 4, and that the Respondent was well aware of the Claimant's need, it is undisputed that the Claimant made such request on 5 May 2016 at the meeting in Hong Kong.

307     Later correspondence further underlines that the Claimant waited in vain for the delivery in 2016. By letter dated 30 June 2016 (Exhibit C-31), the Claimant wrote to the Respondent that *"[a]t the moment, KazSilicon has paid 1 296 000 US dollars and can not get any money or silicon for more than 1 year."*

308     The Claimant therefore requested delivery, at the latest on 5 May 2016, but no delivery was made by the end date of the Contract.

309     The Parties agree that under Article 9.2 of the Contract the Claimant cannot request a penalty of 1% of the value of undelivered goods for each day of delay, i.e. from 6 May until 31 December 2016. Rather, it is uncontested that the penalty is capped at 10% of the value of undelivered SoG-Si. The Claimant based its calculation on the value of USD 720,000 (for USD 18 per kilogram SoG-Si) and therefore claimed USD 72,000. The Respondent did not challenge these figures.

---

[162] Cf. Respondent's SoDC, para. 150.



310     The Sole Arbitrator therefore concludes that the Claimant is entitled to claim USD 72,000 under Article 9.2 of the Contract.

**5.5.     The Claimant's claim for reimbursement of the administrative fine**

311     The Claimant claims that it has the right to be reimbursed for the administrative fine paid by the Claimant in the amount of KZT 4,538,000 (which equals USD 11,707 as per the exchange rate of 26 September 2019) as a consequence of the Respondent's non-fulfilment of its contractual obligations.[163] The Claimant therefore requests payment of USD 11,707 and relies on Article 9.11 of the Contract,[164] which provides:

> *"In the event of the Customer's costs arising from late delivery of the goods by the Supplier, the latter shall reimburse these expenses under the first requirement of the Customer in writing with supporting documents and /or the signing of this Contract to consent to deductions of such expenses from the total of the Contract."*

312     The Claimant further argues that it repeatedly notified the Respondent that the Respondent's improper fulfilment of the Contract infringed currency control legislation of the Republic of Kazakhstan and would result in an administrative fine for which the Respondent were liable. The Claimant refers to Exhibits C-22, C-23, C-26, C-28 and C-34.

313     The Respondent argues that the Claimant tried to pass on an administrative penalty of KZT 4,538,000 or USD 11,707 to the Respondent, which apparently related to the Claimant's breaches of Kazakh foreign currency regulations. The Respondent denies the Claimant's entitlement to ask for recovery, arguing that it was too remote from the Parties' contractual performance to be recoverable, and is therefore irrecoverable as a matter of law. English law requires that any loss should usually either be of a type that occurs in the ordinary course of business, or fall within the special knowledge of the party in breach at the time that they parties enter into the contract. The idiosyncrasies of Kazakh currency regulations do not fall within the ordinary course of selling SoG-Si. Nor did Dr Ounadjela have any knowledge of them.[165]

---

[163] Cf. Claimant's Request for Arbitration/Updated SoC, para. 20.
[164] Cf. Claimant's opening presentation, slide 34.
[165] Cf. Respondent's SoDC, para. 151; Respondent's Rejoinder and Reply to the Counterclaim, paras. 58 et seq.; Respondent's Post-Hearing Brief, para. 63.



314    The Respondent also denies that the penalty was incurred as a result of the Respondent's wrongdoing, and that the Claimant might, for example, have been able to obtain a dollar denominated loan to compensate the authorities or used money from other sources. At the very least, it ought to have mitigated its exposure.[166]

315    It follows from the Sole Arbitrator's above considerations that the Sole Arbitrator finds that the Claimant was entitled to request delivery of 40 t of SoG-Si and a refund of payments for which no delivery was made under the Contract but that the Respondent neither made the delivery nor paid the refund by the end date of the Contract. The Respondent was therefore in breach.

316    In light of the documents on record and the Claimant's explanations, the Sole Arbitrator accepts the Claimant's position that it was fined KZT 4,538,000 by the Kazakh authorities as a result of the Claimant's non-delivery of SoG-Si and non-refundment of the advance payment.[167] More specifically, the Claimant set out the Kazakh currency regulations in quite some detail, particularly in its Request for Arbitration (and Updated SoC). In essence, under Kazakh law, where a resident transfers national or foreign currency to a non-resident for the purpose of importing goods, either the goods must be imported or the national or foreign currency must be refunded within a certain time limit ("*repatriation of the national or foreign currency [...] during the period of repatriation*"). In cases where the non-resident fails to deliver the goods on time, the resident is therefore obliged to ensure that the transferred funds are returned within the "*repatriation period*". The resident who fails to comply with the "*requirement for the repatriation*" commits an administrative offence.[168]

317    That regulatory framework explains why the Claimant repeatedly requested the Respondent to either deliver SoG-Si or to refund the advance payments by the end date of the Contract. Since neither the requested amount of SoG-Si was delivered nor a refund was made by end of 2016, the Claimant was fined with KZT 4,538,000, which is supported by the report on administrative offence dated 22 May 2017 prepared by the Almaty Branch of the National Bank of the Republic of Kazakhstan, the ruling of the Judge of the Court of Karatal District of Almaty Oblast dated 13 November 2017 and the Claimant's payment order in the amount of KZT 4,538,000 dated 25 January 2018.[169] The Respondent did not challenge, at least not in a substantiated manner, that the Claimant was imposed an administrative fine in the claimed amount on the basis of Kazakh currency

[166] Cf. Respondent's Rejoinder and Reply to the Counterclaim, paras. 57 et seqq.
[167] Cf. Exhibits C-40, C-41, C-42 and Claimant's Request for Arbitration/Updated SoC, para. 20.
[168] Cf. Claimant's Request for Arbitration/Updated SoC, para. 20.
[169] Cf. Exhibits C-40, C-41, C-42; Claimant's Request for Arbitration/Updated SoC, para. 20; Claimant's opening presentation, slides 40 et seqq.



control legislation, but rather argued that such fine could not be passed to the Respondent, mainly by taking the position that it was too remote from the Parties' contractual performance to be recoverable.

318    Under English law, where a loss is found to have been caused to the claimant as a consequence of the defendant's breach, some or all of that loss will not be recovered as damages if it is found to be too remote.[170]

319    The applicable test draws a distinction between loss occurring in the "usual course of things" ("first limb" losses) and loss occurring as a result of special circumstances ("second limb" losses).[171]

320    Thus, determining what is in the contemplation of the parties comes in two limbs: First, the knowledge of what happens "in the ordinary course of things", which is imputed to the parties whether or not they had knowledge of it. Second, where actual knowledge of special circumstances are outside the ordinary course of things but was communicated to the defendant or otherwise known by the parties.

321    Further, the test of remoteness is whether the loss resulting from the breach was within the reasonable contemplation of the parties at the time they entered into the contract. What the responding party should have deduced from the facts known to it is generally judged by the standard of the reasonable person. In deciding what the responding party should reasonably have deduced from the facts known to it, the court can take into account the commercial capacity in which it contracted, as reasonable businessmen each must be taken to understand the ordinary practices and exigencies of the other's trade or business. Where a party specialises in a particular trade, a greater knowledge of the relevant market than might have been appropriate in different circumstances may be imputed to it.[172]

322    The Respondent relied on those principles of English law and supported its position with legal authorities.[173] These principles remained unchallenged by the Claimant. Having set out the basic principles under English law, the Sole Arbitrator will now turn to the facts of this case:

323    The Sole Arbitrator notes that in the SoDC, the Respondent describes its business as follows:[174]

---

[170] Cf. RLA-6, Peel E., The Law of Contract, Fifteenth Edition, 2020, para. 20-119.
[171] Cf. RLA-6, Peel E., The Law of Contract, Fifteenth Edition, 2020, paras. 20-126 et seqq.
[172] Cf. RLA-6, Peel E., The Law of Contract, Fifteenth Edition, 2020, para. 20-123.
[173] Cf. Respondent's SoDC, para. 151; Respondent's Rejoinder and Reply to the Counterclaim, paras. 58 et seq.; Respondent's Post-Hearing Brief, para. 63.
[174] SoDC, para. 12.

> *"CPI, the Respondent company, is an innovative com-*
> *pany, incorporated in 2013 as an LLC in California, United*
> *States of America. Its focus was to develop on-grid and*
> *off-grid large scale solar power projects, especially for*
> *emerging markets. It achieved this by enabling the de-*
> *ployment of large solar power plants (>10MW) with a*
> *significant contribution of local contents. Between 2013*
> *and 2016, Respondent successfully realized projects in*
> *Kazakhstan, Morocco and Qatar."*

324     The Respondent is therefore experienced in developing projects in emerging
        markets. Currency control laws are relatively frequent in such markets. Further,
        such laws are in the publicly domain.[175]

325     Further, the Sole Arbitrator notes that the Claimant made the Respondent aware
        of the issues that the Claimant were to face under the currency regulation law
        on several occasions.

326     By letter dated 1 October 2015, the Claimant wrote to the Respondent (Exhibit
        C-22):

> *"At this point of time an independent auditor company*
> *has started procedure of audit of financial and economic*
> *activity of 'MC KazSilicon LLC.', that is also connected*
> *with the expiration of contract No. OMTO 14/79, dated*
> *June 13, 2014. The National Bank of the Republic of Ka-*
> *zakhstan with participation of other fiscal bodies of our*
> *country initiates inspection of 'MC KazSilicon LLC.' re-*
> *garding performance of the Kazakh Currency Legislation.*
> *In order to confirm the turnovers (cash flow, material as-*
> *sets) between our companies we kindly ask you to con-*
> *sider and sign the enclosed verification reports."*

327     By letter dated 6 October 2015 (Exhibit C-26), the Claimant wrote to the Re-
        spondent:

> *"At the same time, as you know, period of validity of the*
> *Contract No. OMTO/14-79 dated June 13, 2014 'On pro-*
> *curement of purified solar grade silicon from single*
> *source method' (further in the text - the Contract), con-*
> *cluded between our companies, expired. According to*

---

[175] Cf. also the references to websites in the Claimant's Request for Arbitration/Updated SoC.



> *Samruk-Kazyna JSC' Procurement Rules for goods, works and services, MC KazSilicon LLP has no possibility to prolong the Contract.*
>
> *In this regard, according to Currency Control Rules and bank's order, it is necessary to terminate the Contract and transfer money back. Besides, it is necessary to deliver 40 MT of SoG Si, which the advance payment was made for.*
>
> *On completion of the said specified procedures, in case of interest of Kazakhstan Solar Silicon in SoG Si, the question of new contract conclusion will be considered."*

328    By letter dated 15 January 2016 (Exhibit C-28, p. 2), the Claimant wrote to the Respondent:

> *"As of today CPI has a debt to 'MC KazSilicon' LLP in amount of 1 296 000 USD that were paid as advance payment for supply of solar grade silicon (Contract # OMTO/14-79 dated 13.06.14).*
>
> *KazSilicon sent notifications addressed to CPI multiple times, as well as informed you personally during the meeting in Astana on December 8-9 2015 regarding that in accordance with currency legislation of the Republic of Kazakhstan, due to expiration of the Contract, it is necessary to implement a return of advance payment or sign Supplementary agreement that extends the terms of the Contract.*
>
> *[...]*
>
> *In turn, we inform you that KazSilicon received a notice from servicing bank on urgent need for a decision on the contract N2OMTO / 14-79 dated 13.06.14. Otherwise, a violation of currency legislation of the Republic of Kazakhstan occurs and the bank will be forced to pass materials to law enforcement agencies (the notice is attached).*
>
> *In this regard, it is necessary for CPI to sign the supplementary agreement to the contract No OMTO / 14-79 dated 13.06.14 as soon as possible. Otherwise, law*



> *enforcement agencies will start checking and both KazSilicon and CPI's business reputation will suffer, which will also have a negative impact on other joint projects."*

329    Following the receipt of the first two letters of early October 2015, the Respondent signed the Supplementary Agreement No. 3 dated 22 October 2015. And following the receipt of the letter of mid-January 2016, the Respondent signed the Supplementary Agreement No. 4 dated 25 January 2016.[176] The Claimant therefore signed agreements related to its delivery duties in knowledge of the issues the Claimant faced in case of non-delivery under Kazakh currency law.

330    In light of the Respondent's expertise in developing large projects in emerging markets and the notifications the Respondent received by the Claimant, the Sole Arbitrator considers that the administrative fine was a loss falling within the "usual course of things", but in any event a loss occurring as a result of special circumstances.As to the Respondent's argument that the Claimant could have mitigated its exposure by obtaining a dollar denominated loan to compensate the authorities or used money from other sources,[177] the Sole Arbitrator is not convinced that assuming a debt to cover for an outstanding performance would have satisfied the Kazakh authorities and would have solved the issue in the long term.

331    The Sole Arbitrator therefore finds that the Claimant is entitled to be reimbursed by the Respondent for the payment of the administrative fine.

332    The Claimant claims USD 11,707 (the currency for payments under Article 6.2 of the Contract) as per the exchange rate of 26 September 2019 (which appears to relate to the filing of the Notice of Arbitration before the Swiss Chambers' Arbitration Institution).[178] This remained unchallenged.

333    The Sole Arbitrator therefore decides that the Respondent shall pay the Claimant the amount of USD 11,707.

### 5.6.    The Respondent's counterclaim

334    The Respondent argues that the Claimant's breaches of contract prevented the Respondent from performing its obligations under the Contract. Consequently,

---

[176] While the English version refers to the 30 December 2015, the Russian version (which takes precedence in case of discrepancies pursuant to Article 13.9 of the Contract) identifies the 25 January 2016 as the date of the Supplementary Agreement No. 4.

[177] Cf. Respondent's Rejoinder and Reply to the Counterclaim, paras. 57 et seqq.

[178] Cf. Claimant's Request for Arbitration/Updated SoC, para. 20.



the Respondent lost the benefit of USD 2 per kilogram of SoG-Si that it would have earned if the parties had fully performed the Contract for delivery of 280 t.[179] The Respondent denies the Claimant's argument that the Respondent's entitlement to damages would be capped at five per cent of the claimed amount. The Respondent argues that the cap applies to penalties for delayed payment. The Respondent is not claiming a penalty for late payment but the payment itself.[180] The Respondent claims damages to put it in the position that it would have been in but for Claimant's breach of contract. The adjusted counterclaim is quantified with USD 316,875.03.[181] It consists of the Contract price for delivery of 280 t of SoG-Si, less the contract price under the JACO contract, less the commission already earned in relation to volumes delivered, and less any payment from the Claimant to the Respondent not otherwise accounted for.[182]

335    The Claimant argues that (i) the nature of the profits remained unclear, (ii) the Respondent did not present evidence for the calculation of profit, (iii) the Respondent did not identify what exactly constituted the fault committed by the Claimant that caused the Respondent to be deprived of its profit, and (iv) it is the Respondent's fault that the Contract was not performed.[183] The Claimant also argues that the Claimant's liability for late payment was capped at five per cent of the unpaid amount under Article 9.6 of the Contract.[184]

336    The Respondent argues that English law recognizes that an injured party to a contract is entitled to damages as of right. Moreover, it recognizes the right of a party to claim damages that will compensate a party by putting it in the position it would have been in if the contract had been fully performed.[185]

337    The Respondent claims that the Claimant breached the contract, and that the Respondent is entitled to damages. As set out earlier, the Sole Arbitrator does not find that the Claimant breached the contract (cf., e.g., paras. 239 et seqq. and 259 et seqq.). The Sole Arbitrator finds that the Parties reduced the amount of delivery to 79 t, that the Claimant was entitled to request the delivery of 40 t, that the Claimant is entitled to request the return of the advance payment, and that the Contract expired by 31 December 2016.

338    As a consequence thereof, there is no basis to claim for damages for being deprived of the profit the Respondent would have made for the delivery of 280 t.

---

[179] Cf. Respondents' SoDC, paras. 152 et seqq.
[180] Cf. Respondents' Rejoinder and Reply to the Counterclaim, para. 100.
[181] Cf. Respondents' Post-Hearing Brief, para. 64.
[182] For the computation of the counterclaim cf. the Respondent's opening presentation, slide 28, and the Claimant's opening presentation, slide 53.
[183] Cf. Claimant's Post-Hearing Brief, paras. 10.3 et seqq.
[184] Cf. Respondent's Rejoinder and Reply to the Counterclaim, para. 155.
[185] Cf. Respondents' SoDC, para. 153.



339     The counterclaim is therefore dismissed.

### 5.7.     The Sole Arbitrator's decision on the Parties' Prayers for Relief

340     In its Post-Hearing Brief, the Claimant formulated its Prayers for Relief as fol-
        lows:[186]

> *"Considering the above, the Claimant asks the Sole Arbi-*
> *trator to recover from the Respondent in favor of the*
> *Respondent:*
> *1. The amount of unjustified gain, namely the amount*
> *of an advance payment of 1,296,000 US dollars for the*
> *goods not delivered;*
> *2. Penalty in the amount of USD 72,000;*
> *3. Damage in the amount of US $ 11,707;*
> *4. Claimant's expenses related to the current arbitra-*
> *tion;*
> *5. Expenses of the Claimant related to the representa-*
> *tion of his interests in the International Arbitration*
> *Court of the International Chamber of Commerce.*
>
> *And also, the Claimant asks the Sole Arbitrator to reject*
> *all the claims of the Respondent."*

341     On the basis of the aforesaid, the Sole Arbitrator grants the Claimant's Prayers
        for Relief Nos. 1, 2 and 3 and its request to reject the Respondent's counterclaim.
        This amounts to an aggregate sum of USD 1,379,707.

342     The Claimant's Prayers for Relief Nos. 4 and 5 will be dealt with in the next sec-
        tion on the arbitration costs.

343     In its Post-Hearing Brief, the Respondent presented the below Prayers for Re-
        lief:[187]

> *"a. declaring that it has jurisdiction over the present dis-*
> *pute;*
> *b. dismissing Claimant's request that it should find Re-*
> *spondent in breach of Clauses 6.1 and 8.1.1 of the*

---

[186] Cf. Claimant's Post-Hearing Brief, paras. 11.7 et seq.
[187] Cf. Respondents' Post-Hearing Brief, para. 66. In its Submission on Costs, the Respondent rectified a typographic error
of its Prayers for Relief in the introductory sentence, which reads in its final version: *"In light of the foregoing Re-*
*spondent requests that the Arbitral Tribunal render a final and binding award –"*.



> Contract;
> c. dismissing Claimant's claim for damages in its en-tirety;
> d. granting the counterclaim in the amount of USD 316,875.03;
> e. dismissing Claimant's request that Respondent should bear the costs of the arbitration;
> f. ordering Claimant to pay simple interest on damages awarded under the counterclaim at a rate of 8 per cent p.a. from the date of such award in which the damages are awarded and up to the date on which Claimant pays them to Respondent;
> g. ordering Claimant to bear the full costs of the arbitra-tion, including but not limited to legal fees, disburse-ments and the costs and fees of the Arbitral Tribunal and the ICC, and reimburse Respondent for those costs that it has incurred;
> h. dismissing all other claims and requests by Claimant."

344    Both Parties' acknowledge the Sole Arbitrator's jurisdiction to decide the present dispute, and both Parties asked the Sole Arbitrator, at some point in time, to declare so.[188] The Respondent's Prayer for Relief (a) is therefore granted. As to the Respondent's Prayer for Relief (b), which mirrors a relief the Claimant had sought in its Request for Arbitration, the Sole Arbitrator notes that the Claimant has no longer maintained such request when the Terms of Reference were drawn up, and there is therefore no interest worthy of legal protection to ask to dismiss a declaratory request, which the Claimant has neither made when the Terms of Reference were discussed nor thereafter. Aside from the lack of an interest wor-thy of legal protection, that request would need to be dismissed on the merits in any event for the same reason as the Respondent's Prayers for Relief (c) is dis-missed, namely because the Sole Arbitrator considers the Claimant's claim to be justified. Considering the outcome of this case, the Respondent's Prayers for Re-lief (b), (c), (d) and (f) are dismissed. As regards the Respondent's Prayers for Relief (e), (g), and (h) (to the extent (h) also relates to the arbitration costs) will be addressed in the next section dealing with the arbitration costs.

345    All other requests, claims and counterclaims made by the Parties are rejected.

346    The Sole Arbitrator will now turn to the costs of this arbitration and their alloca-tion.

---

[188] For the Claimant, cf. Request for Arbitration/Updated SoC, para. 21.



## 6.     The costs of the arbitration

### 6.1.    The Parties' Submissions on Costs

347    Both Parties have requested, in their Prayers for Relief, an award on the costs of the arbitration, including legal fees and expenses.

#### 6.1.1.   The Claimant's Submission on Costs

348    The Claimant submitted the below table in section 2 of its Submission on Costs:

| | Description | Date | Amount |
|---|---|---|---|
| Arbitration costs to the ICC | Payment order № 37 | 25.01.2018 | 4 538 000 tenge |
| Total: | | | 4 538 000 tenge $ 11 707 |

Expenses for the CPI

| | Description | Date | Amount |
|---|---|---|---|
| Expenses for the CPI | Payment order 08 | 13.06.2014 | $ 180 000 |
| | Payment order 10 | 25.06.2014 | $ 936 000 |
| | Payment order 24 | 12.08.2014 | $ 179 871 |
| | Payment order 25 | 21.08.2014 | $ 72 000 |
| | Payment order 26 | 25.08.2014 | $ 133 143.41 |
| | Payment order 43 | 05.01.2015 | $ 64 762.27 |
| | Payment order 64 | 29.05.2015 | $ 432 000 |
| | Payment 37 | 25.01.2018 | $ 10 543 |
| Total: | | | $ 2 008 319.68 |

| | Description | Date | Amount |
|---|---|---|---|
| Services of the LLP "DASS & Partners LTD" | Payment order № 1 | 05.23.2019 | 94 420 690 tenge $ 219 583 |
| | Payment order № 4 | 30.03.2021 | 50 681 520 tenge $ 117 864 |
| Services of the LLP "Integrites Kazakhstan" | Costs for preliminary analysis carried out by «Integrites Kazakhstan» LLP | 13.03.2019 | 14 708 000 38 911$ |
| Total: | | | 159 810 210 tenge $ 376 358 |



| | Description | Date | Amount |
|---|---|---|---|
| **Arbitration costs to the ICC** | Payment order № 3 | 03.02.2020 | $ 3000 |
| | Application for money transfer in foreign currency No. 4 | 03.13.2020 | $ 2000 |
| | Payment order № 7 | 05.29.2020 | $ 25 000 |
| | Payment order № 10 | 12.08.2020 | $ 15 000 |
| **Arbitration costs to the ICC** | ICC Invoice | March 2021 | $ 45 000 |
| **Total:** | | | **$ 90 000** |

| | Description | Date | Amount |
|---|---|---|---|
| **Translation services** | Translation services of the company LLP "Eight Vision" (payment order № 101) | 03.18.2021 | 875,000 tenge ($2032.7) |
| | Translation services of the company LLP "Eight Vision" (payment order № 109) | 03.29.2021 | 1,125,000 tenge ($2613.47) |
| | Opus 2, court reporting services | March 2021 | £ 5870 $ 8151.4 |
| **Total:** | | | 5 512 198 tenge $ 12 969.87 |

### 6.1.2.   The Respondent's comments on the Claimant's Submission on Costs

349    In its comments on the Claimant's Submission on Costs, the Respondent argues that the items listed under the section "*Arbitration Requirements*" concern the merits of the case and have no place in a cost submission.[189]

350    As to the section "*Costs*", the Respondent contests that the Claimant paid USD 90,000 to the ICC as an advance on costs. The Respondent argues that the ICC only requested an advance of USD 85,000, and that it was unlikely that the Claimant paid USD 90,000 when only USD 85,00 were due.[190]

---

[189] Cf. Respondents' Comments on the Claimant's Submission on Costs, paras. 4 et seqq.
[190] Cf. Respondents' Comments on the Claimant's Submission on Costs, paras. 7 et seqq.



351    As regards the section *"Payment for Legal Services for the Support Arbitration Case"*, the Respondent notes that the Claimant claims three sums totalling KZT 159,810,210 or USD 376,358.[191]

352    The Respondent states that the first item refers to legal services rendered allegedly by Dass & Partners in the value of KZT 94,420,690 or USD 219,583. This is supported by a *"Bill No. 1 of 23 May 2019"* in English only. The document makes no reference to payment in KZT. The Respondent argues that it does not understand how the Claimant incurred this considerable sum, which the Respondent says is well in excess of reasonable market rates. The Respondent notes that it was allegedly paid six months before the Claimant filed its Notice of Arbitration with the Swiss Chambers of Arbitration Institution and three months before the Claimant first attempted to notify Respondent of its *"Pre-arbitral claim"*, dated 7 August 2019. The Respondent argues that it cannot understand how the Claimant can have incurred such costs before the arbitration had even started. To the extent the Claimant in fact incurred those amounts in relation to this arbitration, the Respondent disputes that they are reasonable.[192]

353    The Respondent states that the second item refers to legal fees of KZT 50,681,520 or USD 117,864. Again, the Respondent notes that the supporting documentation is in English only and refers only to a USD-denominated amount.[193]

354    The Respondent argues that the combined fees of Dass & Partners of more than a third of a million dollars are inconsistent with its original indication of its legal fees. The Claimant initially estimated those costs at USD 100,000, as is recorded in the Terms of Reference at para. 59 and 60. Now the Claimant suggests that it had already incurred more than twice that amount some 18 months before the Terms of Reference were even executed.[194]

355    The Respondent notes that the third item refers to the legal fees allegedly paid to Integrities Kazakhstan LLP on 13 March 2019. The Respondent notes that apparently, the law firm provided some form of preliminary analysis in the amount of KZT 14,708,000 or USD 38,911. Again, the conversion rate is unclear, nor is it clear in which currency the Claimant is claiming the sum. Integrities Kazakhstan LLP has at no time been counsel of record and its work, according to the Claimant, was apparently completed by March 2019 well before the Claimant started the arbitration.[195]

---

[191] Cf. Respondents' Comments on the Claimant's Submission on Costs, para. 9.
[192] Cf. Respondents' Comments on the Claimant's Submission on Costs, paras 10 et seqq.
[193] Cf. Respondents' Comments on the Claimant's Submission on Costs, para. 13.
[194] Cf. Respondents' Comments on the Claimant's Submission on Costs, para. 14.
[195] Cf. Respondents' Comments on the Claimant's Submission on Costs, paras. 15 et seq.



356     The Respondent further comments that it is not easy to reconcile the supporting documentation with the Claimant's Submission on Costs. The Claimant dates the services 13 March 2019 but submits two payment orders apparently dated 6 April 2017 and 24 May 2017. Neither refers to the arbitration. To the extent that the Claimant in fact incurred KZT 159,810,210 or USD 376,358 in bringing this arbitration, the Respondent submits that the fees are unreasonable and excessive. They represent more than 20 per cent of the total amounts in dispute and about twice the legal fees incurred by the Respondent.[196]

## 6.2.     The Respondent's Submission on Costs

357     The Respondent claims costs under Article 13.4 of the Contract which provides that "*[e]xpenses on carrying out arbitration will be paid according to the decision of arbitration judges*". It further claims costs under Article 38 of the applicable ICC Rules that confers a broad discretion on the Arbitral Tribunal to award costs. Whether or not the Respondent succeeds fully or in part in its defence and counterclaim, the Arbitral Tribunal should have regard to the Claimant's conduct during the proceedings.[197]

358     The Respondent states that the Claimant's conduct was not expeditious and cost-effective. The Claimant complicated the proceedings by failing to articulate its case clearly. This is particularly true of the Claimant's Request for Arbitration that contains little sustained legal argument, no paragraph numbers, poor references and citations and is generally hard to understand. The exhibits were wrongly numbered and some were submitted in Russian only. The Reply and Defence to the Counterclaim again contains almost no footnotes or clear references making it very difficult to know whether Claimant is referring to any document or merely rambling. Further, the Respondent argues that the Claimant to this day had little appreciation of the need to submit legal authorities.[198]

359     Procedurally, the Respondent refers to the Claimant's document production request, its application to file a supplement to its Statement of Claim and a Rejoinder on Counterclaim, and its application for a freezing order, all of which were dismissed. The Respondent also claims that the Claimant behaved unhelpfully in organizing the hearing and its refusal to retain the services of Opus2 for the hearing.[199]

---

[196] Cf. Respondents' Comments on the Claimant's Submission on Costs, paras. 17 et seq.
[197] Cf. Respondent's Costs Submission, paras. 2 et seq.
[198] Cf. Respondent's Costs Submission, para. 4.
[199] Cf. Respondent's Costs Submission, paras. 5 et seq.



360    It concludes that the Respondent was burdened with avoidable legal fees because it had been forced to devote more time and resources to the arbitration than the actual dispute warranted. Any cost order should compensate the Respondent for these unreasonable costs and punish rather than reward Claimant's procedural conduct.[200]

361    The Respondent claims in paragraph 8 of its Submission on Costs the below costs that it incurred in the proceedings:

| Cost Item | Documentary Evidence | Amount |
|---|---|---|
| Legal fees of Ian Meakin, barrister, counsel up to October 2020 | Payment confirmation (RC-1) | CHF 5,000 |
| Legal fees of Peter & Kim, counsel from October 2020 to April 2021 | Coversheets of invoices (RC-2) | CHF 159,276.90, including CHF 4,155 in relation to Claimant's Application for Injunction |
| Advance on Costs of the Arbitration, subject to final adjustment | ICC Payment Notice (RC-3) | USD 40,000 |
| Opus 2, court reporting services | Invoice (RC-4) | GBP 5,440 |
| Hearing interpreters | TJC Global Invoice (RC-5) | EUR 2,495 |
| Disbursements of Dr Ounadjela and Mr Pellegrin | Miscellaneous invoices (RC-6)[2] | EUR 143, and CHF 105.50, and USD 148 |
| Total | | CHF 164,382.40, and USD 40,148, and GBP 5,440, and EUR 2,638 |

362    In total, the Respondent claims CHF 164,382.40, USD 40,148, and GBP 5,440, and EUR 2,638.

---

[200] Cf. Respondent's Costs Submission, para. 7.



## 6.3.     The Claimant's comments on the Respondent's Submission on Costs

363     The Claimant rejects the Respondent's claims that the Claimant's actions were not expeditious and cost-effective. The Claimant argues that it filed its Request for Arbitration on 27 February 2020, but the Respondent submitted its response only on 20 January 2021 with the Statement of Defence and Counterclaim, though filing a summary of the case on 13 November 2020 in which it set out the Respondent's position only in general terms. The Respondent did not file an Answer to the Request for Arbitration, which is relevant under Article 38(5) ICC Rules. Further, the Claimant had considerable time to prepare the Statement of Defence and Counterclaim, while the Respondent had only 20 days to submit the Reply and Defence to the Counterclaim.[201]

364     The Claimant was committed to an expeditious process, and the Claimant therefore agreed to share the costs for Opus2. The Respondent increased the costs by insisting on additional translators, for which there was no need.[202]

365     The Claimant objects to both the compensation of CHF 5,000 to Ian Meaking and of CHF 159,276.90 to Peter & Kim for a number of reasons, including that there was no evidence that these invoices were paid. The Claimant also objects to the Respondent's recovery of the USD 40,000 arguing that the Respondent only submitted an invoice by the ICC but no proof of payment. The Respondent objects to the recovery of costs for Opus2 and the additional translators, again claiming that the Respondent only filed an invoice but not proof of payment. Further, the Respondent also objects to claims for compensation for costs related to the travel of Dr Ounadjela and Mr Pelegrin, stating that they could have attended the hearing without traveling to Geneva.[203]

## 6.4.     The Sole Arbitrator's decision on costs

### 6.4.1.     The costs of the arbitration under the Contract and the ICC Rules

366     Article 13.4 of the Contract provides that "*[e]xpenses on carrying out arbitration will be paid according to the decision of arbitration judges*". This provision appears to grant broad discretion to the Sole Arbitrator.

367     Article 38 ICC Rules states:

---

[201] Cf. Claimant's Comments on the Respondent's Submission on Costs, paras. 2 et seqq.
[202] Cf. Claimant's Comments on the Respondent's Submission on Costs, para. 6.
[203] Cf. Claimant's Comments on the Respondent's Submission on Costs, paras. 7 et seqq.



> *"1 The costs of the arbitration shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scales in force at the time of the commencement of the arbitration, as well as the fees and expenses of any experts appointed by the arbitral tribunal and the reasonable legal and other costs incurred by the parties for the arbitration.*
>
> *2 The Court may fix the fees of the arbitrators at a figure higher or lower than that which would result from the application of the relevant scale should this be deemed necessary due to the exceptional circumstances of the case.*
>
> *3 At any time during the arbitral proceedings, the arbitral tribunal may make decisions on costs, other than those to be fixed by the Court, and order payment.*
>
> *4 The final award shall fix the costs of the arbitration and decide which of the parties shall bear them or in what proportion they shall be borne by the parties.*
>
> *5 In making decisions as to costs, the arbitral tribunal may take into account such circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in an expeditious and cost-effective manner."*

368    Pursuant to Article 38(1) of the ICC Rules, the *"costs of the arbitration"* consist of two main categories:

369    First, they comprise the fees and expenses of the arbitrators and the administrative expenses of the ICC. These costs are fixed by the ICC Court in accordance with the scale in force at the time of the commencement of the arbitration. The Sole Arbitrator, however, decides on the allocation of these costs in the Final Award (Article 38(4) ICC Rules).

370    Second, the reasonable legal and other costs incurred by the Parties. The Sole Arbitrator decides on both the amount of these costs and their allocation in the Final Award (Article 38(4) ICC Rules).



371    Under the ICC Rules, an arbitral tribunal has wide discretion to decide on costs. Article 38(5) of the ICC Rules indeed leaves it to the arbitral tribunal to take into account the circumstances that it deems relevant.

### 6.4.2.    Apportionment of the costs

372    Under Article 38(5) of the ICC Rules the arbitral tribunal *"may take into account such circumstances as it considers relevant, including the extent to which each party has conducted the arbitration in an expeditious and cost-effective manner"*.

373    Consequently, Article 38(5) of the ICC Rules does not impose a method of allocation of the costs between the parties but leaves the arbitral tribunal a wide discretion in determining which party should bear the costs of the arbitration and in which proportion.

374    In exercising his discretionary power, the Sole Arbitrator will, as a starting point, in the present case follow the classic approach according to which the allocation of the costs shall be made in proportion to the outcome of the case, taking into account in particular the relative success of the claims and defences.

375    Further, as the Sole Arbitrator has considerable freedom to apportion the costs of arbitration between the Parties, he will also take into account other factors, including the behaviour of the Parties during the proceedings, as well as the outcome of the procedural decisions made during the arbitration proceedings, an approach which is also consistent with Article 38(5) of the ICC Rules and with the ICC practice.

376    In the present case, the Claimant prevails against the Respondent with respect to the return of the advance payment of USD 1,296,000, the penalty claim of USD 72,000 and the reimbursement of the administrative fine of USD 11,707. Conversely, the Respondent has not prevailed on its defences and counterclaim.

377    The Respondent, however, prevailed on a number of procedural issues, most notably in its defence to the Claimant's application for an interim order, but also in its defence to the Claimant's document production request, and its application to file a supplemented Statement of Claim and a Rejoinder to the Counterclaim. The Sole Arbitrator accepts that these applications resulted in additional costs. The Sole Arbitrator also accepts the Respondent's argument that there were aspects of the Claimant's presentation of its claim that resulted in higher costs, such as, e.g., duplicative numbering of factual exhibits, wrong references to factual exhibits, the filing of exhibits that were not referred to in the submissions, the omission to file translations and legal authorities.



378     As to the behaviour of the Parties in the proceedings, the Sole Arbitrator considers that, overall, both Parties engaged in good faith efforts in conducting this arbitration in an expeditious and cost-effective manner. The Parties agreed on a comparatively tight time schedule and, with the exception of marginal extension requests, adhered to it. Further, the Sole Arbitrator appreciated that, in principle, both Parties acted constructively and respectfully in this arbitration.

379     The Sole Arbitrator notes that the Claimant commented on the procedural timetable in its cost submission. The Sole Arbitrator, however, is not convinced by the advanced arguments. The Sole Arbitrator notes that the Parties jointly presented the procedural timetable to the Sole Arbitrator, and that this proposal was discussed and agreed on the occasion of the Case Management Conference.

380     As to the preparation of the hearing, and in particular the retention of Opus2, the Sole Arbitrator accepts the Respondent's position that it was mainly the Respondent that actively organized the hearing, in particular the retention of Opus2. In the organization of the hearing, the Claimant appeared passive at times, which even seemed to risk at some point that the hearing could take place as scheduled, and more correspondence was exchanged than would have appeared necessary.

381     On the basis of the foregoing and in an overall assessment, the Sole Arbitrator therefore finds it appropriate and fair to apportion the arbitration costs as follows: 25% shall be borne by the Claimant and 75% by the Respondent.

### 6.4.3.     Advances on the ICC arbitration costs

382     On 14 April 2020, the ICC Secretariat informed the Parties that the Secretary General had fixed a provisional advance of USD 30,000 based on the amount in dispute quantified at USD 1,379,707. Taking the payment of the filing fee of USD 5,000 into account, the ICC Secretariat requested the Claimant to pay USD 25,000.

383     On 8 June 2020, the ICC Secretariat acknowledged receipt of USD 25,000 by the Claimant and declared that as such, the provisional advance on costs was entirely paid by the Claimant.

384     On 9 November 2020, the ICC Secretariat informed the Parties that the Court fixed the advance on costs on 5 November 2020 at USD 90,000, subject to later readjustments, and that it did so based on an amount in dispute quantified at USD 1,379,707 (for the principal claims) and one arbitrator. Pursuant to the Financial Timetable dated 9 November 2020 and the payment request of the same date, the ICC Secretariat had already received USD 30,000 from the Claimant,



and requested payment of USD 15,000 from the Claimant and USD 45,000 from the Respondent both by 4 December 2020.

385    On 27 November 2020, the ICC Secretariat noted that pursuant to the Terms of Reference, the amount in dispute was now estimated at USD 1,939,707, and it updated the Financial Table accordingly.

386    On 4 December 2020, the ICC Secretariat informed the Parties that by payment requests dated 9 November 2020, the Secretariat invited the parties to pay the balance of the advance on costs, which the ICC Secretariat had not yet received. The ICC Secretariat enclosed payment requests, in which the ICC Secretariat granted the Parties additional time to pay the amounts set forth therein, i.e. USD 15,000 from the Claimant and USD 45,000 from the Respondent both by 18 December 2020.

387    On 15 December 2020, the ICC Secretariat acknowledged the receipt of the payment order of Claimant.

388    On 13 February 2021, the ICC Secretariat acknowledged receipt of USD 15,000 from the Claimant. The ICC Secretariat recalled that by payment requests dated 9 November and 4 December 2020, it invited the Respondent to pay the balance of the advance on costs, without having received such payment. The ICC Secretariat enclosed to that correspondence a payment request, in which the ICC Secretariat granted the Respondent additional time to pay the amount of USD 45,000 by 18 February 2021. The ICC Secretariat informed the Parties that if the ICC Secretariat would not receive the requested payment, it might invite the Claimant to substitute for the Respondent's share.

389    On 22 February 2021, the Respondent requested to fix separate advances on costs for the claim and counterclaim pursuant to Article 37(3) of the ICC Rules and issue new payment requests accordingly.

390    On 23 February 2021, the ICC Secretariat provided the Parties with estimates of the separate advances on costs and invited the Respondent to inform it by 25 February 2021 whether it intended to maintain its request for separate advances on costs, or whether it was willing to pay the balance of the global advance on costs, i.e., USD 45,000. The ICC Secretariat also invited the Claimant to provide any comments on the request for separate advances on costs within the same time limit.

391    On 24 February 2021, the Claimant requested to fix separate advances on costs for the claims and the counterclaims.



392    On 26 February 2021, the ICC Secretariat acknowledged receipt of the Claimant's correspondence dated 24 February 2021, by which the Claimant requested that the Court would fix separate advances on costs. The Respondent was invited to provide its comments by 25 February 2021.

393    On 1 March 2021, the Respondent informed the ICC Secretariat that it stood by its demand for separate advances for the claims and counterclaims.

394    On 2 March 2021, the ICC Secretariat acknowledged receipt of the Respondent's correspondence dated 1 March 2021, by which the Respondent reiterated its request that the Court would fix separate advances on costs.

395    On 16 March 2021, the ICC Secretariat informed the Parties that on 11 March 2021, the Court fixed separate advances on costs for the principal claims with USD 85,000 and for the counterclaims with USD 40,000. By payment request dated 16 March 2021, the Parties were asked to each pay USD 40,000 by 25 March 2021.

396    On 30 March 2021, the ICC Secretariat acknowledged the receipt of USD 40,000 from the Claimant and USD 40,000 from the Respondent. Therefore, the ICC Secretariat confirmed that the separate advances fixed by the Court were paid by the parties in full. Pursuant to the Financial Table dated 30 March 2021, the ICC Secretariat confirmed that in total, it had received USD 85,000 from the Claimant and USD 40,000 from the Respondent.

**6.4.4.    The Sole Arbitrator's fees and ICC administrative expenses**

397    At its session of 15 July 2021, the Court fixed, pursuant to Article 38 ICC Rules, the arbitration costs as follows:

-    Administrative expenses of the ICC:    USD 26,327

-    Fees of the Sole Arbitrator:    USD 51,900

-    Expenses of the Sole Arbitrator:    USD 373

398    The total amount of the costs of the arbitration fixed by the Court is USD 78,600.

399    Therefore, based on the ratio of allocation decided above, the Claimant shall bear 25% of the total arbitration costs (i.e. USD 19,650) and the Respondent shall bear 75% of the arbitration costs (i.e. USD 58,950). Considering that the Claimant paid USD 85,000, and the Respondent USD 40,000, and that pursuant to the Financial Table dated 16 July 2021 the Claimant is reimbursed by the ICC



Secretariat with 31,550, and that the Respondent is reimbursed by the ICC Sec-
retariat with 14,850, the Respondent is ordered to reimburse to the Claimant an
amount of USD 33,800.

### 6.4.5.  Legal costs and other costs

400   Pursuant to Article 38(1) ICC Rules:

> *"The costs of the arbitration shall include the fees and*
> *expenses of the arbitrators and the ICC administrative ex-*
> *penses fixed by the Court, in accordance with the scales*
> *in force at the time of the commencement of the arbitra-*
> *tion, as well as the fees and expenses of any experts ap-*
> *pointed by the arbitral tribunal and the reasonable legal*
> *and other costs incurred by the parties for the arbitra-*
> *tion."*

401   Thus, the Sole Arbitrator must determine whether the costs claimed by the Par-
ties are reasonable and therefore recoverable. When fixing the Parties' reasona-
ble fees and expenses an ICC tribunal enjoys wide discretion.

402   Following a discussion on the cost submission, the Sole Arbitrator directed the
Parties to submit the invoices for the lawyers' fees (yet without the timesheets)
and for other costs incurred.[204]

403   As to the **costs claimed by the Claimant**, the Sole Arbitrator notes the following:

404   The section named *"Arbitration requirements"* in the Claimant's Submission on
Costs lists claims of the Claimant pertaining to the merits of this case. They have
been adjudicated in the Sole Arbitrator's analysis of the merits of the case and
do not form part of the costs of the arbitration in the meaning of Article 38 ICC
Rules.

405   The section entitled *"Payment for legal services for the support arbitration case"*
lists services provided by Dass & Partners, i.e. the counsel of record for the Claim-
ant in this arbitration, and of Integrites Kazakhstan.

406   Pursuant to the table presented in the Claimant's Submission on Costs, the ser-
vices provided by the counsel of record for the Claimant are supported by the
payment order no. 1 dated 23 May 2019 and the payment order no. 4 dated
30 March 2021. These supporting documents provide as follows:

---

[204] Transcript Day 2, p. 126/13-25, p. 127/1.



407    By *"Bill No. 1 of 23 May 2019"* costs are claimed for USD 219,583. The text for the service provided reads:

*"Services for the protection and representation of the customer's Interest in the International Arbitration"*

408    By *"Bill No. 4 of March 30, 2021"* costs are claimed for USD 117,864. The text for the services provided reads:

*"Services for the customer's protection in the international arbitration and for organization of the arbitration hearings on 22-23 March 2021"*

409    The Claimant also claims costs for services provided by Integrites Kazakhstan, which it describes in the table contained in its Submission on Costs were *"Costs for preliminary analysis carried out by 'Integrites Kazakhstan' LLP"* in the amount of KZH 159,810,210 or USD 38,911. The supporting documents are a *"Payment order No. 310 from 06-04-2017"* for the amount of KZH 6,618,600, and a *"Payment order No. 470 from 24-05-2017"* for the amount of KZH 8,089,400.

410    The Claimant's legal fees raise questions. The services provided by Integrites Kazakhstan date, pursuant to the supporting documents, from April and May 2017, and the costs were therefore incurred about two and a half years prior to the filing of the Notice of Arbitration before the Swiss Chambers' Arbitration Institution. The Claimant did not explain the relevance of these services for the present arbitration. They appear too remote to qualify as reasonable preparatory work for the ICC arbitration.

411    The Claimant did also not explain *"Bill No. 1 of 23 May 2019"*. May 2019 was well before the filing of the Notice of Arbitration before the Swiss Chambers' Arbitration Institution, which was submitted in November 2019. If this payment order pertains to fees for services already provided (as it is commonly charged), they are, compared to the amount in dispute, too high to qualify as reasonable preparatory work for the ICC arbitration. Possibly, this is an advance payment. But, again, that remains unclear.

412    The text of the *"Bill No. 4 of March 30, 2021"*, which in particular refers to the hearing in 22/23 March 2021, suggests that this payment order covers past performance. The interrelation between the Bill No. 1 and Bill No. 3 remains unclear.

413    Be it as it may, compared to the overall amount in dispute, the work performed and the legal fees charged by the Respondent, the legal fees claimed by the Claimant appear too high:



- Based on the Parties' submissions, and as recorded in the Financial Table dated 30 March 2021, the amount in dispute is USD 1,690,582. The claimed lawyers' fees amount to USD 376,358, which is higher than 20%.

- Further, the Claimant submitted comparatively short submissions. The Request for Arbitration also constituted the Updated SoC (with minor changes) and consisted of 21 pages (with a separate list of exhibits attached to the electronic document). The Reply and Defence to the Counterclaim consists of 27 pages, and the Post-Hearing Brief of 25 pages.

- The Respondent's legal fees amount to CHF 159,276.90 for Peter & Kim and CHF 5,000 for Ian Meakin. The Claimant's legal fees are therefore more than double as high as the Respondent's.

414    Considering all circumstances, the Sole Arbitrator believes that for the present purposes, it is appropriate to reduce the claimed amount of the Claimant's legal fees by half, which would bring the legal fees closer to 10% of the amount in dispute (which appears to be an appropriate yardstick in the present circumstances) and which is still higher than the legal fees claimed by the Respondent. As to the currency, the Sole Arbitrator notes that pursuant to the supporting documents filed for the costs charged by Dass & Partners, the Claimant incurred legal fees for the services of its counsel of record in USD (which the Sole Arbitrator notes is also the payment currency pursuant to Article 6.2 of the Contract).

415    Therefore, the legal fees for which the Claimant can, in principle, ask to be compensated amounts to USD 188,179.

416    The Claimant also claims *"Additional disbursements"*, namely (i) translation services in the total amount of KZH 2,000,000 and (ii) GBP 5870 for the services provided by Opus2. These costs remained unchallenged and appear reasonable.

417    As to the **costs claimed by the Respondent**, the Sole Arbitrator considers the legal fees in the amount of CHF 164,276.90 as reasonable. The Sole Arbitrator also accepts the costs for the hearing interpreters. They were specifically retained for the examination of the Claimant's witnesses giving testimony in Russian and were, for that purpose, placed in a separate location from the Parties. Therefore, they provided for the independence required from an interpreter. Also the (marginal) disbursements of the Respondent's witnesses appear reasonable and are accepted.

418    The Claimant's general objection to the Respondent's costs was that the Respondent filed invoices instead of proof of payment. The Sole Arbitrator notes, however, that upon a discussion held at the end of the hearing, the Sole



Arbitrator directed the Parties to file invoices, and did not ask for proof of payment.[205] The Respondent's submission was therefore in line with the Sole Arbitrator's directions. Further, for the purpose of a cost submission, the Sole Arbitrator considers invoices as sufficient proof for costs incurred.

419    Accordingly, based on the ratio of allocation and the deduction decided above, the Sole Arbitrator finds that the total legal costs and expenses shall be allocated between the Parties as follows:

420    The Claimant shall recover 75% of:

- USD 188,179 (the Claimant's accepted legal fees), hence **USD 141,134.25**.

- KZH 2,000,000 (for translation services), hence **KZH 1,500,000**.

- GBP 5870 (for the services provided by Opus2), hence **GBP 4,402.50**.

421    The Respondent shall recover 25% of:

- CHF 164,276.90 (the Respondent's legal fees), hence **CHF 41,069.20**

- GBP 5,440 (for the services provided by Opus2), hence **GBP 1,360**

- EUR 2,495 (for the service of the hearing interpreters), hence **EUR 623.75**.

- EUR 143, CHF 105.50, and USD 148 (for disbursements of the Respondent's witnesses), hence **EUR 35.75, CHF 26.40** and **USD 37**.

422    Therefore, the Respondent shall be ordered to pay **USD 141,134.25, KZH 1,500,000** and **GBP 4,402.50** to the Claimant.

423    The Claimant shall be ordered to pay **CHF 41'095.60, GBP 1,360, EUR 659.50** and **USD 37**.

---

[205] Transcript Day 2, p. 126/13-25, p. 127/1.



7.        **Operative part**

424      Based on the reasons stated above, the Sole Arbitrator renders the following

### FINAL AWARD

(1)    The Sole Arbitrator declares to have jurisdiction over the Claimant's claims and the Respondent's counterclaim.

(2)    The Sole Arbitrator orders the Respondent to pay the Claimant an amount of USD 1,379,707.00.

(3)    The Sole Arbitrator rejects the Respondent's counterclaim.

(4)    The Sole Arbitrator orders the Respondent to pay the Claimant an amount of USD 33,800.00 for the Sole Arbitrator's fees and expenses and the ICC administrative expenses as fixed by the ICC Court.

(5)    The Sole Arbitrator orders the Respondent to pay the Claimant an amount of USD 141,134.25, KZH 1,500,000.00 and GBP 4,402.50 for its legal fees and expenses.

(6)    The Sole Arbitrator orders the Claimant to pay the Respondent an amount of CHF 41,095.60, GBP 1,360.00, EUR 659.50 and USD 37.00 for its legal fees and expenses.

(7)    The Sole Arbitrator rejects all other requests, claims and counterclaims.

***

**Place of arbitration: Geneva, Switzerland**

**Date:**  6 August 2021

Dr Michael Feit
Sole Arbitrator

CHAMBRE DE COMMERCE INTERNATIONALE
COUR INTERNATIONALE D'ARBITRAGE
INTERNATIONAL COURT OF ARBITRATION
INTERNATIONAL CHAMBER OF COMMERCE

CERTIFIED TRUE COPY OF THE ORIGINAL
PARIS, 17 | 05 | 2022

Ana SERRA E MOURA
Deputy Secretary General
ICC International Court of Arbitration